UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| INNER TITE CORP<br><br>Plaintiff,<br><br>v.<br><br>DEWALCH TECHNOLOGIES, INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.<br>04 40219 FDS |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## OF PATENT CLAIM CONSTRUCTION

Respectfully submitted,

Inner-Tite Corp.

By Plaintiff's attorneys,

Dated: February 4, 2004

Maurice E. Gauthier, BBO# 187340
William E. Hilton, BBO# 559515
Gauthier & Connors, LLP
225 Franklin Street, Suite 3300
Boston, Massachusetts 02110
(617) 426 - 9180  Ext. 111

Table of Contents

|  |  |  |  | Page |
|---|---|---|---|---|
| Table of Authorities |  |  |  | iii |
| I | Background |  |  | 1 |
|  | A) | The Parties |  | 1 |
|  | B) | The '691 Patent in Suit |  | 3 |
|  |  | i) | The '701 Application | 5 |
|  |  | ii) | The Claims of the '691 Patent | 8 |
| II. | Applicable Legal Authority |  |  | 8 |
| III. | Argument |  |  | 11 |
|  | A) | Claim 1 |  | 11 |
|  |  | i) | Construction of the term "bracket" | 12 |
|  |  | ii) | Construction of the term "jaw" | 13 |
|  |  | iii) | Construction of the term "force exerting means" | 13 |
|  |  | iv) | Construction of the term "cap" | 14 |
|  |  | v) | Construction of the term "interlocking means" | 15 |
|  | B) | Claim 2 |  | 15 |
|  |  | i) | Construction of the term "interior ledge" | 16 |
|  | C) | Claim 6 |  | 16 |
|  |  | i) | Construction of the term "pivotally connected" | 16 |
|  | D) | Claim 7 |  | 17 |
|  |  | i) | Construction of the term "acute angle" | 17 |
|  | E) | Claim 8 |  | 18 |

Table of Contents, continued:                                    Page:

     i)     Construction of the term "third flange"     18

IV.   Conclusion     19

## Table of Authorities

Cases:                                                                              Page

Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 65 U.S.P.Q.2d
1865 (Fed. Cir. 2003)                                                                11

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L.Ed.2d 202,
106 S.Ct. 2505 (1986)                                                                8

Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792,
17 U.S.P.Q.2d 1097 (Fed. Cir. 1990)                                                  8

Graver Tank & Mfg. Co. v. Linde Aire Prods. Co., 339 U.S. 605,
70 S.Ct. 854, 94 L.Ed.2d 1097 (1950).                                                9

Hilton Davis Chemical Co. v. Warner-Jenkinson Company, Inc.,
62 F.3d 1512, 35 U.S.P.Q.2d 1700 (Fed. Cir. 1995), affirmed,
116 S.Ct. 1014, 134 L.Ed.2d 95 (1996)                                                9

Home Diagnostics, Inc. v. Lifescan, Inc., 381 F.3d 1352,
72 U.S.P.Q.2d 1276 (Fed. Cir. 2004)                                                  10

Lockheed Martin Corp. v. Space Systems / Loral, Inc., 324 F.3d
1308, 66 U.S.P.Q.2d 1282 (Fed. Cir. 2003)                                            11

Markman v. Westview Instruments, Inc., 517 U.S. 370,
116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996),
affirming, 52 F.3d 967, 34 U.S.P.Q.2d 1321 (Fed. Cir. 1995) (en banc)                9

Michaels of Oregon Co. v. Clean Gun, LLC, 2002 U.S. Dist. LEXIS 20371
(D.Or. 2002)                                                                         11

SRI International v. Matsushita Elec. Corp., 775 F.2d 1107,
227 U.S.P.Q. 577 (Fed. Cir. 1985)                                                    10

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996)                 9

Vivid Technologies, Inc. v. American Science & Engineering, Inc.,
200 F.3d 795, 53 U.S.P.Q.2d 1289 (Fed. Cir. 1999)                                    10

