UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
INNER TITE CORP                         )
                                        )
            Plaintiff,                   )
                                        )
v.                                      )            Civil Action No. _____
                                        )             04 40219 FDS
DEWALCH TECHNOLOGIES, INC.              )
                                        )
            Defendant.                   )
_____)


**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**

**IT'S DISPOSITIVE MOTION FOR**

**<u>SUMMARY JUDGMENT OF PATENT INFRINGEMENT</u>**



                          Respectfully submitted,

                          Inner-Tite Corp.

                          By Plaintiff's attorneys,



Dated: May 19, 2006


            `              Maurice E. Gauthier, BBO# 187340
                          William E. Hilton, BBO# 559515
                          Gauthier & Connors, LLP
                          225 Franklin Street, Suite 2300
                          Boston, Massachusetts  02110
                          (617) 426 - 9180   Ext. 111

Table of Contents

Page

Table of Authorities                                                          ii

I       BACKGROUND                                                           1

        A)      The Parties                                                  1

        B)      Procedural History                                          1

        C)      The Invention                                               3

        D)      The '691 Patent                                             4

II.     LEGAL ANALYSIS                                                      6

        A)      Standard for Patent Infringement                            6

        B)      Claim 1 is Infringed by Both Products                       7

                i)      Patent Claim Construction
                        of the Disputed Language                            8

                ii)     Literal Infringement                                10

                iii)    Infringement Under the Doctrine of Equivalents      13

                        a) The All Elements Rule Does Not Bar
                           The Application of the Doctrine of
                           Equivalents in this Action                       14

                        b) The Differences are Insubstantial                18

III.    CONCLUSION                                                          20

<u>Table of Authorities</u>

<u>Cases:</u>                                                                 <u>Page</u>

<u>ADC Telecommunications, Inc. v. Panduit Corp.</u>, 2002 U.S. Dist.
LEXIS 25387 (D.Minn. 2002)                                                      17

<u>Becton Dickinson & Co. v. C.R. Bard, Inc.</u>, 922 F.2d 792,
17 U.S.P.Q.2d 1097 (Fed. Cir. 1990)                                             6

<u>Cooper Cameron Corporation v. Kvaerner Oilfield Products, Inc.</u>,
291 F.3d 1317, 62 U.S.P.Q.2d 1846 (Fed. Cir. 2002)                             16, 17

<u>Ericsson, Inc. v. Harris Corporation</u>, 352 F.3d 1369, 69 U.S.P.Q.2d
1109 (Fed. Cir. 2003)                                                          16

<u>Ethicon Endo-Surgery, Inc. v. United States Surgical Corporation</u>,
149 F.3d 1309, 47 U.S.P.Q.2d 1272 (Fed. Cir. 1998)                             14

<u>Festo Corporation v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.</u>,
535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002).                          13

<u>Graver Tank & Mfg. Co. v. Linde Aire Prods. Co.</u>, 339 U.S. 605,
70 S.Ct. 854, 94 L.Ed.2d 1097 (1950).                                          7, 13, 19

<u>The Holmes Group, Inc. v. RPS Products, Inc.</u>, 2006 U.S. Dist.
LEXIS 13737 (D.Mass. 2006)                                                     17, 18

<u>Home Diagnostics, Inc. v. Lifescan, Inc.</u>, 381 F.3d 1352,
72 U.S.P.Q.2d 1276 (Fed. Cir. 2004)                                            7

<u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370,
116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996),                    6

<u>Nova Biomedical Corporation v. i-Stat Corporation</u>, 1999 U.S. App.
LEXIS 21390 (Fed. Cir. 1999)                                                   16

<u>Rosby Corporation v. Stoughton Trailers, Inc.</u>, 2003 U.S. Dist. LEXIS
17034 (N.D.Ill. 2003)                                                          16

<u>SRI International v. Matsushita Elec. Corp.</u>, 775 F.2d 1107,
227 U.S.P.Q. 577 (Fed. Cir. 1985)                                              7

Table of Authorities, continued:                                          Page:

Cases Continued:

