# EXHIBIT 4
## (part I of II)

## TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO RECONSIDER THE DECISION DENYING SUMMARY JUDGMENT AND TO STRIKE THE AFFIDAVITS

## FILED DECEMBER 14, 2007

## IN

## 04-40219 FDS

# In The Matter Of:

*INNER-TITE CORP. v.*
*DEWALCH TECHNOLOGIES, INC.*

---

*JOHN STACHOWIAK*
*November 29, 2007*

---

*CONTINENTAL COURT REPORTERS, INC.*
*HOUSTON * AUSTIN * DALLAS*
*2777 ALLEN PARKWAY*
*SUITE 600*
*HOUSTON, TX 77019*
*(713) 522-5080*

*Original File 071129JS.TXT, 124 Pages*
*Min-U-Script® File ID: 0801424516*

**Word Index included with this Min-U-Script®**

Page 1

[1]     IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
[2]
    INNER-TITE CORP.,              )
[3]        Plaintiff               )
[4] vs.                            ) CASE NO. 04-40219-FDS
[5] DEWALCH TECHNOLOGIES, INC.,)
        Defendant.                 )
[6]
[7]
[8]        ORAL VIDEOTAPED DEPOSITION
[9]            JOHN STACHOWIAK
[10]           November 29, 2007
[11]
[12]    ORAL VIDEOTAPED DEPOSITION OF JOHN STACHOWIAK,
[13] produced as a witness at the instance of the Defendant
[14] and duly sworn, was taken in the above-styled and
[15] numbered cause on the 29th day of November, 2007, from
[16] 9:14 a.m. to 12:23 p.m., before Beverly Ann Smith,
[17] Certified Shorthand Reporter in and for the State of
[18] Texas, reported by computerized stenotype machine at the
[19] offices of Vinson & Elkins, L.L.P., 1001 Fannin Street,
[20] Suite 2500, Room 25E, Houston, Texas, pursuant to the
[21] Federal Rules of Civil Procedure and the provisions
[22] stated on the record or attached hereto.
[23]
[24]
[25]

Page 2

[1]            APPEARANCES
[2]
[3] FOR THE PLAINTIFF:
[4]    Mr. William E. Hilton
       Gauthier & Connors, L.L.P.
[5]    225 Franklin Street, Suite 3300
       Boston, Massachusetts 02110
[6]    Telephone: 617-426-9180
       Fax: 617-426-2275
[7]    E-mail: WHilton@gc-law.com
[8] FOR THE DEFENDANT:
[9]    Mr. Peter E. Mims
       Vinson & Elkins, L.L.P.
[10]   1001 Fannin Street, Suite 2300
       Houston, Texas 77002-6760
[11]   Telephone: 713-758-2732
       Fax: 713-615-5703
[12]   E-mail: pmims@velaw.com
[13]   Mr. Andrew Baine
       Vinson & Elkins, L.L.P.
[14]   1001 Fannin Street, Suite 2300
       Houston, Texas 77002-6760
[15]   Telephone: 713-758-2732
       Fax: 713-615-5703
[16]   E-mail: abaine@velaw.com
[17] ALSO PRESENT:
[18]   Mr. Binz DeWalch
[19]   Mr. Anthony Hines
       Videographer
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]                   INDEX
[2]                                        PAGE
[3] JOHN STACHOWIAK
[4] Examination by Mr. Mims ................ 5
    Examination by Mr. Hilton .............. 50
[5] Further Examination by Mr. Mims ....... 108
    Further Examination by Mr. Hilton ..... 117
[6] Witness' Signature Page ................ 120
    Court Reporter's Certificate .......... 122
[7]
[8]                 EXHIBITS
[9]
[10] EXHIBIT     DESCRIPTION            PAGE
[11] TX-1    Inner-Tite patent in suit      38
     TX-13   Photograph of ProLock 1        34
[12] TX-14   Photograph of lever in open    22
                 position
[13] TX-15   Photograph of lever in middle  22
                 position
[14] TX-16   Photograph of lever fully      22
                 rotated
[15] TX-19   Photograph of side panel       28
                 contact and lower panel gap
[16] TX-20   Photograph indicated forces    29
                 exerted by clamping member
[17] TX-21   Depiction of forces clamping   37
                 ProLock 2 to box
[18] TX-22   Drawing of ProLock 2 lever in  35
                 open position
[19] TX-23   Drawing of beginning actuation 35
                 of lever
[20] TX-24   Drawing of lever in fully      35
                 installed position
[21] TX-26   Depiction of forces clamping   36
                 ProLock 1 to box
[22] TX-29   Demonstrative document of      20
                 ProLock product
[23] TX-32   Drawing of Inner-Tite patent   34
     TX-82   Meter box                      8
[24] TX-83   ProLock 2 device               9
     TX-84   ProLock 1 device               15
[25] TX-85   Memorandum and order on        40

Page 4

(Exhibits continued....)

| Exhibit | Description | Page |
|---|---|---|
| TX-86 | Inner-Tite product, Jiffy Lock | 42 |
| TX-87 | Supplemental declaration by DeWalch | 51 |
| TX-88 | Witness' hand-drawn diagram | 57 |
| TX-89 | Third declaration by Binz DeWalch | 64 |
| TX-90 | Declaration by Binz DeWalch | 67 |
| TX-91 | Confidential drawings of ProLock | 74 |
| TX-A | ProLock patent | 41 |
| TX-B | Patent file history, ProLock | 44 |
| TX-B-1 | Declaration for patent application | 44 |
| TX-B-2 | Power of Attorney and correspondence address indication form | 44 |

1—09:14  Page 5

[1] THE VIDEOGRAPHER: This is Tape 1 in the
[2] videotaped deposition of John Stachowiak. The date is
[3] November 29th, 2007. The time is 9:14 a.m. We're on
[4] the record.
[5]     JOHN STACHOWIAK,
[6] having been first duly sworn, testified as follows:
[7]     MR. HILTON: I'd just like to state for
[8] the record — oh, we haven't identified ourselves.
[9] William Hilton, counsel for plaintiff.
[10]    MR. MIMS: Peter Mims, counsel for the
[11] defendant.
[12]    MR. DEWALCH: Binz DeWalch, defendant.
[13]    MR. BAINE: Andrew Baine, Vinson & Elkins.
[14]    MR. HILTON: I'd just like to state that
[15] this deposition is being taken under the Federal Rules
[16] of Civil Procedure, and all objections except as to form
[17] are preserved.
[18]         EXAMINATION
[19]         BY MR. MIMS:
[20] Q: Mr. Stachowiak, could you please state your
[21] full name for the record?
[22] A: John Edward Stachowiak.
[23] Q: And where do you live?
[24] A: At 8827 Willacy Court —
[25] Q: And that's —

1—09:15  Page 6

[1] A: — in Houston.
[2] Q: And that's here in Houston?
[3] A: Uh-huh.
[4] Q: Have you ever had your deposition taken before?
[5] A: No.
[6] Q: Let me just review some sort of procedural
[7] guides — guidelines to help us get through this. The
[8] first thing is it's very important that you and I and
[9] Mr. Hilton and you do not talk at the same time so the
[10] court reporter is able to take down the questions and
[11] answers accurately.
[12]     Secondly, if you don't understand my
[13] question, or Mr. Hilton's question for that matter,
[14] please feel free to ask us to restate it; and I'm sure
[15] we will.
[16]     If at any time, you know, you need to take
[17] a break, you know, you're allowed to take a break during
[18] the deposition. Just let us know, and you can take a
[19] break.
[20] A: Okay.
[21] Q: All right. Can you describe generally your
[22] college education with respect to engineering?
[23] A: Uh-huh. University of Houston, B.S. in
[24] mechanical engineering, graduated in 1996.
[25] Q: Okay. After you graduated, did you take a job

1—09:16  Page 7

[1] that — in which you used your engineering skills?
[2] A: Yes.
[3] Q: And what was your first job out of college?
[4] A: It was with a company by the name of JetStream
[5] of Houston.
[6] Q: And what kind of business is JetStream of
[7] Houston?
[8] A: JetStream is a manufacturing company. They
[9] manufacture high-pressure water-blast components.
[10] Q: And did — so, you were involved in the design
[11] of those sorts of products?
[12] A: Yes.
[13] Q: How many years did you stay at JetStream?
[14] A: Six years.
[15] Q: And then after JetStream where did you go to
[16] work?
[17] A: DeWalch.
[18] Q: And at DeWalch you also worked as an engineer?
[19] A: Correct.
[20] Q: Can you just generally describe what your job
[21] duties were at DeWalch?
[22] A: Uh-huh. I was engineering manager. My
[23] responsibilities were to oversee the general engineering
[24] duties and at the same time simultaneously — excuse
[25] me — develop product and improve existing product.