Table of Authorities, continued:                                    Page:

Statutes:

35 U.S.C. §103(a)                                                      5

35 U.S.C. §112, ¶2                                                     8

35 U.S.C. §112, ¶6                                             10, 11, 13,14

35 U.S.C. §271                                                       8, 9


Rules:

37 C.F.R. §1.141(a)                                                    6

37 C.F.R. §1.146                                                       6

Fed.R.Civ.P., Rule 56(c)                                              8


Secondary Authority:

MPEP §809.02 - §809.04                                                6

MPEP §809.02(c)(B)(1)                                                 6

## I.    BACKGROUND

### A)    The Parties

Plaintiff Inner-Tite Corp. (hereafter Inner-Tite) of Holden, Massachusetts is a recognized leader in the design and manufacture of meter security and locking devices for electric, gas, water utility and cable television companies worldwide.  Meter security and locking devices generally provide locking assemblies that facilitate the prevention of unauthorized access to utility meter boxes that measure the usage of electric power, gas, water, or cable television access at a particular location.  As efforts to thwart utility company meter boxes have improved and become more sophisticated, utility companies have been required to obtain meter security and locking devices that are not only tamper evident, but also tamper proof.

In February 2001, Inner-Tite filed a United States patent application on an invention for an improved meter security and locking device.  The application issued in July 2004 as U. S. Patent No. 6,763,691, a copy of which is attached as Exhibit A to the Hilton Affidavit filed herewith.  A meter box that includes a meter security and locking device in accordance with an embodiment of the present invention is shown in Figure 1 of U.S. Patent No. 6,763,691(the '691 patent), which is reproduced below.



Hilton Affidavit, Exhibit A, Figure 1.

As stated in the '691 patent, certain prior art meter security and locking devices were fixed in place by means of bolts extending through holes in the side walls of the meter boxes (Hilton Affidavit, Exhibit A, col. 1, lines 15 - 21). The '691 patent explains that:

> This complicates installation, requiring the use of hand tools to drill or punch out the required bolt holes, and requires workmen to reach into the box interiors to tighten the bolts during installation.

Hilton Affidavit, Exhibit A, col.1, lines 21 - 25. Other prior art security and locking devices are disclosed in the '691 patent to avoid piercing the meter box side walls,

> relying instead on mounting brackets that overlap the upper edges of the side walls and that are secured in place by retaining screws bearing directly against the interiors of the side walls.

Hilton Affidavit, Exhibit A, col.1, lines 29 - 32. The '691 patent explains, however, that

> the retaining screws are vulnerable to being bent or frictionally dislodged when external components of the lock assemblies are hammered, pried or otherwise forced by those seeking to gain unauthorized access to the box interiors. The Mounting brackets are thus loosened and ultimately disengaged from the box side walls, resulting in failure of the lock assemblies.

Hilton Affidavit, Exhibit A, col.1, lines 33 - 39.

The invention generally provides for a locking device that includes, *inter alia*, a bracket having first and second flanges, a jaw, and a force exerting means for urging the jaw towards the first flange. The subject matter of the '691 patent was invented by a design engineer at Inner-Tite., Robert E. Rafferty, and Inner-Tite is the assignee of all right, title and interest in the '691 patent. See plaintiff's Statement of Undisputed Facts (SUF, ¶1) filed herewith and Hilton Affidavit, Exhibit B.

Page 2

Defendant DeWalch Technologies, Inc. (hereafter DeWalch) of Houston, Texas also sells locking systems for utility companies. The product accused of patent infringement in the present action is the DeWalch Prolock product shown in Exhibit B of the complaint in the present action. At issue in the present motion, however, is the proper construction of the claims in the '691 patent, not a determination of whether the accused device infringes the '691 patent.