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996)          7

Warner-Jenkinson Company, Inc. v. Hilton Davis Chemical, 520 U.S.
17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)                      6, 7, 13, 15, 17

Wright Medical Technology, Inc. v. Osteonics Corporation,
122 F.3d 1440, 43 U.S.P.Q.2d 1837 (Fed. Cir. 1997)                           15


Statutes:

35 U.S.C. §112, ¶2                                                            6

35 U.S.C. §271                                                               6


Rules:

Fed.R.Civ.P., Rule 56                                                        2

## I.    BACKGROUND

### A)    The Parties

Plaintiff Inner-Tite Corp. (hereafter Inner-Tite) of Holden, Massachusetts is a recognized leader in the design and manufacture of meter security and locking devices for electric, gas, water utility and cable television companies worldwide. Meter security and locking devices generally provide locking assemblies that prevent unauthorized access to utility meter boxes that measure the usage of electric power, gas, water, or cable television access at a particular location. In about March, 2000 Inner-Tite introduced its Jiffy Lock product. On July 20, 2004 Inner-Tite was awarded U.S. Patent No. 6,763,691 (the '691 patent) for the invention relating to the Jiffy Lock product. A copy of the '691 patent is shown in Exhibit A of the Affidavit of Peter S. Stecher filed herewith.

Defendant DeWalch Technologies, Inc. (hereafter DeWalch) of Houston, Texas also sells locking systems for utility companies. DeWalch has sold a ProLock 1 product and currently sells a ProLock 2 product. Inner-Tite became aware of the ProLock 1 product in 2004. The ProLock 2 product is a modified version of the ProLock 1 product, and was recently introduced to the market in April 2006. The ProLock 1 and ProLock 2 products are shown in Exhibits B and C of the Stecher Affidavit, as well as Exhibits A and B of the affidavit of Robert E. Rafferty filed herewith.

### B)    Procedural History

In the present action, Inner-Tite alleges that the ProLock 1 and ProLock 2 products each infringe claim 1 of the '691 patent. On April 19, 2006 the parties filed a stipulation concerning an agreement to narrow the issues in this action. The parties agreed to narrow the issues to the single issue of whether either or both of the ProLock 1

and ProLock 2 products include certain language from claim 1 of the '691 patent either literally or under the doctrine of equivalents. The only contested language from claim 1 of the '691 patent is shown below in bold:

> 1. For use in combination with a utility box having a bottom, a side wall, and a cover which may be opened to gain access to the interior of the box, and which when closed, overlaps an upper edge of the side wall, a lock assembly for maintaining the cover in its closed position, said lock assembly comprising:
>> a bracket having first and second mutually spaced flanges integrally joined by an intermediate web;
>> **a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges**, said bracket being configured for removable mounting on said side wall, with said intermediate web interposed between said cover and the upper edge of said side wall, and with said first flange and said jaw respectively located adjacent exterior and interior surfaces of said side wall;
>> force exerting means for urging said jaw towards said first flange to thereby clamp said side wall therebetween;
>> a cap having a lip configured and dimensioned to overlap said cover; and
>> interlocking means for securing said cap to said bracket.

Stecher Affidavit, Exhibit A, col.4, lines 24 – 44 (**emphasis added**).

The present motion is submitted as a motion for summary judgment under Fed.R.Civ.P., Rule 56, and a hearing is scheduled for July 26, 2006. Inner-Tite anticipates offering testimony at that hearing. In the event that the court determines that factual issues exist that might otherwise preclude summary judgment, the parties request that the court make such factual determinations in rendering its decision on the presently filed cross motions. It is the intention of the parties that resolution of the above single issue will result be fully dispositive of this case.

In further support of this motion, Inner-Tite submits the accompanying Statement of Undisputed Facts (SUF).

Page 2

### C)     The Invention

Utility companies rely on utility meters to monitor usage of their products by individual customers.  Unauthorized tampering with such meters by certain customers, however, is a persistent problem that costs the utility companies millions of dollars annually.  As efforts to compromise the security of utility company meter boxes have improved and become more sophisticated, utility companies have been required to obtain meter security and locking devices that are not only tamper evident, but also tamper proof.