1—09:17    Page 8

[1] Q: And, so, you became involved in developing
[2] products that DeWalch sold?
[3] A: Correct.
[4] Q: Can you describe generally the products of
[5] DeWalch Technologies that you were involved with?
[6] A: Basically the products were utility locking
[7] products to lock down a meter box for security purposes.
[8] Q: All right. Just to kind of put things in
[9] perspective, I'm going to hand you a meter box just so
[10] you can point it out to the Court.
[11] MR. HILTON: Has this been marked yet as a
[12] deposition exhibit?
[13] MR. MIMS: No, it has not been.
[14] Q: (By Mr. Mims) Can you identify that utility box
[15] as the kind of meter box you were referring to?
[16] A: Yes.
[17] MR. MIMS: Let me put a sticker on this,
[18] and we'll put a number on it. I'm going to ask the
[19] court reporter to mark this as TX-82.
[20]    (Exhibit TX-82 marked)
[21] Q: (By Mr. Mims) Mr. Stachowiak, I've handed you
[22] what's been marked TX-82. Can you identify that as the
[23] utility box on which DeWalch Technology products were
[24] used?
[25] A: Yes, it is. It is the main box that we used,

1—09:19    Page 9

[1] very similar.
[2] Q: And just to make it clear what kind of products
[3] we're talking about, I'm going to hand you what's been
[4] marked as TX-83 and ask you to identify that after the
[5] court reporter marks it.
[6] A: Okay.
[7]    (Exhibit TX-83 marked)
[8] Q: I'm handing you what's been marked as TX-83.
[9] A: Uh-huh.
[10] Q: One thing is you need to say "yes" or "no"
[11] instead of "uh-huh" because the court reporter's —
[12] A: Yes.
[13] Q: — record won't reflect that, what it is.
[14]    But can you identify TX-83?
[15] A: Yes.
[16] Q: What — what is it?
[17] A: This is what we call the ProLock.
[18] Q: And can you just quickly attach it to the
[19] utility box just to show how it attaches?
[20] A: Uh-huh.
[21] Q: All right. I'm going to take these two back
[22] now.
[23]    So, these are the types of products that
[24] you were involved in?
[25] A: That's right.

1—09:20    Page 10

[1] Q: Would you have been involved also in not only,
[2] I guess, design of products, were you involved in the
[3] manufacture of products?
[4] A: Yes.
[5] Q: And what kind of responsibilities would that
[6] involve?
[7] A: Oversee — make sure we met the timelines, the
[8] schedule, quality control, make sure the part functions
[9] as it should during the R & D process.
[10] Q: And, so, would you be involved in, I guess,
[11] designing the equipment to make whatever you designed?
[12] A: Yes.
[13] Q: And what — would you use, you know, molds,
[14] dies; or how would you — what would you use to make
[15] these products?
[16] A: Typically different — there was investment
[17] casting involved. There was stamping involved, some
[18] machining involved.
[19] Q: And you would be involved in streamlining that
[20] process?
[21] A: Correct.
[22] Q: Now, we're here today because of a patent
[23] infringement case. And you understand that?
[24] A: Yes.
[25] Q: All right. And the issues in this case have to

1—09:21    Page 11

[1] do with the ProLock products that you were involved in;
[2] and, so, we're going to focus on some of those types of
[3] issues.
[4]    My first question is: What was your
[5] involvement with the ProLock? What was your first
[6] involvement with the ProLock?
[7] A: I don't understand the question. I'm sorry.
[8] Q: What — did you have anything to do with the
[9] development of the ProLock?
[10] A: Yes.
[11] Q: And can you at a very high level generally
[12] describe what your involvement was?
[13] A: My involvement was to design a — a product
[14] that would function as the ProLock does, the goal being
[15] quick installation.
[16] Q: All right. So, were you the person who
[17] developed the ProLock?
[18] A: That's correct.
[19] Q: All right. And, in fact, there's a — there
[20] was ultimately a patent application filed where you were
[21] the named inventor on the ProLock. Correct?
[22] A: Yes.
[23] Q: So, you worked on this project by yourself and
[24] developed the ProLock?
[25] A: That's right.

**Page 12** — 1—09:22

[1] Q: Can you tell me approximately when this all
[2] took place? Do you recall?
[3] A: No, I don't.
[4] Q: All right. If I — if I gave you the date that
[5] the patent application was filed, in April of 2004,
[6] would that help you place it in time?
[7] A: Possibly.
[8] Q: I mean, is it — it was obviously before April
[9] of '04?
[10] A: Uh-huh. Yes.
[11] Q: Do you recall if it was, you know, before in
[12] '03 or late '04?
[13] A: I can't recall the exact date. I'm sorry.
[14] Q: Okay. That's fine.
[15] Do you know how long it took you to
[16] develop the ProLock?
[17] A: I would say....
[18] Q: And let us just say coming up with a design
[19] first before — not the manufacturing.
[20] A: Coming up with the design, I don't remember the
[21] exact amount of time.
[22] Q: Did someone assign this project to you, or did
[23] you just sort of do it on your own?
[24] A: It was assigned.
[25] Q: And who assigned it to you?

**Page 13** — 1—09:23

[1] A: A gentleman by the name of Ivan Canga.
[2] Q: Okay. And he came to you and said: Develop a
[3] new locking means for a utility box?
[4] A: Yes.
[5] Q: And, so, what was your approach in — what were
[6] you trying to accomplish besides, you know, speedy
[7] installation? Any other particular design goals or —
[8] A: Uh-huh, security.
[9] Q: Now, when you developed this product, the
[10] ProLock, there obviously — this wasn't a product that
[11] was like this exact design, was there?
[12] A: No.
[13] Q: Were there other existing products that you
[14] were aware of?
[15] A: Yes.
[16] Q: I mean, can you give me a range of the
[17] different types of solutions that were out there?
[18] A: The general — the type of solution that —
[19] that was current was a style that you punched a hole in
[20] the side of the box and attached a screw from the back
[21] side, and — and that was generally what was out there.
[22] And there was another type of device that had a
[23] thumbscrew that served the same function.
[24] Q: Was the thumbscrew on the inside of the box or
[25] the outside of the box?

**Page 14** — 1—09:24

[1] A: On the inside.
[2] Q: And do you know who sold that product?
[3] A: Inner-Tite.
[4] Q: All right. So, you were aware of the — the
[5] original design where you drilled a hole through the
[6] wall —
[7] A: Uh-huh.
[8] Q: — as well as Inner-Tite's screw into the wall
[9] inside?
[10] A: That's right.
[11] Q: And, so, were you trying to eliminate the —
[12] the use of the — of the punch?
[13] A: Yes.
[14] Q: And you obviously didn't use a screw in — in
[15] the ProLock. Correct?
[16] A: That's correct.
[17] Q: Can you generally describe — and I'll hand
[18] this to you —
[19] A: Uh-huh.
[20] Q: — what's been marked as TX-83, which is the
[21] ProLock 1? Can you generally describe —
[22] MR. DEWALCH: It's 2, I think.
[23] MR. MIMS: Let me have a look here.
[24] Oh, you're right. This is a ProLock 2.
[25] Excuse me.

**Page 15** — 1—09:25

[1] Q: (By Mr. Mims) Can you generally describe how
[2] the ProLock design works with regard to, you know, not
[3] having a hole punched or a screw?
[4] A: Okay. The — this is placed over the box, and
[5] the side wall of the box enters this area here, okay.
[6] This lever is then actuated, which forces this member
[7] toward the inside of the box, clamping the two —
[8] clamping the box in between this member and this member
[9] (indicates).
[10] Q: All right. So, how did you come up with this
[11] type of design where you have the — this clamping
[12] member that has two sides and — rather than a single
[13] screw, I guess?
[14] A: Well, like I said, trying to come up with
[15] something that is quick, okay. So, I knew that if the
[16] installer had to take time to screw something in —
[17] Q: Right.
[18] A: — that would take time. Okay. I also knew
[19] that there's somewhat of a possible learning curve, if
[20] you will, in — in a screw or a punch style. So, I came
[21] up with this lever; and, you know, it was a quick,
[22] one-step, easy way to install the product.
[23] MR. MIMS: All right. Can you mark this
[24] as, I guess, 84?
[25] (Exhibit TX-84 marked)

1—09:27                                                            Page 16

[1] **Q:** (By Mr. Mims) I'm now going to hand you what's
[2] been marked as TX-84, which is the ProLock 1.
[3] **A:** Uh-huh.
[4] **Q:** And you can recognize that as a ProLock 1?
[5] **A:** Yes.
[6] **Q:** And that's the original, first design that you
[7] came up with?
[8] **A:** That's right.
[9] **Q:** I wanted to ask you about the — the use of
[10] the — the clamping member that has two points as
[11] opposed to a single point. Was that — were you just
[12] trying to avoid the screw and have it for timing?
[13] That — was that really the key point, that you were
[14] trying to avoid the time in putting in the screw?
[15] **A:** That's correct.
[16] **Q:** Now, once you had come up with this design, you
[17] only had it in drawings, I assume.
[18] **A:** Uh-huh.
[19] **Q:** How did you go about making the first
[20] prototype?
[21] **A:** There was a — at DeWalch there was a machine
[22] shop that we had inside the building, and we had some
[23] prototype machine. Then we had to make some forming
[24] dies and formed it up, and that was it.
[25] **Q:** And started making them?