### B)    The '691 Patent in Suit

U.S. Patent No. 6,763,691 is directed to a lock assembly for a security meter box. Various devices in accordance with different embodiments of the invention are shown in the '691 patent. For example, Figures 2 - 3 show a locking device that includes a mounting bracket 28 with a first flange 30, a second flange 32, and intermediate web 34 between the first and second flanges. The first flange 30 engages a side wall 14 of a meter box. A jaw 38 is pivotally mounted on the second flange 32, and a threaded thumb screw 52 is positioned within a threaded hole in the second flange 32 as shown below.



Hilton Affidavit, Exhibit A, Figure 2.

The threaded thumb screw 52 may be advanced against the jaw 38 to secure the assembly against the wall 14 of the meter box. Figure 4 of the '691 patent shows a similar locking device to that shown in Figures 2 - 3 except that the mounting bracket

Page 3

includes a longer intermediate web 34a such that the thumb screw 52 advances the jaw 38a against the wall 14 from a direction that is perpendicular to the wall 14.

Figures 5A - 5B of the '691 patent show another locking device in accordance with another embodiment of the invention that includes a mounting bracket 28b with a first flange 30a and a second flange 32b. A jaw 38b is pivotally mounted on the second flange 32b, and a cam 76 is rotatably attached to the second flange 32b. The rotatable cam 76 is actuated by a handle 78 to secure the second flange 32b against the wall 14 as shown in Figure 5B.



Hilton Affidavit, Figures 5A – 5B.

Figures 6A - 6B of the '691 patent show a further locking device in accordance with the invention that includes a mounting bracket 28b with a first flange 30b and a second flange 32b. A jaw 80 is pivotally mounted on the second flange 32b, and a resilient spring 82 is rotatably attached to the second flange 32b and to the jaw 80 for urging the jaw 80 against the inner surface of the wall 14 as shown in Figure 6B below.



Hilton Affidavit, Figures 6A – 6B.

The '691 patent issued July 20, 2004 from U.S. Patent Application Ser. No. 09/795,701 (the '701 application) filed February 28, 2001 (SUF, ¶2).

### i)    The '701 Application

The '701 application originally included eight claims (SUF, ¶3), and these claims eventually issued with minor amendments as claims 1 – 8 of the '691 patent (Hilton Affidavit, Exhibit C, pp. IT 00006 - IT 00021).

In an office action that was mailed on May 8, 2002, claims 1 and 5 were rejected as to form, and claims 1 – 8 were rejected under 35 U.S.C. §103(a) over combinations of the following references: U.S. Patents Nos. 4080811; 4414829; 3938839 and 4120182 (Hilton Affidavit, Exhibit C, pp. IT 00043 - IT 00050).  Copies of these prior art patents are attached to the Hilton Affidavit filed herewith as Exhibits D – G.

In an amendment filed by the applicant on July 22, 2002, claims 1 and 5 were amended, and the applicant argued that the above references did not disclose the subject matter of the claims (Hilton Affidavit, Exhibit C, pp. IT 00056 - IT 00063).  In the remarks, applicant provided the following definition of *jaw* as "either of two mechanical parts that open and close to grip or crush something, as in a monkey wrench or vise" ((SUF, ¶4, and Hilton Affidavit, Exhibit C, p. IT 00058).

In a second office action mailed October 22, 2002, an election requirement was made requiring that the applicant elect a species for examination purposes (Hilton Affidavit, Exhibit C, pp. IT 00064 - IT 00068). Although a search had already been performed and such an election was therefore procedurally inappropriate at that time (see 37 C.F.R. §1.146), the office action stated that claims 1 - 3, 5, 6 and 8 were generic to the plurality of disclosed species (SUF, ¶5), and identified three species disclosed in the application as follows: Species I – Figures 2 – 4; Species II – Figures 5A and 5B; Species III – Figures 6A and 6B. As explained in 37 C.F.R. §141(a),

> Two or more independent and distinct inventions may not be claimed in one national application, except that more than one species of an invention, not to exceed a reasonable number, may be specifically claimed in different claims in one national application, **provided the application also includes an allowable claim generic to all the claimed species** and all the claims to species in excess of one are written in dependent form (§ 1.75) or otherwise include all the limitations of the generic claim.