The security of utility personnel is also a concern in some locations, and it is generally desired that utility personnel be able to install new meter locking devices as quickly as possible.  Prior to the invention of the '691 patent, certain conventional utility meter locks for securing meter box covers to meter boxes included a bolt that passed through the meter box wall.  For example, U.S. Patent No. 4,414,829 discloses such a meter lock.  Retrofitting these locks into existing meter boxes however, required that that the utility personnel drill or punch a hole in the meter box, which takes additional time and requires additional tools.  Other conventional meter locks not requiring a hole in the box wall, involved capturing the box wall between a bracket outside the box and a fastening screw within the box.  U.S. Patent No. 4,080,811, for example, shows in Figure 4 thereof a meter lock that includes a cap-screw 25 that secures a meter box wall 1 between the cap-screw 25 and a exterior portion 38 of a bracket 21.  It was discovered, however, that such fastening screws could become loosened over time, compromising the security of the meter box.

The invention provides a meter box lock assembly that is easily applied to a meter box without requiring a hole to be drilled or punched into the meter box, yet provides a

secure closure of the box cover.  The lock assembly of the invention includes a bracket, a

jaw, a force exerting means, a cap that together function to secure a meter box cover to a

meter box, and interlocking means for securing the cap to the bracket.

### D)    The '691 Patent

U. S. Patent No. 6,763,691 issued from U.S. Patent Application Ser. No.

09/795,701 (the '701 application) filed February 28, 2001.

The only amendment to claim 1 that occurred during prosecution was as follows:

> 1.    For use in combination with **[~~an electric meter box or other like enclosure~~] <u>a utility box</u>** having a bottom, a side wall, and a cover which may be opened to gain access to the interior of the box, and which when closed, overlaps an upper edge of the side wall, a lock assembly for maintaining the cover in its closed position, said lock assembly comprising:
>> a bracket having first and second mutually spaced flanges integrally joined by an intermediate web;
>> a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges, said bracket being configured for removable mounting on said side wall, with said intermediate web interposed between said cover and the upper edge of said side wall, and with said first flange and said jaw respectively located adjacent exterior and interior surfaces of said side wall;
>> force exerting means for urging said jaw towards said first flange to thereby clamp said side wall therebetween;
>> a cap having a lip configured and dimensioned to overlap said cover; and
>> interlocking means for securing said cap to said bracket.

Stecher Affidavit, Exhibit E, p. IT 00060, (**emphasis added**).  This amendment merely

expanded the scope of the claim's preamble, and did not in any way relate to the

language at issue in the present motion (SUF, ¶10).

Of the several embodiments of the invention disclosed in the '691patent, the

embodiment illustrated in Figures 5A and 5B most closes resembles the ProLock

products, and thus this embodiment will be referenced in the following more detailed description of the invention.

In Figures 5A and 5B, a locking device in accordance with the invention comprises a mounting bracket 28b having first and second flanges 30a and 32a adapted to straddle the wall 14 of a meter box.  A jaw 38b is pivotally mounted on the second flange 32b, and a cam 76 is rotatably attached to the second flange 32b.   The rotatable cam 76 is actuated by a handle 78 to pivotally advance the jaw, thus clamping the wall 14 between the jaw and the first flange 30a as shown in Figure 5B.



Stecher Affidavit, Exhibit A, FIGS. 5A – 5B.  The specification of the '691 patent states that:

> as shown in Figures 5A and 5B, the second flange 32b of the bracket 28b may be equipped with a rotatable cam 76 operated by means of a handle 78.  When unlocked, as shown in FIG. 5A, the cam allows freedom of movement of the jaw 38b relative to the bracket flanges 30a, 32b to thereby accommodate mounting of the bracket on the box side wall.  [ ]  The bracket may then be locked in place by depressing the handle 78, as shown in FIG. 5B, to rotate the cam 76 against the jaw 38b, thus urging the jaw into its locked position.

Stecher Affidavit, Exhibit A, col.3, lines 48 - 57.