1—09:28                                                            Page 17

[1] **A:** That's right, made some prototypes. That's
[2] right.
[3] **Q:** Now, the dies that you used for the prototypes,
[4] were those the dies that you ultimately used for
[5] manufacturing?
[6] **A:** No.
[7] **Q:** Okay. Walk me through that step of how you
[8] went from prototypes to final product.
[9] **A:** Okay. We had a prototype and, of course, we
[10] had drawings. Then the next step was to find somebody
[11] to manufacture this thing — well, actually, find
[12] somebody that can make the equipment for us to
[13] manufacture this thing.
[14]     This was Progressive Dies. We found
[15] somebody to — a company to manufacture some progressive
[16] dies so we could — so we could run a product.
[17] **Q:** And they made the dies for you?
[18] **A:** That's correct.
[19] **Q:** And then once they made the dies, then you had
[20] something to make commercial product?
[21] **A:** That's right.
[22] **Q:** Okay. And then those — once you had those
[23] dies from Progressive, that's what you used to make the
[24] product while you were there?
[25] **A:** That's right.

1—09:29                                                            Page 18

[1] **Q:** So, when you left — and, then, let me just
[2] make this clear: When did you leave DeWalch
[3] Technologies?
[4] **A:** I can't recall the exact date.
[5] **Q:** What season and year?
[6] **A:** This was 2006.
[7] **Q:** Okay. And when you left DeWalch, where did you
[8] go to work?
[9] **A:** Weatherford —
[10] **Q:** And that's where you —
[11] **A:** — International.
[12] **Q:** And that's where you are today?
[13] **A:** That's right.
[14] **Q:** And are you doing an engineering-related job
[15] there?
[16] **A:** That's correct.
[17] **Q:** Okay. How different were the prototypes from
[18] the actual commercial production?
[19] **A:** Very close.
[20] **Q:** Very close? And what was — I mean, were the
[21] differences, you know, a matter of millimeters or just
[22] very subtle differences?
[23] **A:** I don't recall exactly.
[24] **Q:** Nothing materially different?
[25] **A:** Materially different?

1—09:30                                                            Page 19

[1] **Q:** Yeah. I mean, the prototypes were pretty much
[2] similar to what you ended up with in the dies?
[3] **A:** Pretty similar in shape.
[4] **Q:** In shape? Okay.
[5]     And, so, you had those dies delivered; and
[6] then you started making product. Do you recall when the
[7] dies were finally finished?
[8] **A:** No.
[9] **Q:** Was it soon after you developed the product; or
[10] did it take, you know, months, weeks?
[11] **A:** Months.
[12] **Q:** Months?
[13] **A:** Uh-huh.
[14] **Q:** Would you say, you know, a quarter of a year to
[15] a half a year?
[16] **A:** Can you repeat the question?
[17] **Q:** Yeah. I mean — yeah. You came up with your
[18] design.
[19] **A:** Okay.
[20] **Q:** You came up with a prototype. That took a
[21] while.
[22] **A:** Uh-huh.
[23] **Q:** And then you eventually got to production with
[24] dies.
[25] **A:** That's right.

Case 4:04-cv-40219-FDS  Document 96-6  Filed 12/14/2007  Page 8 of 18

JOHN STACHOWIAK                                                INNER-TITE CORP. v.
November 29, 2007                                              DEWALCH TECHNOLOGIES, INC.

                    1—09:31                    Page 20

[1]  Q: I was just trying to get a sense of — of
[2]  timing, whether that process took, you know, three
[3]  weeks, three months, six months.
[4]  A: It was longer than six months, but I don't
[5]  recall the exact time.
[6]  Q: But less than a year?
[7]  A: Possibly.
[8]  Q: Okay. So, you're — that's just so —
[9]  A: I don't — I don't remember.
[10] Q: Okay. Now, do you recall making a
[11] determination to file a patent?
[12] A: Yes.
[13] Q: And — and, so, that happened in — the patent
[14] office records reflect that it was filed in April of
[15] '04.
[16] A: Okay.
[17] Q: And you recall being involved with that?
[18] A: Yes.
[19] Q: Okay. Why don't we talk about how the ProLock
[20] products work, and I have some pictures that I want to
[21] show you. First, I'm going to hand you something that's
[22] been marked — hold on. Let me get the reporter to mark
[23] it.
[24]   MR. MIMS: Can you mark this that number?
[25]   (Exhibit TX-29 marked)

                    1—09:32                    Page 21

[1]  Q: (By Mr. Mims) I'm going to hand you what's been
[2]  marked as TX-29.
[3]  A: Okay.
[4]  Q: And just so we can talk about this with the
[5]  same terms —
[6]  A: Okay.
[7]  Q: — this is a — a demonstrative document that
[8]  we've already filed with the Court. And just so we'll
[9]  have similar language and we won't get confused looking
[10] at small parts —
[11] A: Okay.
[12] Q: — we've called — I think you called it a
[13] lever, as well, and I think you've called it a clamping
[14] member; but I wanted to go through on the ProLock 2,
[15] which is the one closest to you — I mean, ProLock 1, I
[16] mean, closest to you, that's marked TX-84, you can see
[17] how the — I guess we'll call it the bracket? Is that
[18] what you would call that entire piece that has the
[19] flanges and webs?
[20] A: We can call it a bracket, yes.
[21] Q: Let's just call it a bracket.
[22] A: Uh-huh.
[23] Q: It has first flange and a second flange, and I
[24] only point that out because the first flange is the one
[25] that's in — that is outside the box and the second

                    1—09:34                    Page 22

[1]  flange is the one inside the box, just so we'll —
[2]  A: Correct.
[3]  Q: — have our terminology. Can — does that make
[4]  sense to you?
[5]  A: That's right. That makes sense.
[6]  Q: Okay. All right. Now, the first thing I want
[7]  to hand you is — I'm going to hand you a series of
[8]  three photographs, but let me let the court reporter
[9]  mark those.
[10]   MR. HILTON: What numbers are these?
[11]   MR. MIMS: These are going to be 14, 15,
[12] and 16.
[13]   (Exhibits TX-14, TX-15, and TX-16 marked)
[14] Q: (By Mr. Mims) Mr. Stachowiak, I'm going to hand
[15] you what's been marked TX-14, 15, and 16.
[16]   MR. MIMS: And I have these, too,
[17] Mr. Hilton.
[18]   MR. HILTON: Thanks a lot. In this order?
[19]   MR. MIMS: Yes.
[20] Q: (By Mr. Mims) And if you could look at 14
[21] first, and 14 shows the — the lever, I guess, in its,
[22] I'll call it, "open position."
[23] A: Okay.
[24] Q: Okay. Do you recognize that as being sort of
[25] the first position when you first install the ProLock on

                    1—09:35                    Page 23

[1]  the box?
[2]  A: Yes.
[3]  Q: Okay. Take a look at what's been marked as 15,
[4]  TX-15. And can you describe the middle position, if you
[5]  like, what's happened there where the lever's moved up
[6]  till straight up?
[7]  A: Sorry. Can you repeat the question?
[8]  Q: Yes. I mean, when the lever is at that — that
[9]  far in, can you describe what's happening, let's say,
[10] with respect to the faces of the clamping member? How's
[11] that?
[12] A: Okay. Basically it's — it's just starting to
[13] become engaged.
[14] Q: All right. And then if you look at the third
[15] picture, which is marked, I think, 16, TX-16, do you see
[16] that?
[17] A: Uh-huh. Yes.
[18] Q: That is with the clamping member all the way?
[19] A: Correct.
[20] Q: And can you describe the difference between
[21] what's seen on the first — the — from 14 to 15, maybe
[22] you can describe the whole process as to the forces that
[23] are — how the — how the lever is applying forces to
[24] clamp the box.
[25] A: Okay. On 14, this is the installation