37 C.F.R. §141(a) (emphasis added). The essence of an election requirement is that if claims to more than one species of an invention are filed, the examiner may require an applicant to elect one species for examination purposes. If, however, a generic claim that covers all species is later determined to be patentable, then the election requirement is withdrawn. See, for example, 37 C.F.R. §1.146 and Sections 809.02 – 809.04 of the Manual of Patent Examining Procedure (MPEP), a copy of which is attached to the Hilton Affidavit as Exhibit H, pp. 800-49 to 800-53.

In fact, once a generic claim is found to be allowable, the applicant should be advised that claims to the non-elected species are no longer withdrawn. See MPEP §809.02(c)(B)(1), at page 800-50 of Hilton Affidavit, Exhibit H. The examiner expressly stated in the office action that claims 1 – 3, 5, 6 and 8 were generic to all species (SUF,

¶5). Only claim 4 was directed to the elected species, and no claims were directed any other species. No claims, therefore, were withdrawn or canceled following the species election. Claim 1 of the '701 application was not amended following issuance of the restriction requirement on September 22, 2002 (SUF, ¶6).

In the '701 application, the applicant elected species I and expressly reserved the right to prosecute claims to species II and III (Hilton Affidavit, Exhibit C, p. IT 00070). In the following office action mailed May 29, 2003, however, the examiner again acted upon all of the claims (Hilton Affidavit, Exhibit C, p. IT 00072): claims 1 - 2 and 6 - 8 were rejected, and claims 3 – 5 were indicated as being allowable if rewritten in independent form (Hilton Affidavit, Exhibit C,. pp. IT 00071 - IT 00079). The office action mailed May 29, 2003 further relied on a new reference, U.S. Patent No. 4202574, a copy of which is attached to the Hilton Affidavit as Exhibit I.

Although applicant filed a response (Hilton Affidavit, Exhibit C, pp. IT 00082 - IT 00083), the rejection was maintained in a final office action (Hilton Affidavit, Exhibit C, pp. IT 00085 - IT 00093). The applicant thereafter filed a notice of appeal on July 15, 2003 (Hilton Affidavit, Exhibit C, pp. IT 00109 - IT 00115). Following briefing by the applicant (Hilton Affidavit, Exhibit C, pp. IT 00103 - IT 00108 and IT 00118 - IT 00120), and the examiner (Hilton Affidavit, Exhibit C, pp. IT 00109 - IT 00115), the Board of Patent Appeals and Interferences issued a decision on March 31, 2004 reversing the examiner's rejection of the claims (SUF, ¶12). A notice of allowance issued thereafter (Hilton Affidavit, Exhibit C, pp. IT 00124 - IT 00130), and the patent issued on July 20, 2004.

### ii)    The Claims of the '691 Patent

The '691 patent includes eight claims. Claim 1 is an independent claim, and each of claims 2 – 8 depends either directly or indirectly from claim 1. Inner-Tite maintains that claims 1, 2 and 6 - 8 of the '691 patent are infringed by DeWalch. Because claim 1 was considered to be generic during prosecution (SUF, ¶5) and claim 1 did not change following the time that it was considered generic (SUF, ¶6), claim 1 of the '691 patent is generic to the embodiments shown in Figures 2 - 3, 4, 5A - 5B and 6A - 6B (SUF, ¶8).

## II.    APPLICABLE LEGAL AUTHORITY

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P., Rule 56(c). A genuine issue of material fact exists if the evidence is such that a reasonable jury could render a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

A patent is infringed if the accused device infringes at least one of the claims (35 U.S.C. §271), and the claims are the numbered paragraphs appearing at the end of the patent 35 U.S.C. §112, ¶2. The claims include independent and dependent claims, and a dependent claim is not infringed unless each of the claims from which it depends is infringed. Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 17 U.S.P.Q.2d 1097 (Fed. Cir. 1990). In order for a patent to be infringed, therefore, at least one independent claim must be infringed.