Figures 2, 3, 6A and 6B show further embodiments of the invention as claimed in at least claim 1, which is the only claim at issue in the present motion.

## II.    LEGAL ANALYSIS

### A)    Standard for Patent Infringement

A patent is infringed if the accused device infringes at least one of the claims (35 U.S.C. §271), and the claims are the numbered paragraphs appearing at the end of the patent 35 U.S.C. §112, ¶2.  The claims include independent and dependent claims, and a dependent claim is not infringed unless each of the claims from which it depends is infringed.  *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 17 U.S.P.Q.2d 1097 (Fed. Cir. 1990).  In order for a patent to be infringed, therefore, at least one independent claim must be infringed.

The analysis of whether a patent claim is infringed under 35 U.S.C. §271 is a two part inquiry.  First, the meaning of the claim asserted to be infringed must be determined, and second, the properly construed claim language must be compared to the accused device both literally and under the doctrine of equivalents.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996), *affirming*, 52 F.3d 967, 34 U.S.P.Q.2d 1321 (Fed. Cir. 1995) (en banc).  The first step in the infringement analysis, determining the meaning of the claims is an issue of law, and must be performed based on a review of the claims themselves, the patent specification, the file history of the patent, and the prior art.  *Id.*

Once a claim has been construed, the properly construed claim language is compared with the accused device by the finder of fact to determine whether infringement exists literally or under the doctrine of equivalents.  *Warner-Jenkinson*

*Company, Inc. v. Hilton Davis Chemical*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).  The doctrine of equivalents is a judicially created doctrine that provides that although the requirements of literal infringement may not be met, infringement of a patent claim may still be found.  *Graver Tank & Mfg. Co. v. Linde Aire Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed.2d 1097 (1950).

Patent claim construction is an issue of law for the court (*Markman*, *supra*.), and patent claims are construed based on the intrinsic record, which includes the patent in suit and the file history of the patent in suit.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996).  Certain extrinsic evidence, therefore, such as present statements by the inventor, the patentee's actual product, and the alleged infringer's accused product are *not* relevant to the claim construction inquiry.  The words and terms of a patent claim are construed in accordance with their ordinary meaning unless the patent or file history make it clear that a claim term is to be accorded a different definition.  *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1355 72 U.S.P.Q.2d 1276 (Fed. Cir. 2004) ("As always, the claim language itself governs the meaning of the claims").  Although reference should be made to the disclosed embodiments of the invention in the patent specification to understand examples of that which is covered by the claims, the claims should not be construed to be limited to the examples disclosed in the specification.  *SRI International v. Matsushita Elec. Corp.*, 775 F.2d 1107, 227 U.S.P.Q. 577 (Fed. Cir. 1985).

**B)      Claim 1 is Infringed by Both Products**

The parties have agreed to narrow the issues in the present action to whether the accused products include "a jaw mechanically interengaged with and carried by said

bracket for movement between said first and second flanges" as claimed in claim 1 of the '691 patent either literally or under the doctrine of equivalents.

### i) Patent Claim Construction of the Disputed Language

The term *jaw* is expressly defined in the file history of the '691 patent.  In an argument filed on July 22, 2002, the applicant stated that:

> the most appropriate definition for this term is either of two mechanical parts that open and close to grip or crush something, as in a monkey wrench or vise.

Stecher Affidavit, Exhibit E, p. IT 00058.

Examples of jaws are shown at 38 in Figures 2 - 3, at 38a in Figure 4, at 38b in Figures 5A - 5B, and at 80 in Figures 6A - 6B.  The remaining terms in this clause of claim 1 should be construed in accordance with their ordinary meaning.  For example, the ordinary meaning of the word *between* is "in or through the space that separates" (SUF, ¶3 and Stecher Affidavit, Exhibit D).

Claim 1 further states that the first flange is located exterior of the utility box side wall, the jaw is located interior of the utility box side wall, and the force exerting means urges the jaw towards the first flange to thereby clamp the side wall therebetween.  The force exerting means, therefore, applies force from the second flange generally toward the first flange, thereby applying the clamping force against the meter box wall.