1—09:37  Page 24

[1] position. 15, the installer is beginning to rotate the
[2] lever. In 16, the lever's been rotated fully. When the
[3] lever rotates, it bears on a face of the clamping
[4] member, okay, and urges it toward the — toward the box
[5] wall which clamps onto the — clamps onto the box.
[6]   Q: And if you can look at the clamping member,
[7] there's an upper face, if you like — maybe that's what
[8] we could call it — or a side panel where it actually is
[9] contacting. If you look at the last exhibit, number —
[10] I think it's 16?
[11]   A: Yes.
[12]   Q: If you look at the upper face of that — on the
[13] wall, do you see where it's contacting?
[14]   A: Yes.
[15]   Q: All right. What do you call that upper face?
[16] Is that what you....
[17]   A: The upper face —
[18]   Q: I'm referring to the space up —
[19]   A: To the actual box?
[20]   Q: Yes, to the actual box.
[21]   A: Okay. What do I call — I'm sorry. Repeat —
[22]   Q: Yeah.
[23]   A: Repeat your question.
[24]   Q: What do you — do you have a term for what you
[25] call that face of the —

1—09:38  Page 25

[1]   A: I just called it — I usually called it the box
[2] flange.
[3]   Q: Okay. And then there's a space below that in
[4] the picture where you see there's sort of a lower panel,
[5] if you like, that's — there's a space between it and
[6] the wall?
[7]   A: Yes.
[8]   Q: Do you see that?
[9]   A: Yes.
[10]   Q: What is the function of that lower part —
[11] portion?
[12]   A: We're still talking about the box. Correct?
[13]   Q: Yes. Well, what I'm talking about is the —
[14] where's the — I'll show you.
[15]   MR. MIMS: And maybe you can show this to
[16] the — on the video.
[17]   Q: (By Mr. Mims) I'm talking about this space
[18] right here, down here. We just talked about the front
[19] face, and then there's a lower face.
[20]   A: Okay. Okay.
[21]   Q: Let me just hand that to you.
[22]   A: So, we're talking about the ProLock and not the
[23] box?
[24]   Q: Right. We're talking about the ProLock product
[25] that — we've just talked about the upper face that

1—09:39  Page 26

[1] contacts the box.
[2]   A: Correct.
[3]   Q: There's a lower face down here where there's a
[4] space in the picture.
[5]   A: Okay. Can you point it out on a — on a — the
[6] face or space you're talking about?
[7]   Q: Yes.
[8]   A: I just want to make sure —
[9]   Q: Right. I'm talking about —
[10]   MR. MIMS: Tell me if you've got that in.
[11]   THE VIDEOGRAPHER: Yes, I do.
[12]   Q: (By Mr. Mims) I'm talking about this face down
[13] here as opposed to this face we just talked about. All
[14] right?
[15]   A: This face right here?
[16]   Q: Yes, sir.
[17]   A: Right here?
[18]   Q: Yeah, that part at the bottom.
[19]   A: This — or this face here, along here?
[20]   Q: Everything that's down there, the whole — the
[21] whole length.
[22]   A: This — this here?
[23]   Q: Yes. I'm talking about this — this face in
[24] here.
[25]   A: Everything your pen is touching —

1—09:40  Page 27

[1]   Q: Yes.
[2]   A: — right now?
[3]   Q: Yeah.
[4]   A: Okay. That — the box — this portion as
[5] you — as you — as we stated, clamps — clamps on that
[6] box flange, if you will.
[7]   Q: The upper portion?
[8]   A: Correct, the upper portion. This portion that
[9] you were — what are we calling this?
[10]   Q: Let's call it the "lower panel." How's that?
[11]   A: "Lower panel." Okay. The lower panel is the
[12] security means. I mean, that's — that's what — that's
[13] what makes the product secure.
[14]   Q: And how does it prevent — I mean, why don't
[15] you describe the security risk that you're trying to
[16] avoid?
[17]   A: We're trying to avoid the — the device from
[18] becoming removed from the box.
[19]   Q: And, so, if someone tried to force it open —
[20]   A: Someone tried to force it open — that's
[21] correct.
[22]   Q: — what would that lower panel do in that
[23] ins- — situation?
[24]   A: The lower panel — if the box was pried upon,
[25] the lower panel would — would make contact with the

Case 4:04-cv-40219-FDS   Document 96-6   Filed 12/14/2007   Page 10 of 18

JOHN STACHOWIAK
November 29, 2007
INNER-TITE CORP. v.
DEWALCH TECHNOLOGIES, INC.

---

1—09:41  Page 28

[1] underside of this — this side upper flange on the box
[2] and prevent the perpetrator from removing the ProLock.
[3]   Q: Okay. So, would the lower panel slide or would
[4] it catch on that — I guess that lower —
[5]   A: It would catch.
[6]   Q: And that was the intent of your design?
[7]   A: Correct.
[8]   (Off-the-record remarks)
[9]   (Exhibit TX-19 marked)
[10]   Q: Now, in that last photograph, the lower panel
[11] is not in contact right now?
[12]   A: That's correct.
[13]   Q: And, so, it's only when someone exerts a force
[14] that it contacts?
[15]   A: Correct.
[16]   Q: I'm going to hand you what's been marked Trial
[17] Exhibit 19.
[18]   A: Uh-huh.
[19]   MR. MIMS: Mr. Hilton?
[20]   MR. HILTON: Are we calling this TX-19?
[21]   MR. MIMS: Yes, that's what I've been
[22] calling it.
[23]   MR. HILTON: So, it's Deposition
[24] Exhibit TX-19 —
[25]   MR. MIMS: No.

---

1—09:43  Page 29

[1]   MR. HILTON: — if you've associated
[2] with —
[3]   MR. MIMS: I'm calling it TX-19 because
[4] it's a trial exhibit.
[5]   Q: (By Mr. Mims) Mr. Stachowiak, do you see where
[6] the side panel contact and the lower panel gap are shown
[7] on this photograph?
[8]   A: Yes.
[9]   Q: Does that accurately summarize what you just
[10] testified to?
[11]   A: Yes.
[12]   Q: And the side panel contact refers to the side
[13] panel actually being in contact with the utility box?
[14]   A: Correct.
[15]   MR. MIMS: Can you mark this as 20?
[16]   (Exhibit TX-20 marked)
[17]   Q: (By Mr. Mims) I'm going to hand you what's been
[18] marked as Trial Exhibit 20, TX-20; and we just mentioned
[19] the side panel contacts. Do you see the two arrows A?
[20]   A: Yes.
[21]   Q: Now, are you familiar with indicating forces or
[22] pointing out where forces are applied?
[23]   A: Yes.
[24]   Q: Would you say that the arrows A accurately
[25] reflect where the force is exerted on the utility box by

---

1—09:44  Page 30

[1] the clamping member?
[2]   A: Yes.
[3]   Q: Now, if you look in the middle, there's an
[4] arrow B. And if you recall earlier, we were talking
[5] about a first and second flange; and the second flange
[6] is — excuse me. The first flange is the one that's
[7] outside the box; and, so, the arrow B is pointing to the
[8] first flange outside the box.
[9]   A: Yes.
[10]   Q: Do you see that?
[11]   A: I do.
[12]   Q: Now, can you explain how a force is also
[13] applied by where that arrow B is to clamp the ProLock in
[14] place?
[15]   A: Yes.
[16]   MR. HILTON: Objection, vague.
[17]   Q: (By Mr. Mims) Do you understand my question?
[18]   A: Yes.
[19]   Q: Okay. Go ahead; you may answer.
[20]   A: When the lever is actuated, which urges the
[21] clamping member toward the side wall of the box or the
[22] upper flange of the box, it pulls in the first flange
[23] toward the opposite end just from a reactionary force,
[24] reactionary movement.
[25]   Q: So, you have two force vectors, if you like, on

---

1—09:45  Page 31

[1] the outside; and you have a opposite vector in the
[2] middle between those two clamping members pushing on the
[3] first flange, so to speak?
[4]   A: Well, right. But it's — the two forces are on
[5] the inside on the —
[6]   Q: Right. Yes. The inside of the box?
[7]   A: Uh-huh.
[8]   Q: So —
[9]   A: That's right.
[10]   Q: So, what you have, then, is — do you have —
[11] you — does that result in a movement of the metal wall
[12] based on those forces where it's not straight? I mean
[13] the metal wall of the box. You understand my question?
[14]   A: Can you repeat it, please?
[15]   Q: Sure. And maybe I can do it by putting one of
[16] these on, and I'll — I'm going to put in front of the
[17] camera the utility box marked TX-82 and the ProLock 1
[18] which is marked TX-84.
[19]   When this force — when this clamp is put
[20] down, do you have some deflection in this wall here
[21] based on the forces on the outside — inside the box
[22] pushing outwardly and the force on this first flange
[23] pushing inward to where this metal plate is not strictly
[24] straight because you have forces pushing here and
[25] another force pushing in?