The analysis of whether a patent claim is infringed under 35 U.S.C. §271 is a two part inquiry. First, the meaning of the claim asserted to be infringed must be determined, and second, the properly construed claim language must be compared to the accused device both literally and under the doctrine of equivalents. Markman v. Westview Instruments, Inc., 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996), affirming, 52 F.3d 967, 34 U.S.P.Q.2d 1321 (Fed. Cir. 1995) (en banc). The first step in the infringement analysis, determining the meaning of the claims is an issue of law, and must be performed based on a review of the claims themselves, the patent specification, the file history of the patent, and the prior art. Id.

Once a claim has been construed, the properly construed claim language is compared with the accused device by the finder of fact to determine whether infringement exists literally or under the doctrine of equivalents. Hilton Davis Chemical Co. v. Warner-Jenkinson Company, Inc., 62 F.3d 1512, 35 U.S.P.Q.2d 1700 (Fed. Cir. 1995), affirmed, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996). The doctrine of equivalents is a judicially created doctrine that provides that although the requirements of literal infringement may not be met, infringement of a patent claim may still be found. Graver Tank & Mfg. Co. v. Linde Aire Prods. Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed.2d 1097 (1950).

The present motion seeks an interpretation of the claims only, not an analysis of whether the accused product infringes the claims either literally or under the doctrine of equivalents. Patent claim construction is an issue of law for the court (Markman, supra.), and patent claims are construed based on the intrinsic record, which includes the patent in suit and the file history of the patent in suit. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996). Extrinsic evidence, therefore, such as present statements by

the inventor, the patentee's actual product, and the alleged infringer's accused product are
*not* relevant to the claim construction inquiry. Id. Discovery, therefore, is not needed
prior to a determination of claim construction in this case. Vivid Technologies, Inc. v.
American Science & Engineering, Inc., 200 F.3d 795, 53 U.S.P.Q.2d 1289 (Fed. Cir.
1999).

The words and terms of a patent claim are construed in accordance with their
ordinary meaning unless the patent or file history make it clear that a claim term is to be
accorded a different definition. Home Diagnostics, Inc. v. Lifescan, Inc., 381 F.3d 1352,
1355 72 U.S.P.Q.2d 1276 (Fed. Cir. 2004) ("As always, the claim language itself governs
the meaning of the claims").

Although reference should be made to the disclosed embodiments of the invention
in the patent specification to understand examples of that which is covered by the claims,
the claims should not be construed to be limited to the examples disclosed in the
specification. SRI International v. Matsushita Elec. Corp., 775 F.2d 1107, 227 U.S.P.Q.
577 (Fed. Cir. 1985).

While most claim elements in the '691 patent recite structure, some claim
elements are limited only by a stated function. Claim elements that are limited by a
function only are permitted under 35 U.S.C. §112, ¶6, which states:

> An element in a claim for a combination may be expressed
> as a means or step for performing a specified function
> without recital of structure, material, or acts in support
> thereof, and such claim shall be construed to cover the
> corresponding structure, material, or acts described in the
> specification and equivalents thereof.

35 U.S.C. §112, ¶6.

Claim elements that include the *means/for* format are presumed to be intended to fall under 35 U.S.C. §112, ¶6. Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 65 U.S.P.Q.2d 1865 (Fed. Cir. 2003). Such means-plus-function elements must be construed to cover structures that perform the stated function and are either identical to the structures disclosed in the patent for performing the specified function, or are equivalent to the structures disclosed in the patent for performing the specified function. Lockheed Martin Corp. v. Space Systems / Loral, Inc., 324 F.3d 1308, 66 U.S.P.Q.2d 1282 (Fed. Cir. 2003).

Lastly, although an election requirement was made in the '701 application, claim 1 (which the examiner acknowledged was generic) was eventually allowed by the Board of Appeals. At least claim 1, therefore, is generic to each of the species identified in the office action and in the '701 application. Moreover, election/restriction requirements "do not constitute a substantive claim construction doctrine." Michaels of Oregon Co. v. Clean Gun, LLC, 2002 U.S. Dist. LEXIS 20371 (D.Or. 2002) (Instead, restriction practice is a procedural tool).