The language "carried by said bracket for movement between said first and second flanges" therefore provides that the jaw may be moved from the second flange toward the first flange such that a clamping force from the second flange may urge the jaw against the meter box wall.

The specification states with respect to the embodiment of Figures 5A and 5B that "the cam allows freedom of movement of the jaw38b relative to the bracket flanges 30a, 32b to thereby accommodate mounting of the bracket on the box side wall". (Stecher Affidavit, Exhibit A, col.3, lines 51 - 54). The word *between* in claim 1 is therefore supported in the specification by a discussion of relative movement of elements. A review of each of the jaws 38, 38a, 38b and 80 of each of the embodiments in the '691 patent supports that the language "carried by said bracket for movement between said first and second flanges" relates to relative movement of the jaw from the second flange toward the first flange.

The language "a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges" should therefore, be construed to mean a structure that is either of two mechanical parts that open and close to grip or crush something, as in a monkey wrench or vise, and that is interengaged with and carried by the bracket for movement in or through the space that separates the first and second flanges such that force may be applied (e.g., by the force exerting means) from the second flange generally toward the first flange.

This is consistent with both the remaining language of the claims as well as the applicant's use of this language in connection with the jaws 38, 38a, 38b and 80 in the '691 patent.

### i) Literal Infringement

The ProLock 1 product is shown below in both perspective and cut-away views:



Rafferty Affidavit, ¶5 Exhibit A.  As shown below in individual sectional views for clarity, the product includes a bracket having first and second mutually spaced flanges integrally joined by an intermediate web as follows:



Rafferty Affidavit, ¶5 Exhibit A.  The ProLock 1 product also includes a jaw mounted on the bracket as shown below for movement between the first and second flanges (SUF, ¶12).  The free range of movement is delineated at one extreme by contact with the second flange at "X", and at the other extreme by contact with the first flange at "Y":



Rafferty Affidavit, ¶5, Exhibit A, and SUF, ¶13.

The ProLock 1 product further includes a force exerting means in the form of a lever-actuated cam for urging the jaw towards the first flange. The free range of movement of the jaw is restricted at one end by contact with the lever, and at the other end by contact with the side wall of the meter box as shown below:



Rafferty Affidavit, ¶5, Exhibit A.

Thus, it will be seen that the jaw is mounted for movement between the first and second flanges, and is urged by the lever activated cam away from the second flange and towards the first flange to clamp the box side wall therebetween (SUF, ¶¶ 10, 11). The jaw of the ProLock 1 product, therefore, is one of two mechanical parts that open and close to grip or crush something, as in a monkey wrench or vise, and that is interengaged with and carried by the bracket for movement in or through the space that separates the first and second flanges such that force may be applied (e.g., by the force exerting means) from the second flange against the meter box wall. The jaw of the ProLock 1 product is, therefore, mechanically interengaged with and carried by the bracket for movement between the first and second flanges as required by claim 1 of the '691 patent.

The ProLock 2 product includes a slightly modified jaw as shown below together with the bracket:



Rafferty Affidavit, ¶5, Exhibit B and SUF, ¶¶17, 18.  In particular, the jaw has been cut away in an insubstantial effort to avoid contact with the first flange when closed.  Again, the free range of movement is delineated at one extreme by contact with the second flange at "X", and at the other extreme by contact with the first flange at "Y".

The ProLock 2 product also includes the force exerting means for urging the jaw towards the first flange as shown below:



Rafferty Affidavit, ¶5, Exhibit B.  The free range of movement of the ProLock 2 jaw is also restricted at one end by contact with the lever, and at the other end by contact with the side wall of the meter box.

The jaw of the ProLock 2 product is mounted for movement between the first and second flanges, and is urged by the lever activated cam away from the second flange and

towards the first flange to clamp the box side wall therebetween (SUF, ¶¶ 10, 11).  The

jaw of the ProLock 2 product, therefore, is one of two mechanical parts that open and

close to grip or crush something, as in a monkey wrench or vise, and that is interengaged

with and carried by the bracket for movement in or through the space that separates the

first and second flanges such that force may be applied (e.g., by the force exerting means)

from the second flange against the meter box wall.  The jaw of the ProLock 2 product is,

therefore, mechanically interengaged with and carried by the bracket for movement

between the first and second flanges as required  by claim 1 of the '691 patent.