1—09:47                                                         Page 32

[1]  A: Yes.
[2]  Q: How would you describe that — I mean, is there
[3]  a way to describe that kind of force being — it twist
[4]  the box?
[5]  A: Yes. I would say there is a torsion with some
[6]  shear included.
[7]  Q: Okay. And, so, that's a different kind — in
[8]  other words, hold — holding something in place by
[9]  putting those types of forces we just discussed results
[10] in a torsion or bending of the wall?
[11] A: Correct.
[12] Q: And that's — that is a result of your putting
[13] the forces outside of the flanges, if you like?
[14] A: That's right.
[15] Q: All right. Now, no — no one had — that you
[16] had seen in any of the previous utility box locks had
[17] applied forces in that manner, had they?
[18] A: That's right.
[19] Q: So, you came up with the idea of doing the
[20] forces that way and putting the lever on?
[21] A: That's right.
[22] Q: Now, you had seen the use of, let's say, you
[23] know, flanges on either side of the box before? In
[24] other words, people had put a flange on either side of
[25] the box before?

1—09:48                                                         Page 33

[1]  A: Yes.
[2]  Q: But they had always put their forces that held
[3]  it together sort of, so to speak, between the flanges'
[4]  width? In other words, if you look at the full width of
[5]  the flanges, whether they were putting a screw through
[6]  or counter punching, it was always in between the
[7]  flanges?
[8]  A: That's right.
[9]  Q: And you decided to take the forces outside the
[10] flanges?
[11] A: Yes.
[12] Q: Is it necessary for the lower panel in your
[13] design to clamp the side wall to prevent the ProLock
[14] from being removed? Does that make sense to you? In
[15] other words —
[16] A: If you'd be a little more specific —
[17] Q: Sure.
[18] A: — in your question.
[19] Q: Remember we talked about the lower panel that
[20] was not in contact?
[21] A: Correct.
[22] Q: Is it necessary for that lower panel to clamp
[23] to the side wall to prevent the person who was trying to
[24] break in?
[25] A: No.

1—09:49                                                         Page 34

[1]  Q: Okay. And that's because it serves to catch on
[2]  that ledge of the flange —
[3]  A: Correct.
[4]  Q: — of the wall?
[5]  A: Correct.
[6]  Q: Okay. Now, so, did you come up with the idea
[7]  of moving outside the flanges, if you like; or did you
[8]  come up with a lever first?
[9]  A: I would say simultaneously.
[10]    (Exhibit TX-13 marked)
[11] Q: Mr. Stachowiak, I'm going to hand you what's
[12] been marked TX-13 which is a photograph of the ProLock
[13] 1. And from this do you recognize this as a ProLock 1?
[14] A: Yes.
[15] Q: All right. When you — when you look at this
[16] particular picture, there is in — let me hand you
[17] another exhibit.
[18]    (Off-the-record remarks)
[19] MR. MIMS: Can you mark that as Exhibit
[20] 32, TX-32?
[21]    (Exhibit TX-32 marked)
[22] Q: (By Mr. Mims) I'm going to hand you what's been
[23] marked TX-32, and what I've handed you is a drawing from
[24] the — the Inner-Tite patent that is the subject of this
[25] lawsuit.

1—09:52                                                         Page 35

[1]  A: Okay.
[2]  Q: And if you look at — there's sort of a — I'll
[3]  call it an orange sort of color.
[4]  A: Yes.
[5]  Q: And it says the space that separates the first
[6]  flange and the second flange. And this is referring to
[7]  the space that's between the first and second flange.
[8]  A: Okay.
[9]  Q: Now, if you go back to the exhibit I just gave
[10] you, which was the photograph of the ProLock 2
[11] A: TX-13?
[12] Q: Yes. And if you look at it from this angle,
[13] does the clamping member enter the space that's between
[14] the first and second flange of the ProLock?
[15] A: No, it does not.
[16] Q: Now —
[17] MR. DEWALCH: That's ProLock 1, I think.
[18] Doesn't matter but —
[19] MR. MIMS: Let me — now 2 — oh, yes.
[20] Let the record reflect I was talking about ProLock 1.
[21] Q: (By Mr. Mims) I'm going to hand you now, after
[22] the court reporter marks it, several exhibits regarding
[23] ProLock 2.
[24]    (Exhibits TX-22, TX-23, and TX-24 marked)
[25] Q: I'm going to now hand you what's been marked

---

1—09:54    Page 36

[1] TX-22 to 24.
[2]    MR. MIMS: Mr. Hilton, here is TX-22, 23,
[3] and 24.
[4]    MR. HILTON: Thanks.
[5]    Q: (By Mr. Mims) If you could spread out 22, 23,
[6] and 24; and we went through a similar exercise with
[7] ProLock 1. But could you briefly describe what's shown
[8] by the series of the three drawings with regard to
[9] ProLock 2 here?
[10]    A: Sure.
[11]    Q: Starting with 22.
[12]    A: In 22 the — it is in the — as we called it
[13] before, the "open" — the lever is in its "open"
[14] position, and the assembly is being inserted onto the
[15] box wall. In TX-23 the lever is — the installer is
[16] beginning to actuate the lever, and 24 it is in its
[17] fully installed position.
[18]    Q: All right.
[19]    (Exhibit TX-26 marked)
[20]    Q: I'm going to hand you what's been marked as
[21] T-26, and can you describe how the forces shown on T-26
[22] clamp the ProLock 2 device to a utility box and perhaps
[23] describe the forces while you're doing that?
[24]    A: Yes. As the lever is — this lever is
[25] actuated, it makes contact with the clamping member,

1—09:57    Page 37

[1] which pulls the first flange toward the upper portion of
[2] the box side wall, resulting in the clamping member and
[3] the first flange trapping of the box wall.
[4]    (Exhibit TX-21 marked)
[5]    Q: So, the similar sort of forces that we
[6] described — that you described in the ProLock 1 work
[7] here for the ProLock 2?
[8]    A: Correct.
[9]    Q: I'm going to hand you now what's been marked
[10] TX-21.
[11]    A: Uh-huh.
[12]    MR. MIMS: Mr. Hilton, here's TX-21.
[13]    Q: (By Mr. Mims) And referring again to —
[14] referring — referring again to — strike that.
[15]    Referring again to TX-32, which is the
[16] drawing from the patent in suit, do you have that in
[17] front of you?
[18]    A: I do.
[19]    Q: And looking at Exhibit 21, does the clamping
[20] member on the ProLock 2 ever enter the space between the
[21] first and second flanges?
[22]    MR. HILTON: Objection, vague.
[23]    Q: (By Mr. Mims) And do you understand my
[24] question?
[25]    A: Yes.

1—09:59    Page 38

[1]    Q: You may answer.
[2]    A: No, it does not.
[3]    Q: Now, do you recall when you first heard about
[4] the Inner-Tite patent that's involved in this
[5] litigation?
[6]    A: As a date?
[7]    Q: Yeah. I mean just generally the situation, how
[8] you came to learn about it.
[9]    A: I believe it was from one of the salesmen at
[10] DeWalch.
[11]    Q: Did you learn about it — so, you learned about
[12] it before the litigation was filed?
[13]    A: That's right.
[14]    Q: Okay. Let me hand you —
[15]    MR. MIMS: Mark this 1.
[16]    (Exhibit TX-1 marked)
[17]    Q: (By Mr. Mims) Let me hand you what's been
[18] marked TX-1 which is a copy of the patent in suit.
[19]    When was the first time you ever actually
[20] saw this patent? Was it when the salesman told you
[21] about it or later?
[22]    A: Later.
[23]    Q: And when was that time?
[24]    A: I don't recall the exact time.
[25]    Q: Do you remember the circumstances of how you

1—10:00    Page 39

[1] first saw the patent?
[2]    A: Yes. I was aware that there was a patent, and
[3] I logged onto the U.S.P.T.O. web site and printed it out
[4] and looked at it.
[5]    Q: When you first read the — the claims of the
[6] patent —
[7]    A: Yes.
[8]    Q: — did you notice any difference that appeared
[9] to you that made your design different than what was in
[10] the patent?
[11]    A: Yes.
[12]    Q: What was that?
[13]    A: I noticed in the Claim No. — No. 1 — I'm
[14] sorry.
[15]    Q: Yes.
[16]    A: I need a second. I just haven't looked at this
[17] thing in a while.
[18]    Q: That's all right.
[19]    A: "A jaw mechanically inter-engaged with and
[20] carried by said bracket for movement between first and
[21] second flanges."
[22]    Q: And what particular part of that did you notice
[23] was different?
[24]    A: That our device, the ProLock, did not enter
[25] that space.