## III.    ARGUMENT

Inner-Tite maintains that at least claims 1 - 2 and 6 - 8 of the '691 patent are infringed.

### A)    Claim 1

Claim 1 of the '691 patent is as follows:

> 1.    For use in combination with a utility box having a bottom, a side wall, and a cover which may be opened to gain access to the interior of the box, and which when closed, overlaps an upper edge of the side wall, a lock assembly for maintaining the cover in its closed position, said lock assembly comprising:
>        a bracket having first and second mutually spaced flanges integrally joined by an intermediate web;

a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges, said bracket being configured for removable mounting on said side wall, with said intermediate web interposed between said cover and the upper edge of said side wall, and with said first flange and said jaw respectively located adjacent exterior and interior surfaces of said side wall;

force exerting means for urging said jaw towards said first flange to thereby clamp said side wall therebetween;

a cap having a lip configured and dimensioned to overlap said cover; and interlocking means for securing said cap to said bracket.

Hilton Affidavit, Exhibit A, col.4, lines 24 – 44.

### i) Construction of the term "bracket"

The term *bracket* is not expressly defined in either the '691 patent or the file history of the '691 patent, and there is no indication that the applicant intended this term or any of the other terms in this clause of claim 1 to have a meaning other than their ordinary meaning (SUF, ¶¶14, 15, 16).

Examples of brackets are shown at 28 in Figures 2 and 3, at 28a in Figure 4, and at 28b in Figures 5A - 5B and 6A - 6B. These, however, are examples of brackets only. The meaning of the term bracket should be construed in accordance with the ordinary meaning of the terms in this clause of claim 1.

The term *bracket* should be construed, therefore, to mean a rigid structure that includes a first rigid section that is spaced from a second rigid section, and includes an intermediate section between the first rigid section and the second rigid section. The bracket is removably mountable on a side wall of a utility box with the intermediate section interposed between the cover and the upper edge of the side wall such that the first rigid section is located adjacent an exterior surface of the side wall, and the jaw is located adjacent an interior surface of the side wall.

### ii) Construction of the term "jaw"

The term *jaw* is expressly defined in the file history of the '691 patent. In an argument filed on July 22, 2002, the applicant stated that "the most appropriate definition for this term is"

> either of two mechanical parts that open and close to grip
> or crush something, as in a monkey wrench or vise.

Hilton Affidavit, Exhibit C, p. IT 00058.

Examples of jaws are shown at 38 in Figures 2 - 3, at 38a in Figure 4, at 38b in Figures 5A - 5B, and at 80 in Figures 6A - 6B. The remaining terms in this clause of claim 1 should be construed in accordance with their ordinary meaning. For example, the ordinary meaning of the word *between* is "in or through the space that separates" (SUF, ¶17 and Hilton Affidavit, Exhibit J).

The term *jaw* should be construed, therefore, to mean either of two mechanical parts that open and close to grip or crush something, as in a monkey wrench or vise, and that is interengaged with and carried by the bracket for movement between (i.e., in or through the space that separates) the first and second flanges. This is consistent with the applicant's use of this term in connection with the jaws 38, 38a, 38b and 80.

### iii) Construction of the term "force exerting means".

The term *force exerting means* is in *means plus function* format as provided by 35 U.S.C. §112, ¶6 (SUF, ¶8). As discussed above, such a term is construed to cover structure that performs the function stated in the claims (urging said jaw towards said first flange to thereby clamp said side wall therebetween), and is either identical to the structure disclosed in the application for achieving this stated function, or is equivalent to

the structure disclosed in the application for achieving the stated function. The structure

disclosed in the application for achieving this function is the thumb screw 52 shown in

Figures 2 - 4 (SUF, ¶9), the rotatable cam 76 shown in Figures 5A - 5B (SUF, ¶10), and

the resilient spring 82 shown in Figures 6A - 6B (SUF, ¶11). Structure that is equivalent

to the thumb screw 52, the rotatable cam 76 and the resilient spring 82 is any structure

that includes a driving mechanism for urging the jaw against an interior surface of the

side wall.