### iii)    Infringement Under the Doctrine of Equivalents

In the event that this court does not find that the jaw of either the ProLock 1 or

ProLock 2 products is mechanically interengaged with and carried by the bracket for

movement between first and second flanges, Inner-Tite submits that this language of

claim 1 is met by the accused devices under the doctrine of equivalents.

Infringement under the doctrine of equivalents may be found when the differences

between the claimed subject matter and the accused device are insubstantial.  *Warner-

Jenkinson*, *supra*.  Infringement exists where the accused product performs substantially

the same function in substantially the same way to achieve the same result.  *Graver Tank

& Mfg. Co.*, *supra*.

Application of the doctrine of equivalents may be estopped when the claim

language at issue was added during prosecution of the application for reasons relating to

patentability.  *Festo Corporation v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535

U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002).  The language of claim 1 at issue in

this action, however, was not added to claim 1 during prosecution, and there is, therefore, no such estoppel in this action (SUF, ¶¶, 10 and 11).

**a)      The All-Elements Rule Does Not Bar the Doctrine Of Equivalents in this action**

Another limitation on the application of the doctrine of equivalents is the all-elements rule, sometimes referred to as the all-limitations rule, which holds that each limitation or its equivalent must be found in the accused device. *Ethicon Endo-Surgery, Inc. v. United States Surgical Corporation*, 149 F.3d 1309, 47 U.S.P.Q.2d 1272 (Fed. Cir. 1998). The Federal Circuit stated in the *Ethicon* decision, however, that if the all-elements rule were applied in any instance where the accused device did not literally meet every limitation of the claim, then the all-elements rule would "swallow the doctrine of equivalents, reducing the application of the doctrine to nothing more than a repeated analysis of literal infringement". *Id.*, 149 F.3d at 1317. In particular, the Federal Circuit stated in *Ethicon* that:

> any analysis of infringement under the doctrine or equivalents necessarily deals with subject matter that is 'beyond', 'ignored' by, and not included in the literal scope of a claim. Such subject matter is not necessarily 'specifically excluded' from coverage under the doctrine **unless its exclusion is somehow inconsistent with the language of the claim**.

*Ethicon*, *supra*, 149 F.3d at 1317 (**emphasis added**).

Inner-Tite contends that to the extent that the language of claim 1 that is at issue, is not literally met by either the ProLock 1 or ProLock 2 products, that the disputed language of claim 1 should be applied under the doctrine of equivalents as:

Page 14

> a jaw mechanically interengaged with and carried by said
> bracket for movement *substantially* between said first and
> second flanges.

Such an application of claim 1 under the doctrine of equivalents does not remove any

element from the claims, is not inconsistent with any of the remaining language of claim

1, does not cause any language of the claims to become meaningless, and does not cause

claim 1 to read on any prior art.

Application of the doctrine of equivalents as asserted by Inner-Tite does not

remove any element from claim 1, but rather adds the term *substantially*, which is

entirely consistent with the purpose for which the doctrine continues to exist.  See

*Warner Jenkinson*, *supra*.  Application of the doctrine as asserted by Inner-Tite is also

consistent with the language of the claims, and does not cause any of the claims of the

'691 patent to become meaningless.  Further, this application of the doctrine of

equivalents does not cause claim 1 to read on any prior art.  The prior art cited during

prosecution of the application that issued as the '691 patent included no jaw in

combination with the remaining elements of the claim as asserted by the applicant in the

amendment filed July 22, 2002 (Stecher Affidavit, ¶¶ 7 - 12, Exhibits F - J).