1—10:02                                                      Page 40

[1]  Q: Okay. Didn't go between —
[2]  A: The — the clamping device.
[3]  Q: Now, I know you're not a patent lawyer; but we
[4] likely have a court who's told us what this limitation
[5] means.
[6]     (Off-the-record sotto voce remarks)
[7]     (Exhibit TX-85 marked)
[8]  Q: I'm going to hand you what's been marked TX-85.
[9]  MR. MIMS: And, Mr. Hilton, here's a
[10] TX-85.
[11] Q: (By Mr. Mims) I want to focus you on page 10 of
[12] this document.
[13] A: Okay.
[14] Q: And if you could look at the bottom paragraph,
[15] the Court has construed what that language means; and
[16] I'll just read it aloud just while you can read along
[17] and digest this.
[18] He says: Thus, the language issue in this
[19] case, quote, a jaw mechanically inter-engaged with and
[20] carried by said bracket for movement between said first
[21] and second flanges, unquote, is properly construed as
[22] follows.
[23]    And he has two items: Either of the two
[24] mechanical parts that open and close to grip or crush
[25] something as in a monkey raw — wrench or vice, and

1—10:03                                                      Page 41

[1] then, 2, mechanically inter-engage with and carry by
[2] said bracket, and then, 3, for movement in or through
[3] the space that separates the first and second flanges,
[4] unquote.
[5]     Now, you read the word "between" but you
[6] didn't know — the Court hadn't told you what it meant.
[7] But looking at Item 3 where he has told us that
[8] "between" means for movement in or through the space
[9] that separates the first and second flanges, and now
[10] looking at your design, does the clamping member of the
[11] ProLock 1 and 2 move in or through the space that
[12] separates the first and second flanges?
[13] A: No, it does not.
[14] Q: Now, can you look at the date on that patent
[15] that's been marked as TX-1?
[16] A: Yes.
[17] Q: The day it was issued...?
[18] A: The date of patent, July 20th, 2004.
[19] MR. MIMS: Can you mark this as TX-A?
[20]    (Exhibit TX-A marked)
[21] Q: (By Mr. Mims) All right. I'm going to hand you
[22] now what's been marked TX-A —
[23] MR. HILTON: "TX-A," is that what you
[24] said?
[25] MR. MIMS: "A" as in apple.

1—10:06                                                      Page 42

[1]  MR. HILTON: Okay.
[2]  Q: (By Mr. Mims) — and ask you if you can
[3] identify what TX-A is?
[4]  A: This is a United States patent.
[5]  Q: Can you turn to page 2 of the document? And
[6] now can you identify which patent it is?
[7]  A: This is the patent for the ProLock.
[8]  Q: All right. And you'll notice there's a filing
[9] date that's given on the left-hand column in No. 22.
[10] A: Yes.
[11] Q: And what is that date?
[12] A: April 13th, 2004.
[13] Q: And that date, of course, is earlier than the
[14] date that the Inner-Tite patent was issued. Correct?
[15] A: That's correct.
[16] Q: What's the date on that patent, again?
[17] A: July 20th, 2004.
[18] Q: So, when you designed the ProLock patent —
[19] excuse me — the ProLock product, you did not have a
[20] copy of the Inner-Tite patent. Correct?
[21] A: No, I did not.
[22] Q: Were you — did you have access to an
[23] Inner-Tite product that's reflected in that patent?
[24] A: Yes, I did.
[25]    (Exhibit TX-86 marked)

1—10:07                                                      Page 43

[1]  Q: I'm going to hand you what's been marked as
[2] TX-86. And can you identify what TX-86 is?
[3]  A: This is Inner-Tite's product.
[4]  Q: Do you know what it was called?
[5]  A: The Jiffy Lock.
[6]  Q: All right. Can you just hold it up so the —
[7] for the camera so the record will reflect what it looks
[8] like?
[9]  A: (Complies).
[10] MR. MIMS: I can have it back now.
[11] Q: (By Mr. Mims) But the point is — of my
[12] question is that when you — when you designed your
[13] product, you did not have a copy of the Inner-Tite
[14] patent that had this claim limitation about "between"?
[15] A: That's correct.
[16] Q: Now, looking at the face of your patent, which
[17] is the TX Exhibit A, if you look at the right-hand
[18] column, there's a list of patents at the top. Do you
[19] see that?
[20] A: I do.
[21] Q: And you see — going up from the bottom five
[22] up, do you see a Rafferty number?
[23] A: I do.
[24] Q: Can you read that number into the record?
[25] A: Which number are you referring to?

1—10:08     Page 44

[1]  Q: The 6763.
[2]  A: 6763691.
[3]  Q: And is that, in fact, the same patent that's
[4]  marked as TX-1?
[5]  A: Yes, it is.
[6]     (Exhibit TX-B marked)
[7]  Q: Mr. Stachowiak, I'm going to hand you what's
[8]  been marked TX-B, as in "boy."
[9]  MR. MIMS: Mr. Hilton.
[10] Q: (By Mr. Mims) And my first question to you is:
[11] This is — actually, this is a file history from your
[12] patent.
[13] A: Okay.
[14] Q: Have you ever seen the entire file history of
[15] your patent?
[16] A: No, I have not.
[17] Q: All right. And, so, just so it's clear,
[18] you're — you are not the patent attorney that filed
[19] this patent?
[20] A: That's right.
[21]    (Exhibits TX-B-1 and TX-B-2 marked)
[22] Q: Let me hand you two additional exhibits. First
[23] I'm going to hand your — hand you TX-B-1 and TX-B-2.
[24] A: Okay.
[25] Q: Now, looking at TX-B-1, if you could turn to

1—10:10     Page 45

[1]  page 2 of TX-B-1, can you recognize your signature?
[2]  A: Yes.
[3]  Q: And that reflects that you signed it as the
[4]  sole inventor on April 8th, '04?
[5]  A: That's right.
[6]  Q: And the second exhibit, TX-B....
[7]  A: TX-B-2?
[8]  Q: Yes, sir. Do you — can you look on that page
[9]  at the bottom and see your name and signature?
[10] A: Yes, I do.
[11] Q: Where you granted the power of attorney to
[12] Arnold and Ferrera?
[13] A: Yes.
[14] Q: Now, you obviously reviewed the patent
[15] application and then signed this declaration.
[16] A: Yes.
[17] Q: Was that your primary involvement in this
[18] procedure?
[19] A: Sorry. Can you —
[20] Q: The patent — the patent prosecution, was that
[21] your primary involvement?
[22] A: No.
[23] Q: What else was your involvement?
[24] A: I'm sorry; I'm a little confused by the
[25] question.

1—10:11     Page 46

[1]  Q: Okay. Let me back up. These documents reflect
[2]  that you signed the papers when they filed the patent
[3]  application.
[4]  A: (Witness nods head).
[5]  Q: And, so, before that, I assume you reviewed the
[6]  patent application.
[7]  A: I did.
[8]  Q: After you were involved in the initial review,
[9]  did you get involved in preparing responses?
[10] A: No.
[11] Q: That was handled by the patent attorneys?
[12] A: Correct.
[13] MR. MIMS: All right. Can we take a short
[14] break? I think I'm finished, but I just wanted to check
[15] with co-counsel.
[16] MR. HILTON: Oh, okay. Great.
[17] MR. MIMS: Let's go off the record.
[18] THE VIDEOGRAPHER: 10:11, we're off
[19] record.
[20]    (Recess taken)
[21] THE VIDEOGRAPHER: 10:24, we're back on
[22] record.
[23] Q: (By Mr. Mims) All right. We have now focused
[24] the camera on the side of the ProLock 1, installed on
[25] utility box TX-82. And I'm going to point to the

1—10:25     Page 47

[1]  uppermost side panel right here; and then there's a
[2]  lower panel, as well. Do you remember our testimony
[3]  about that?
[4]  A: I do.
[5]  Q: Now, focusing on the upper panel of that
[6]  clamping member that hits the face of the inside of the
[7]  box —
[8]  A: Yes.
[9]  Q: — what is the function of that — of that
[10] side — upper side panel?
[11] A: To make contact with the upper portion of the
[12] wall.
[13] Q: And does that clamp the product in place — the
[14] forces help clamp the product in place?
[15] A: Yeah, it secures the — it secures the product
[16] in place, yeah.
[17] Q: All right. There's a lower panel, as well; and
[18] we talked earlier about security and all of that. And
[19] that's the function of it. Correct?
[20] A: Correct.
[21] Q: If you — if someone were to pry — try to pry
[22] the ProLock 1 off, is it correct to describe it that
[23] that lower panel would then abut the wall and stop
[24] somebody from breaking in?
[25] A: Yes, it would prevent the — the ProLock from

1—10:26     Page 48

[1] being removed. That's right.
[2]    Q: And, so, the lower panel that we talked about
[3] doesn't serve the clamping function but more of a
[4] security function?
[5]    A: Correct.
[6]    Q: All right. Would your testimony be the same
[7] for ProLock 2 in terms of the side panels serving a
[8] clamping function?
[9]    A: Yes.
[10]    Q: And — and the lower portion — the lower panel
[11] would also still serve a security function?
[12]    A: Well, describe what you're talk — referring to
[13] as a panel on the — on this second ProLock.
[14]    Q: Okay. I'm referring to this — everything from
[15] here all the way out.
[16]    A: No, that does not serve —
[17]    Q: Which part does?
[18]    A: These —
[19]    THE VIDEOGRAPHER: Gentlemen, can you
[20] raise it up a little bit? Thank you.
[21]    A: These members here.
[22]    Q: (By Mr. Mims) Yes.
[23]    A: Not this.
[24]    Q: Right. Okay.
[25]    A: On this design.