The term *force exerting means* should be construed, therefore, to mean some

structure that urges the jaw towards the first rigid section to thereby clamp the side wall

therebetween, and is any of the thumb screw 52 shown in Figures 2 - 4, the rotatable cam

76 shown in Figures 5A - 5B, the resilient spring 82 shown in Figures 6A - 6B, or is any

structure that is equivalent to the thumb screw 52, the rotatable cam 76 or the resilient

spring 82, i.e., that includes a driving mechanism for urging the jaw against an interior

surface of the side wall.

### iv) Construction of the term "cap".

The term *cap* is not expressly defined in either the '691 patent or the file history of

the '691 patent, and there is no indication that the applicant intended this term or any of

the other terms in this clause of claim 1 to have a meaning other than their ordinary

meaning (SUF, ¶¶14, 15, 16).

Examples of caps are shown at 54 in Figures 2 - 3 and at 54a in Figure 4. Again,

these are examples only as claim terms are not limited to the disclosed embodiments.

The term *cap* should be construed, therefore, to mean a structure that includes a

lip that overlaps the utility box cover.

### v) Construction of the term "interlocking means".

The term *interlocking means* is in *means plus function* format as provided by 35 U.S.C. §112, ¶6 (SUF, ¶13). As discussed above, such a term is construed to cover structure that performs the function stated in the claims (securing the cap to the bracket), and is either identical to the structure disclosed in the application for achieving this stated function, or is equivalent to the structure disclosed in the application for achieving the stated function. The structure disclosed in the application for achieving this function is the barrel lock 64 shown in Figures 2 - 3, as well as the barrel lock 64, sleeve 74 and screw 72 assembly shown in Figure 4. Structure that is equivalent to the barrel lock 64, or the barrel lock 64 / sleeve 74 / screw 72 assembly is any structure that includes a lock that engages both the cap and the bracket.

The term *interlocking means* should be construed, therefore, to mean some structure that secures the cap to the bracket, and is either identical to the barrel lock 64 shown in Figures 2 - 3, or identical to the barrel lock 64, sleeve 74 and screw 72 assembly shown in Figure 4, or is any structure that is equivalent to either the barrel lock 64 or barrel lock 64, sleeve 74 and screw 72 combination, i.e., that includes a lock that engages both the cap and the bracket.

### B)    Claim 2

Claim 2 of the '691 patent is as follows:

> 2. The lock assembly of claim 1 wherein the side wall of said box is provided with an interior ledge spaced below said upper edge, and wherein said jaw engages said side wall beneath said ledge.

Hilton Affidavit, Exhibit A, col.4, lines 45 – 48.

### i) Construction of the term "interior ledge"

The term *interior ledge* is not expressly defined in either the '691 patent or the file

history of the '691 patent, and there is no indication that the applicant intended this term

or any of the other terms in this clause of claim 2 to have a meaning other than their

ordinary meaning (SUF, ¶¶14, 15, 16). An example of the interior ledge is shown at 18

in Figures 2 - 6B.

The term *interior ledge* should be construed, therefore, for mean a structural part

of the side wall that is spaced below the upper edge of the side wall, and beneath which

the jaw engages the side wall.

### C)    Claim 6

Claim 6 of the '691 patent is as follows:

> 6. The lock assembly of claim 1 wherein said jaw is pivotally connected to said
> second flange.

Hilton Affidavit, Exhibit A, col.4, lines 57 – 58.

### i) Construction of the term "pivotally connected"

The term *pivotally connected* is not expressly defined in either the '691 patent or

the file history of the '691 patent, and there is no indication that the applicant intended

this term or any of the other terms in this clause of claim 6 to have a meaning other than

their ordinary meaning (SUF, ¶¶14, 15, 16).