The all-elements rule, therefore, does not bar the scope of claim 1 as asserted by

Inner-Tite.  See for example, *Wright Medical Technology, Inc. v. Osteonics Corporation*,

122 F.3d 1440, 43 U.S.P.Q.2d 1837 (Fed. Cir. 1997), in which the Federal Circuit

reversed and remanded a finding of summary judgment of non-infringement that relied

on the all-elements rule to bar application of the doctrine of equivalents.  In *Wright*

*Medical*, the Federal Circuit stated that the language "an intramedullary rod portion

adapted to closely fit in and extend through the narrowest portion of the human femur"

could be met under the doctrine of equivalents by a device that includes an intramedullary rod portion that, while not exactly meeting this limitation, is substantially the same.

In *Nova Biomedical Corporation v. i-Stat Corporation*, 1999 U.S. App. LEXIS 21390 (Fed. Cir. 1999), the Federal Circuit reversed a grant of summary judgment of non-infringement under the doctrine of equivalents, finding that the all-elements rule does not bar the application of the doctrine of equivalents. In *Nova Biomedical*, the Federal Circuit stated that the all-elements rule "does not mean, however, that a patentee cannot prevail under the doctrine of equivalents 'when a claim limitation is not expressly met by an accused device" *Id*. 1999 U.S. LEXIS at 21399. The court confirmed that "the touch-stone of any equivalents inquiry is the substantiality of the differences between the accused device and the literal language of the claim". *Id*.

Similarly, in *Ericsson, Inc. v. Harris Corporation*, 352 F.3d 1369, 69 U.S.P.Q.2d 1109 (Fed. Cir. 2003) (reversing a finding that the all-elements rule bars the application of the doctrine of equivalents), the Federal Circuit stated that it agreed that the limitation at issue would be vitiated if the accused device was *contrary* to the language of the claim at issue, but reversed where the accused device was *substantially the same* as the language of the claim.

In *Rosby Corporation v. Stoughton Trailers, Inc.*, 2003 U.S. Dist. LEXIS 17034 (N.D.Ill. 2003), the court held that the all-elements rule did not bar the application of the doctrine of equivalents since the difference between touching and barely touching was minimal. The claim at issue specifically required "side panels ... aligned side-by-side in contiguous abutting relation" *Id*, 2003 U.S. Dist. LEXIS at 17050. The court reviewed several cases relating to the all-elements rule, and distinguished cases such as *Cooper*

*Cameron Corporation v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317, 62 U.S.P.Q.2d 1846 (Fed. Cir. 2002). In *Cooper Cameron*, the court stated that to apply the asserted claim scope would render the language meaningless since the patentee sought to remove a limitation by the doctrine of equivalents, not modify the limitation by the word substantially as is the case in the present action.

See also, *ADC Telecommunications, Inc. v. Panduit Corp.*, 2002 U.S. Dist. LEXIS 25387 (D.Minn. 2002) (holding that the all-elements rule does not bar application of the doctrine of equivalents, and stating that "Contrary to Panduit's assertion that ADC's theory of equivalents would violate the all-limitations rule, a finding of insubstantial difference between an exit trough that mounts to the top edge of the lateral trough and one that mounts to a groove in the sidewall just beneath the top edge, similarly covering and coming over the top edge, would not vitiate this element").

Such an application of the doctrine of equivalents is entirely consistent with the purpose for which the doctrine exists. For example, in *Warner Jenkinson*, *supra*, the Supreme Court held that a dye purification process that operated at a pH of 5.0 might infringe a patent claim to a process that operated "at a pH from approximately 6.0 to 9.0" if the reason for adding this language to the claim was not related to patentability. In short, the court remanded the case for a determination of whether an amendment related estoppel existed, but made it clear that without such an estoppel, the doctrine may be applied.

Conversely, in *The Holmes Group, Inc. v. RPS Products, Inc.*, 2006 U.S. Dist. LEXIS 13737 (D.Mass. 2006), a claim at issue (claim 18 of US Patent No. 6,425,932) was directed to a filter assembly and included the element "a hanger having a pair of opposed legs *configured to form a gap*" *Id*, 2006 U.S. LEXIS at 13742. The accused

device included two hangers, each with one leg only.  The court found that to apply the claim under the doctrine of equivalents to the accused product would vitiate this claim limitation.  It is submitted that this is because if there were only one leg, there could not be a *gap* formed by the recited pair of legs.  In short, such an application of the doctrine would render the gap language of the claim meaningless.