1—10:27     Page 49

[1]    Q: Yeah. On the secondary tabs?
[2]    A: Correct.
[3]    Q: Okay. All right. One last question: Do you
[4] have an opinion as to whether the ProLock 1 and ProLock
[5] 2 are a better product than the Jiffy Lock that was
[6] marked as TX-86?
[7]    MR. HILTON: Objection.
[8]    Q: (By Mr. Mims) You can answer. Do you have an
[9] opinion?
[10]    A: Yes, I have an opinion.
[11]    Q: What's your opinion?
[12]    A: I —
[13]    MR. HILTON: Objection.
[14]    Q: (By Mr. Mims) Go ahead. You may answer the
[15] question.
[16]    A: I believe that the ProLock is a — is a better
[17] product.
[18]    Q: And why do you believe it's a better product?
[19]    MR. HILTON: Objection.
[20]    A: Because it is a full-proof, as you will — if
[21] you will, design. Once it's clamped, it's clamped. I
[22] mean, there's no in between.
[23]    Q: (By Mr. Mims) Okay. Anything else that
[24] features about the ProLock versus Jiffy Lock that you
[25] think distinguish it as an improvement?

1—10:28     Page 50

[1]    MR. HILTON: Objection.
[2]    A: I believe it's more secure. I don't know how
[3] detailed you would like me to get, but
[4]    MR. MIMS: Okay. Well, with that, I'll
[5] pass the witness.
[6]    MR. HILTON: Okay.
[7]              EXAMINATION
[8]              BY MR. HILTON:
[9]    Q: Do you recall the season in 2006 when you left
[10] DeWalch?
[11]    A: I believe it was....
[12]    Q: Or March, if you can — or the month, I should
[13] say, if you can recall.
[14]    A: — summer. It was early 2006, July or August,
[15] somewhere around there.
[16]    MR. HILTON: I have some exhibits, also.
[17] I'll first ask that this be marked as whatever the
[18] ne- — we might as well go consecutive with the numbers,
[19] from wherever Peter left off.
[20]    Peter, this is a — actually, let me see
[21] that copy. I need that copy. I can give you one of
[22] these instead. You wouldn't want my copy.
[23]    What's our next number?
[24]    MR. MIMS: Eighty-seven.
[25]    MR. HILTON: Okay. Thanks.

1—10:29     Page 51

[1]    THE REPORTER: Is it TX-87?
[2]    MR. HILTON: And this is for you, Peter.
[3] Yes, we can do TX-87. That's fine.
[4]    THE REPORTER: Do you want me to hand it
[5] to the witness?
[6]    MR. HILTON: Yes, please.
[7]    (Exhibit TX-87 marked)
[8]    Q: (By Mr. Hilton) Mr. Stachowiak, have you ever
[9] seen this document before?
[10]    A: No.
[11]    Q: On page 3 there's a photograph that I believe
[12] you saw a copy of this morning.
[13]    A: Okay.
[14]    Q: You see that?
[15]    A: I see it.
[16]    Q: We could reference the exhibit, too, actually.
[17] It was TX-20, if I'm not mistaken.
[18]    I'm going to read two sentences from the
[19] text that appears under the paragraph.
[20]    A: Okay.
[21]    Q: This is a declaration that was filed by Binz
[22] DeWalch in this case. The two sentences I'm going to
[23] read are, "The front edges of the two side panels acting
[24] in concert with the pressure of the first flange on the
[25] exterior of the side wall of the utility box place the

                    1—10:31                    Page 52

[1] side wall of the utility box in sheer and bending,
[2] thereby clamping the ProLock products in place upon the
[3] utility box.
[4]     "These forces are indicated by the green
[5] arrows in the photographs above and below" — the next
[6] page has one for ProLock 2 — "installed" — "of the
[7] installed ProLock products."
[8]     Do you see the green arrows?
[9]     A: I do.
[10]    Q: I believe you testified this morning that these
[11] show, with arrows marked A, two vector forces on one
[12] side and, with arrows marked — an arrow marked B, a
[13] vector force on the other side. Is that correct?
[14]    A: Yes.
[15]    Q: Are point forces being applied to the wall of
[16] the box — the wall of the box? Do you know what I mean
[17] by a point force?
[18]    A: Yeah, can you define point force?
[19]    Q: A force that is not spread over an area but is
[20] concentrated in a point.
[21]    A: No, that's not a point force.
[22]    Q: There are no point forces being applied to the
[23] box that you can discern from this clamp?
[24]    A: No. In my opinion, they're area — everything
[25] is in area — there's an area involved, not a point.

                    1—10:32                    Page 53

[1]     Q: Can you describe the area — can you describe
[2] the area associated with the — I need names for these
[3] things. Let me back — start over.
[4]     Let's call side panels the portion that
[5] is — is on the side here (indicates). Each of these is
[6] side panels. Actually — yeah, there's a picture there.
[7] Is that okay? Do you understand —
[8]     A: Sure.
[9]     Q: — what I mean by "side panels"?
[10]    A: Sure. Uh-huh.
[11]    Q: The part that has an edge that contacts the
[12] wall of the box?
[13]    A: Yes.
[14]    Q: Can you describe for me the area of that edge
[15] of the side panel that would apply force to the box? Is
[16] it — first, is it a point force?
[17]    A: It is not a point force as you define it.
[18]    Q: How would you describe the area of that side
[19] edge of the side panel that applies force to the box?
[20]    A: Okay. There is a thickness to the wall, okay;
[21] and there's a height on which the contact length from
[22] the clamping member contacts the box, which is an area.
[23]    Q: Okay. With regard to the force shown at —
[24] indicated as B —
[25]    A: Yes.

                    1—10:33                    Page 54

[1]     Q: — from the outside, I believe you testified
[2] that you would not characterize that as a point force
[3] involved in clamping the box.
[4]     A: B would not be a point force.
[5]     Q: How would you — how would you describe the
[6] force applied by the first flange, which is the flange
[7] outside the box? How would you describe that force
[8] applied by that first flange in the clamping process?
[9]     A: Because the — the lever is connected to the —
[10] I'm sorry. I want to find my diagram.
[11]    Q: Take your time.
[12]    A: Because the lever is connected to the — I
[13] guess we can call this the main bracket.
[14]    Q: Bracket's fine. Sure.
[15]    A: Okay. As the lever is actuated and makes
[16] contact with the clamping member, it pulls the main
[17] bracket toward the lever; and in turn the lever pushes
[18] the clamping member toward the first flange, okay —
[19]    Q: So —
[20]    A: — which — which imparts a force equal to the
[21] exerting force of a — both A arrows.
[22]    Q: What part of the first flange exerts that
[23] force?
[24]    A: The inside portion makes contact with the box
[25] wall.