Examples of jaws that are pivotally connected to the second flange are shown in

Figure 2, in which jaw 38 is mechanically interengaged with and pivots about second

flange 32 (Hilton Affidavit, Exhibit A, col. 2, lines 55 - 59). Another example of a

pivotally connected jaw and second flange is shown in Figure 4 in which a jaw 38a is

mechanically interengaged with and pivots about a second flange 28a. A further example

of a pivotally connected jaw and second flange is shown in Figures 5A - 5B in which jaw

38b is mechanically interengaged with and pivots about a second flange 32b. Yet another example of a pivotally connected jaw and second flange is shown in Figure 6A - 6B in which jaw 80 rotates about an axis of rotation A in the second flange 32b.

The term *pivotally connected* should be construed, therefore, to mean attached at a general area of attachment yet permitted to rotate at least a small amount with respect to the general area of attachment.

### D)    Claim 7

Claim 7 of the '691 patent is as follows:

> 7. The lock assembly as claimed in claim 1 wherein said second flange is inclined at an acute angle with respect to said first flange.

Hilton Affidavit, Exhibit A, col.4, lines 59 – 61.

### i) Construction of the term "acute angle"

The term *acute angle* is not expressly defined in either the '691 patent or the file history of the '691 patent, and there is no indication that the applicant intended this term or any of the other terms in this clause of claim 7 to have a meaning other than their ordinary meaning (SUF, ¶¶14, 15, 16). An example of a lock assembly in which the second flange 32 is inclined at an acute angle with respect to the first flange 30 is shown in Figures 2 - 3. An example of a lock assembly in which the second flange 32b is inclined at an acute angle with respect to the first flange 30a is shown in Figures 5A - 5B. An example of a lock assembly in which the second flange 32b is at an acute angle with respect to the first flange 30b is shown in Figures 6A - 6B.

The term *acute angle* should be construed, therefore, to mean an angle of incline of the second flange with respect to the first flange of less than about 90 degrees.

**E)    Claim 8**

Claim 8 of the '691 patent is as follows:

> 8. The lock assembly as claimed in claim 1 wherein said bracket is provided
> with a third flange projecting from said first flange, and wherein said
> interlocking means engages said third flange.

Hilton Affidavit, Exhibit A, col.4, lines 62 – 65.

### i) Construction of the term "third flange"

The term *third flange* is not expressly defined in either the '691 patent or the file

history of the '691 patent, and there is no indication that the applicant intended this term

or any of the other terms in this clause of claim 8 to have a meaning other than their

ordinary meaning (SUF, ¶¶14, 15, 16). An example of a third flange is shown at 36 in

Figures 2 - 3, and is shown at 36a in Figure 4. Similar third flanges are disclosed to be

employed with the assemblies shown in Figures 5A - 6B.

The term *third flange* should be construed, therefore, to mean a structure that

projects from the first flange and is engaged by the locking means.

## IV.    CONCLUSION

For the reasons stated above, plaintiff Inner-Tite Corp. requests that this court

grant the present motion for partial summary judgment of patent claim construction in

accordance with the constructions presented above.

Respectfully submitted,

Inner-Tite Corp.

By Plaintiff's attorneys,

Dated: February 4, 2005

Maurice E. Gauthier  BBO # 187340
William E. Hilton, BBO # 559515
Gauthier & Connors, LLP
225 Franklin Street, Suite 3300
Boston, Massachusetts  02110
(617) 426 - 9180   Ext. 111

CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the above document was served upon counsel for defendant, Denise W. DeFranco of Foley Hoag LLP, Seaport World Trade Center West, 155 Seaport Boulevard, Boston, Massachusetts 02210-2600 and John Edmonds of Vinson & Elkins, 2300 First City Tower, 1001 Fannin Street, Houston, Texas 77002-6760 on this 4th day of February 2005.

William E. Hilton