Another claim at issue in the *Holmes Group* action (claim 1 of U.S. Patent No. 6,685,760) required, in part, a first hanger coupled to the top wall and *including a leg extending over said top wall*.  Similarly, it is submitted that to apply this language to cover a product that included a first hanger coupled instead to lip on the filter frame may have caused the leg to not *extend over the top wall* as further required by the claim. Again, it appears that application of the doctrine of equivalents was limited because the scope of protection asserted by the patentee rendered *further language* of the claims at issue meaningless.  This is not the case in the present action.

The all-elements rule, therefore, does not bar Inner-Tite's application of claim 1 of the '691 patent under the doctrine of equivalents in urging that the language at issue be applied as *a jaw mechanically interengaged with and carried by said bracket for movement **substantially** between said first and second flanges*.

### b)  The Differences Are Insubstantial

The ProLock 1 product and the ProLock 2 product each include a jaw that is mechanically interengaged with and carried by the bracket for movement with respect to the first and second flanges.  To the extent that the court finds that this movement is not *between* the first and second flanges, Inner-Tite asserts that the movement is *substantially*

between the first and second flanges, and performs substantially the same function in substantially the same way to achieve the same result. *Graver Tank*, *supra*.

The function of the jaw of the lock assembly of claim 1 of the '691 patent is to press against the side wall of the meter box generally opposing the force provided by the first flange (See Rafferty Affidavit, ¶2). This function is entirely consistent with the remaining limitations of the claim, including that it the jaw be located adjacent an interior surface of the side wall and that the first flange be located adjacent an exterior surface of the side wall. The jaw of each of the ProLock 1 and ProLock 2 products presses against the side wall generally opposing the first flange (See Rafferty Affidavit, ¶10). The fact that the jaw may not be precisely aligned with the first flange does not in any way detract from the fact that the jaw is urged against the side wall generally opposing the force provided by the first flange (See Rafferty Affidavit, ¶11).

The way (or structure) by which this function is achieved is by a rigid element that attaches to the bracket and is movable toward the side wall of the meter box (See Rafferty Affidavit, ¶3). Again, this is entirely consistent with the remaining language of the claims. The jaw of each of the ProLock 1 and ProLock 2 products is a rigid element that attaches to the bracket and is movable toward the side wall of the meter box. (See Rafferty Affidavit, ¶12).

The result thereby achieved by the jaw is to secure the bracket to the meter box side wall using the force exerting means (See Rafferty Affidavit, ¶4). This is also consistent with the force exerting means language of claim 1, which states "force exerting means for urging said jaw towards said first flange to thereby clamp said side wall therebetween. The first flange, jaw and force exerting means of each of the ProLock 1

and ProLock 2 products cooperate to achieve the result of securing the bracket to the meter box side wall.  (See Rafferty Affidavit, ¶13).

The jaw of each of the ProLock 1 and ProLock 2 products, therefore, achieves substantially the same function in substantially the same way to achieve the same result. Infringement of claim 1 by each of these products clearly exists under the doctrine of equivalents.


**III.    CONCLUSION**

For the reasons stated above, plaintiff Inner-Tite Corp. requests that this court find that defendant's ProLock 1 and ProLock 2 products infringe claim 1of the '691 patent.


Respectfully submitted,

Inner-Tite Corp.

By Plaintiff's attorneys,

\_\_\_/s/ William E. Hilton_____

Dated: May 19, 2006

Maurice E. Gauthier, BBO# 187340
William E. Hilton, BBO# 559515
Gauthier & Connors, LLP
225 Franklin Street, Suite 2300
Boston, Massachusetts  02110
(617) 426 - 9180   Ext. 111


CERTIFICATE OF SERVICE
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing and paper copies will be sent to persons indicated as non-registered participants on May 19, 2006 by First Class Mail.

_____/s/William E. Hilton_____
William E. Hilton