                    1—10:35                    Page 55

[1]     Q: All of the inside portion that makes contact
[2] with the wall?
[3]     A: Can you repeat your question?
[4]     Q: My question was: What part of the first flange
[5] provides that force that results in the clamping?
[6]     A: The inside. It's not shown here in the — in
[7] your diagram and I cannot see it in this picture, but
[8] it's the inside face.
[9]     Q: Okay. Thank you.
[10]    Are you familiar with a force diagram,
[11] about vector di- — force vector diagram?
[12]    A: I think so.
[13]    Q: If I — if I roughly draw a wall of a meter
[14] box looking down on it, this would be a view — I'll try
[15] not to become untethered — looking straight down on
[16] this edge —
[17]    A: Okay.
[18]    Q: — of the meter box.
[19]    Could you diagrammatically for me draw the
[20] forces that would be applied by the side panels and the
[21] forces that would be applied by the — by the first
[22] flange, both on that — for one product on that line?
[23]    A: Uh-huh. Sure.
[24]    Q: Thank you.
[25]    Okay. Now —

1—10:37  Page 56

[1] MR. MIMS: Can I have a — just have a
[2] chance to look at the exhibit, as well? I just can't
[3] see from there.
[4] MR. HILTON: Sure. Sure.
[5] MR. MIMS: Okay. Thank you.
[6] Q: (By Mr. Hilton) Could you label for me which of
[7] those forces would be associated with A and which would
[8] be associated with B with respect to the photograph that
[9] you see in the — in the declaration that's been entered
[10] as Exhibit....
[11] MR. HILTON: What is the declaration?
[12] THE REPORTER: I don't have a list of the
[13] exhibits.
[14] MR. HILTON: The last one entered. Sorry.
[15] THE REPORTER: The last one he entered?
[16] MR. HILTON: I entered.
[17] MR. MIMS: This is marked 87.
[18] MR. HILTON: Eighty-seven? Thank you.
[19] Q: (By Mr. Hilton) So, this is looking down on a
[20] product that's on the wall; and as I understand, A shows
[21] the forces that would be applied by the side panels and
[22] B shows the force that would be applied by the first
[23] flange. Is that correct?
[24] A: That's right.
[25] Q: Thank you.

1—10:39  Page 57

[1] MR. HILTON: Can we mark this as the next
[2] exhibit, please? Eighty-eight, yes.
[3]     (Exhibit TX-88 marked)
[4] Q: (By Mr. Hilton) Have you ever seen a ProLock
[5] product that shears a wall when it's clamped onto the
[6] wall of the meter box?
[7] A: Have I ever seen — I'm sorry. Can you —
[8] Q: Have you ever seen a ProLock product that
[9] shears a meter box wall when it is clamped onto the
[10] wall?
[11] MR. MIMS: Objection, vague.
[12] Q: (By Mr. Hilton) Do you — do you understand the
[13] question?
[14] A: No. Can you be a little more specific with the
[15] word "shear"?
[16] Q: To break, to separate —
[17] A: Have I ever seen —
[18] Q: To separate.
[19] A: Have I ever seen one shear as in — completely
[20] shear in half?
[21] Q: Right, and separates.
[22] A: No, I have not.
[23] Q: Have you ever tested whether or not any of the
[24] ProLock products shear a wall when they're clamped on
[25] the wall?

1—10:40  Page 58

[1] A: Shear in your definition as far as break, no, I
[2] have not.
[3] Q: Have you ever test — tested or are you aware
[4] of any tests regarding whether or not any of the ProLock
[5] products apply shearing forces to a wall with any
[6] testing?
[7] A: With any testing? Can you define what testing
[8] is? Give me an example of testing. I'm not sure what
[9] testing —
[10] Q: Any — any investigation that would help your
[11] understanding of whether or not the — any ProLock
[12] products apply shear forces, other than referencing
[13] drawings and doing analysis on drawings? Any physical
[14] testing?
[15] MR. MIMS: Objection, vague.
[16] A: The physical — I mean, can you define more
[17] physical —
[18] Q: (By Mr. Hilton) I'll try a different way.
[19] A: I'm not sure what test you're looking for.
[20] Q: Have you ever tried to measure any extent of
[21] any shear forces applied by a ProLock product?
[22] A: No.
[23] Q: Are you aware of anyone ever having — are you
[24] aware of anyone that has attempted to measure whether
[25] shear forces are applied to a wall of a meter box by a

1—10:42  Page 59

[1] ProLock product?
[2] A: I'm not aware of anybody attempting to measure
[3] that.
[4] Q: Have you ever tested — are you aware of any
[5] measurements of any bending resulting in a wall of the
[6] ProLock — of a meter box by having a ProLock product
[7] attached to it?
[8] A: Of any measurements. Physical measurements?
[9] Q: Right. Right.
[10] A: Am I aware — I'm sorry. Repeat the question.
[11] Q: That's fine. I'm happy to. Are you aware
[12] of — of — that's different.
[13]     Have you ever tried to measure any actual
[14] bending of a meter box wall when a ProLock product was
[15] attached to it?
[16] A: Yes.
[17] Q: Can you explain how you tried to measure that?
[18] A: I tried to — once the ProLock was installed, I
[19] tried to measure it with calipers and other measurement
[20] instruments to determine what the deflection was.
[21] Q: What deflection were you — how were you trying
[22] to measure any deflection?
[23] A: I was trying to get a measurement on this side
[24] with respect to the space between (indicates).
[25] Q: What space between do you mean?

1—10:44      Page 60

[1] A: The space —
[2] Q: I'm sorry; I'm trying to understand.
[3] A: — on either side of this — on this side and
[4] this side in this region. Of course, we can't — we
[5] can't see, but I could — it was more of a visual than
[6] anything.
[7] Q: You were trying to visually inspect to see
[8] whether there was bending? Is that correct?
[9] A: It was more a visual — yes, more visual, with
[10] calipers, visual, you know, looking at the dial, see if
[11] I could get in there and measure it.
[12] Q: Okay. Maybe it would help — where did you
[13] place the calipers? That might help me.
[14] A: I tried to place them on the outside and
[15] protrude them on the inside there, through that —
[16] through that small gap.
[17] Q: The gap between the face of the side panel and
[18] the first flange?
[19] A: Uh-huh.
[20] Q: And did you discern any bending with your
[21] measurements?
[22] A: I don't recall what my findings were. I
[23] attempted to measure it, yes.
[24] Q: You don't recall what you found?
[25] A: No, I don't — I don't recall.

1—10:45      Page 61

[1] Q: Are you aware of anyone else ever trying to do
[2] any testing of whether or not a side wall of a meter box
[3] bends when a ProLock product is placed on it?
[4] A: No.
[5] Q: You're not aware of it?
[6] Do you agree, then, that — do you agree
[7] that the arrows shown in — reference TX-20. Let's pull
[8] out TX-20 and TX-26.
[9] MR. MIMS: Can you describe those,
[10] Mr. Hilton —
[11] MR. HILTON: Sure.
[12] MR. MIMS: — just so I can find them?
[13] MR. HILTON: They're the photographs with
[14] the green arrows.
[15] Q: (By Mr. Hilton) First with regard to TX-20,
[16] let's look at 20 first.
[17] A: TX-20. Okay.
[18] Q: Do you believe that the arrows indicated in
[19] green accurately reflect the forces being applied to the
[20] meter box wall?
[21] A: Repeat the question, please.
[22] Q: Do you believe that the arrows indicated in
[23] green accurately reflect the forces being applied to the
[24] meter box wall?
[25] MR. MIMS: Objection, vague, no

1—10:48      Page 62

[1] foundation.
[2] A: I agree that the first arrow, A and B, it's —
[3] the arrow was shown — the second arrow was shown here,
[4] okay, on this portion of the — but it — I'm assuming
[5] that it should be in the same location as the first
[6] arrow, A. And with that understanding, yes.
[7] Q: (By Mr. Hilton) If — if those arrows
[8] accurately indicate the forces being applied to the
[9] meter box wall, with that modification you mentioned,
[10] bringing the second arrow A closer to the wall, how is
[11] that consistent with the force diagram that you drew as
[12] TX-88 which shows not point forces but forces spread
[13] along an area?
[14] A: I'm assuming that these are very generic
[15] representation of the force, okay, and that this B is
[16] assumed to be translated over that entire surface.
[17] Q: So, they — they do not show the actual forces
[18] being applied. You interpret that to be sort of a
[19] generic representation?
[20] A: I do.
[21] Q: Is that what you call it?
[22] A: I do, yes.
[23] Q: Is there any compression that occurs on that
[24] meter box wall?
[25] A: No.

1—10:50      Page 63

[1] Q: There isn't? There are no compressive forces
[2] at play?
[3] A: Can you define compression?
[4] Q: Compression?
[5] A: Compression — a compressive force.
[6] Q: Compressive force is where you have a force and
[7] some opposing force that causes something in the middle
[8] to — and I'll say be compressed, but to undergo a force
[9] that would cause it to want to be reduced in size.
[10] MR. MIMS: Objection, vague and
[11] mischaracterizes the force.
[12] Q: (By Mr. Hilton) Do you understand the question?
[13] A: Can you repeat it? I just want to hear your —
[14] your definition again.
[15] Q: I'll try to ask differently. Are the — do you
[16] believe there are any net compressive forces going —
[17] involved in the clamping of the ProLock product and the
[18] meter box wall?
[19] MR. MIMS: Objection, vague.
[20] A: Can you define net compressive force?
[21] Q: (By Mr. Hilton) A net compressive force? Sure.
[22] Where at least two forces are acting on an object such
[23] that there is some opposition between the forces to
[24] cause the object to be compressed.
[25] MR. MIMS: Objection, vague.