IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INNER-TITE CORPORATION,            §
                                   §
            Plaintiff              §
                                   §
v.                                 §        Civil Action No.
                                   §        04-40219-FDS
DEWALCH TECHNOLOGIES, INC.,        §
                                   §
            Defendant              §
                                   §

**DEFENDANT DEWALCH'S PROPOSED
<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

**PROPOSED FINDINGS OF FACT**

**I.    Summary of the Case**

1.    Inner-Tite Corp. alleges that its competitor DeWalch Technologies, Inc., infringes U.S. Patent No. 6, 763,691 (the "'691 patent") by its sale of two products, the ProLock 1 product and the ProLock 2 product.  The parties have agreed that infringement turns on a single question, namely whether the ProLock products meet the limitation requiring "a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges" as claimed in claim 1 of the '691 patent.

2.    DeWalch's ProLock products do not infringe the claim limitation  requiring "a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges" as claimed in claim 1 of the '691 patent, either literally or under the doctrine of equivalents.  On August 31, 2007, this Court issued an order construing the disputed claim limitation as follows:  "(1) either of two mechanical parts that open and close to grip or crush something, as in a monkey wrench or vise, (2) mechanically interengaged with and carried by

said bracket (3) for movement in or through the space that separates the first and second

flanges." TX 85, at p. 10.  The first and third components of this Court's construction are not

met by the ProLock products.  Hence, the ProLock products do not literally infringe the claim.

3.     The ProLock products do not lock onto meter boxes like a monkey wrench or a

vise, each of which operate through a compressive (or crushing) force.  Rather, the products

operate through a different type of force, called shear (or bending).

4.     The ProLock products do not move in or through the space that separates the first

and second flanges.  The clamping member of the ProLock products surrounds the second flange

and moves outside of and around the space that separates the first and second flanges, thereby

applying a force that is offset from the first flange and causing the wall of the meter box to bend.

5.     Inner-Tite's argument that the pins protruding from the second flange are part of

the second flange ignore the claim requirement of "first and second mutually spaced flanges

integrally joined by an intermediate web" as well as the different function of these pins.  These

pins are outside the width of the first flange and thus are not "mutually spaced" to any

corresponding part of the first flange.  In addition, the pins – like the web in the bracket – serve

an entirely different function than the flange:  allowing the clamping member to rotate outside of

and around the second flange and thereby apply forces that are not opposite to the first flange,

but rather offset from the first flange.

6.     The ProLock products also do not infringe under the doctrine of equivalents.  The

ProLock products are substantially different from the claimed product because of the different

forces at play in the DeWalch clamping mechanism.  The bending force which serves the

clamping function in the ProLock products allows the ProLock products to clamp in a different

way than the compressive forces of the '691 patent that are required by the Court's claim construction of the term "jaw."

## II.   Background

### A.   The '691 Patent

7.     The '691 patent that issued to Inner-Tite is extremely narrow.  In the first instance, the Examiner made it clear that Inner-Tite could not pursue claim coverage on all of the embodiments disclosed in the application.  In particular, the Examiner believed that the embodiments shown in Figures 5A, 5B, 6A, and 6B of the application were directed to different inventions than the embodiment shown in Figures 2 - 4.   TX 50, at IT00066.  Accordingly, the examiner applied a "restriction requirement" to the application, requiring Inner-Tite to select which embodiments it wanted to pursue in the application.  *Id.*  Inner-Tite opted to pursue coverage of the embodiments shown in Figures 2 - 4.  *Id.*, at 00070.  Thus, the Patent Office does not view the issued claims as being directed to the embodiments shown in Figures 5A, 5B, 6A, or 6B.

8.     Moreover, the '691 patent disclosure itself recognizes that most of the components of the device were known in the prior art.  For example, in the "Description of the Prior Art" portion of the patent, several prior art meter-box locking devices are identified.  TX 1, at col. 1:13-25.  The prior art Michelman product (U.S. Patent No. 4,120,182),  TX 55, which is shown below, is exemplary:



9.    The "Description of the Prior Art" portion of the patent also explains that meter locking devices with mounting brackets and retaining screws were also known in the art.   TX 1, at col. 1:26-39.  Such mounting brackets avoided the necessity of piercing the meter-box side walls.  *Id.*, at col.1:27-33.  The prior art Nielsen product (U.S. Patent No. 4,080,811),  TX  51, which is shown below, is exemplary.  For ease of reference, the mounting bracket is shown in yellow and the retaining screw is shown in blue.  In the words of the '691 patent, the mounting bracket has a first flange (38), a second flange (23), a third flange (33), and a retaining screw (25):



10. The "Summary of the Invention Section" of the '691 patent explains that Inner-Tite's purported contribution to the art is nothing more than a "jaw [that] is mechanically interengaged with and carried by the mounting bracket for movement between the first and second flanges" of the mounting bracket. TX 1, at col. 1:60-62. Figures 2 and 4 of the '691 patent are shown below with the "jaw" shown in red between the first (30, 30a) and second (32, 32a) flanges of the bracket:



11. The only claim at issue in this case is claim 1 of the '691 patent. It recites:

1. For use in combination with a utility box having a bottom, a side wall, and a cover which may be opened to gain access to the interior of the box, and which when closed, overlaps an upper edge of the side wall, a lock assembly for maintaining the cover in its closed position, said lock assembly comprising:

a bracket having first and second mutually spaced flanges integrally joined by an intermediate web;

*a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges*, said

6

> bracket being configured for removable mounting on said side
> wall, with said intermediate web interposed between said cover
> and the upper edge of said side wall, and with said first flange and
> said jaw respectively located adjacent exterior and interior surfaces
> of said side wall;
>
> force exerting means for urging said jaw towards said first flange
> to thereby clamp said side wall therebetween;
>
> a cap having a lip configured and dimensioned to overlap said
> cover; and interlocking means for securing said cap to said bracket.

*Id.* at col. 4:24-44 (emphasis added).

12.    The '691 patent specification indicates that the "jaw" limitation (bolded above) is the purported contribution that the '691 patent made to the art. However, the Patent Examiner did not believe that inclusion of a jaw between the flanges made the invention patentable over the Neilsen patent depicted above. Particularly, the Patent Examiner rejected the claimed invention three times, each time asserting that the claimed invention was obvious in view of the Neilson patent in combination with other prior-art locking devices. In total, the Patent Examiner cited five different prior art locking devices variously combined with the teachings of the Neilson patent as making the claimed invention obvious. Inner-Tite tried to convince the Examiner that the claimed invention was not obvious, arguing that the prior art components "would not serve as a jaw mounted for <u>movement between</u> the flanges." TX 50, at IT00058. (emphasis in original).

13.    This argument originally did not convince the Examiner. The Examiner maintained the rejection of the claims as obvious over the prior art. TX 50, at IT00085-91. Inner-Tite ultimately appealed the rejection to the Board of Patent Appeals and Interferences at the U.S. Patent & Trademark Office (the "Board"). *Id.*, at IT00095-98. Again, in its Appeal Brief, Inner-Tite argued that the prior art "lacks a jaw that is *moveable between* the bracket flanges 29 [sic-30], 32." *Id.*, at 105 (emphasis added).

7

14.     In its "Decision on Appeal," the Board agreed with the argument that Inner-Tite made in its Appeal Brief that the prior art did not show a bracket mounted for movement between the flanges. *Id.*, at 00126. The application was returned to the Examiner, and the Examiner issued the patent as the Examiner was obliged to do. In the "Reasons for Allowance," the Examiner stated: "The prior art of record fails to disclose that the lock assembly further comprises a jaw interengaged to the bracket in such a way that the jaw *moves between* first and second flanges of the bracket …." *Id.*, at IT00134 (emphasis added). Thus, the *movement* of the *jaw* between the first and second flanges was critical to patentability.

**B.      DeWalch's ProLock Products**

15.     Overall perspective drawings of the ProLock products are depicted below:



ProLock 1                              ProLock 2

16.     The clamping member of the ProLock products has three surfaces: two identical side panels on either side of a single lower panel. There is also a "projection" on the lower panel which protrudes upwards from the clamping member for the purpose of stopping the travel of the lever. The lever is used to apply force to the clamping member. The clamping member is mounted outside of and around the bracket on two pins protruding from the outside surface of the

second flange of the bracket.   The two pins are inserted into the holes on the side of the clamping member.

17.     The only difference between the two ProLock products can be seen in the lower panel of the clamping member of the ProLock 2.  In the ProLock 2, a rectangular portion of the "lower panel" shown on the ProLock 1 has been removed to form "secondary engagement tabs" that extend from the side panels.  The two photographs below of the ProLock products show a similar perspective view:




**ProLock 1**                          **ProLock 2**

18.     The ProLock products are comprised of three parts: a bracket, a lever, and a clamping member.  The drawing below identifies the various components of the parts:

9



**Lever, Bracket, and Clamping Member**

The bracket shown above has first, second and third flanges and two webs as seen in the '691

patent.  Each of these three pieces is manufactured from a single piece of metal.  One major

difference, however, is that the bracket of the Products also has two pins protruding from the

outside surface of the second flange.  (As noted above, the two holes of the clamping member

are used to mount the clamping member on the two pins on the side of the second flange.)  These

two protruding pins extend outside the width of the first flange, and are thus not "mutually

spaced" from the first flange.  These pins are outside of the space between the first and second

flanges and serve the function of allowing the clamping member to move outside and around the

first and second flanges of the bracket.  This configuration allows the clamping member to apply

a force to the inside wall of the meter box that is offset from the force applied to the outside wall

of the meter box by the first flange.  Rectangles cut out of the interior of the two sides of the

second flange form two pins at the base of the second flange.  Note that these two pins are within

the width of the first flange, and are thus mutually spaced from the first flange.  The two holes of

the lever are used to mount the lever on these two pins at the base of the second flange.

     19.    Slightly different perspectives of the three parts are given below.  The first part is

the bracket:



**Bracket**

When the ProLock 1 or 2 is initially placed on the meter box, the bracket is the part that fits over

the wall of the meter box.   This perspective shows the location of the pins with respect to the

first flange.  The two protruding pins, on which the clamping member rotates outside of and

around the bracket, extend beyond the width of the first flange.  With no "mutual" (or

corresponding) part directly across from the pins on the first flange, the pins are not "mutually

spaced" from the first flange.  In addition, the protruding pins, like the two webs of the bracket

do not serve the same function as the flanges.  The lower pins on which the lever is installed are

within the width of the mutually spaced first flange.

     20.    The second part shown below is the lever, which is used to apply force to the

clamping member so as to secure the ProLock product to the meter box.  The edge opposite the

lever handle contacts the projection on the clamping member to stop the travel of the lever.  The

lever is rotated causing the cam surface to push on the lower panel of the clamping member and

thereby rotate the clamping member toward the meter box.  The upper portion of the side panel

of bracket engages the meter box before the lower panel of the bracket contacts the meter box.



**Lever**

21.     Immediately below are the clamping members for the ProLock 1 and ProLock 2:

**ProLock 1**                    **ProLock 2**



**Clamping Member**

22.     As can be seen by these drawings, the ProLock 2 is identical to the ProLock 1

except for the removal of the rectangular portion of the lower panel and the addition of

secondary engagement tabs that extend downward from the two side panels.   The function of the

lower panel and the secondary tabs is to provide additional security in the event that pressure is applied to pry open the meter box.  In the event that pressure is applied to pry open the meter box, the front edge of the lower panel of the clamping member of the ProLock 1 and the secondary engagement tabs of the ProLock 2 would be urged into abutment with the ledge of the meter box.

### C.     The Operation of the ProLock Products

23.     The ProLock products are designed for easy and quick installation onto meter box walls. Installation is a three-step process which takes a matter of seconds.  This three-step process is shown below for both ProLock products.  As will be seen below, the clamping member does not move "in or through the space that separates" the first and second mutually spaced flanges of the bracket.



**ProLock 1**                                    **ProLock 2**

### 1.     Step 1

24.     In Step 1 above, the ProLock products are initially placed on the meter box by sliding the bracket over the meter box wall.  When the bracket is installed as shown, the meter box wall occupies the space between the first and second flanges.  In addition, when the user

holds the lever against the bracket, the bracket loosely rests on the meter box wall, thereby

allowing the user to position the ProLock product in the selected location on the wall.

 

|         **ProLock 1**         |         **ProLock 2**         |

**2.      Step 2**

25.      In Step 2, the operator pulls the lever away from the bracket and meter box wall,

thereby applying force to the clamping member through the cam portion of the lever.  This forces

the clamping member to swing forward to contact the inside wall of the meter box, but the lower

panel of the clamping member never contacts the meter box.  Rather, before the lower panel

makes contact, the front edge of the side panels engage the wall of the meter box.  (Note that in

Step 2, the lever has been pulled slightly farther in the photograph of the ProLock 2 on the right.)

The mechanical effect of the movement of the lever is to cause the clamping member to move

outside of and around the space that separates the first and second mutually spaced flanges,

pulling the first flange against the outside of the meter box wall, while pushing the front edges of

the side panels against the inside of the meter box wall.  The lower panel and the bottom front

edge of the clamping member do not contact the wall of the meter box.  With respect to the

ProLock 2, note that because of the removal of the rectangular portion of the front lower panel

and the formation of the secondary engagement tabs, the lower panel is further distanced from

the inner wall of the meter box.

 

**ProLock 1**                    **ProLock 2**

### 3.     Step 3

26.     In Step 3, the user further pulls the lever away from the bracket until the lever

ends its travel when it contacts the projection on the clamping member.  At this point, the lever

snaps into its secure final position. The Figures above show the ProLock 1 and ProLock 2 after

this third step has been completed.  During Step 3, the user experiences resistance as force is

applied.  The force applied to the inner wall of the meter box by the front edge of the side panels

of the clamping member acts in concert with the offsetting force applied to the outer wall by the

first flange, which actually deflects the wall of the meter box.  Because the forces of the front

edge of the clamping member are offset from the first flange – that is, the front edges of the

clamping member are not directly opposite the first flange of the bracket – the front edges of the

two side panels and the first flange work together to place the meter box wall in shear and

bending and thereby fix the ProLock products securely in place.   The photograph below shows

how these offsetting forces are applied to the wall of the meter box by the first flange and the two side panels of the clamping member.



27.     Three surfaces – the front edges of the two side panels and the first flange – work together to place the meter box wall in shear and bending and thereby fix the ProLock products securely in place.  Had the front edges of side panels of the clamping member met the inside of the meter box wall directly opposite the first flange on the outside of the meter box, there could be no movement of the clamping member beyond Step 2.  Because the ProLock products have a clamping member that moves not between but outside of and around the space that separates the first and second mutually spaced flanges, the lever can be used to achieve further movement of the clamping member after initial contact with the wall of the meter box.

**III.     The ProLock Products Do Not Literally Infringe the '691 Patent.**

28.     Inner-Tite, the patentee, bears the burden of proving that the ProLock products infringe the '691 patent.  *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538 (Fed. Cir. 1987).  In this case, as in most patent cases, the issue of literal infringement turns entirely on the Court's construction of the disputed claim limitation.

16

29.     Here, the only disputed claim limitation is the limitation requiring "a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges."  By its order dated August 31, 2007, the Court agreed with DeWalch's proposed claim construction and construed the above-quoted limitation of claim 1 as follows: "(1) either of two mechanical parts that open and close to grip or crush something, as in a monkey wrench or vise, (2) mechanically interengaged with and carried by said bracket (3) for movement in or through the space that separates the first and second flanges."  TX 85, at p. 10.  A finding of noninfringement follows directly from this construction, because (a) the clamping member of the ProLock products does not move "in or through the space that separates" the first and second flanges, and (b) the clamping member of the ProLock Product does not "grip or crush, as in a monkey wrench or vise."

**A.     The Bracket of the ProLock Products Is Not Mounted for "Movement**
***In or Through the Space* that Separates the First and Second Flanges."**

30.     In order to satisfy the "jaw" limitation according to this Court's claim construction, the clamping member of the ProLock products must be mounted for "movement in or through the space that separates the first and second flanges."  The drawing below shows a color-coded version of the bracket of the ProLock products. Using the language of the '691 patent, the green-shaded area represents the "first flange," and the blue-shaded area represents the "second flange."  The "space that separates" the first and second flange is the three-dimensional wedge-shaped space shaded in orange.



**Bracket**

31.     The white portion that protrudes from the second flange of the bracket is a small

pin upon which the clamping member is mounted.  In order to fit onto the protruding pins, the

clamping member is manufactured to be wider than the flanges.  The side panels and lower

panels of the clamping member collectively surround the *space that separates* the first and

second flanges.  No part of the clamping member ever disturbs the orange wedge-shaped *space

that separates* the first and second flanges.  The clamping member as a whole thus sits *outside*

the space that separates, and moves *outside and around* the space that separates the first and

second flanges.

32.     Although it did not make this argument in its summary judgment papers, Inner-

Tite argued at trial that the protruding pins are actually part of the flange and that a diagonal line

must be drawn from the outermost end of the protruding pin to the outside edge of the first

flange.  As noted above, however, the pins are outside the width of the first flange and thus are

not "mutually spaced" to any corresponding part of the first flange (or the intermediate web).

33.     Claim 1 of the '691 patent includes an express limitation on the first and second

flanges.  Claim 1 requires that the bracket have "first and second mutually spaced flanges

integrally joined by an intermediate web." TX 1, at col. 4:30-31. As can be seen in Fig. 3 of the '691 patent, the first flange and the second flange have the same width and thus are "mutually spaced." See '691 patent, Fig. 3. The specification similarly notes:

> With reference to FIG. 3, it will be seen that the lock assembly includes a mounting bracket **28** having first and second mutually spaced and angularly disposed flanges **30**, **32** integrally joined by an intermediate web 34. A third flange **36** is formed integrally with and projects laterally from the first flange 30.

Id., at col. 2:47-52. This description of the "mutually spaced first and second flanges" and Figure 3 make clear that the second flange must be "mutually spaced" across the web from the first flange. Note that the third flange is not described as mutually spaced because it is not so spaced. In the ProLock products, there is no structure in the first flange that is directly across from the protruding pins. Thus, the protruding pins are not part of the "mutually spaced" second flange. In addition, just as the web is not part of the second flange because it serves a different function, the added protruding pins are not part of the second flange. Mr. Rafferty admitted this functional distinction in his deposition. The pins – like the web in the bracket – serve a different function than the flange: namely, allowing the clamping member to rotate outside of and around the second flange and thereby apply the forces that are offset from the first flange.

34. Comparing the width of the first and second flange, on the one hand, with the width of the clamping member, on the other, make clear that the clamping member moves outside of and around the first and second flanges. Because the clamping member is wider than the bracket, it is physically impossible for the clamping member to move "in or through the space that separates" the first and second flanges. Thus, the clamping member does not literally infringe claim 1 of the '691 patent.

19

B.     **The ProLock Products Do Not "*Grip or Crush Something, as in a Monkey Wrench or Vise.*"**

35.     In order to satisfy the "jaw" limitation according to this Court's claim construction, the clamping member of the ProLock products must include "either of two mechanical parts that open and close to grip or crush something, as in a monkey wrench or vise." In the ProLock products, the two parts that create the clamping force are the first flange and the side faces of the clamping member.  As explained above, the first flange and the side faces of the clamping member do not directly oppose each other where they meet the meter-box wall. Consequently, they do not "grip or crush … as in a monkey wrench or vise."  In a monkey wrench or vise, if the object being gripped or crushed is absent, the "jaws" would contact each other.  This is not so in the ProLock products.  The clamping member is not capable of contacting the first flange because the clamping member is mounted, and moves, *outside of and around* the space that separates the first and second flanges.  The side panels of the clamping member are thus spaced by a distance that is wider than the width of the first flange.  These features of the clamping member and first flange make them work in a markedly different manner than a monkey wrench or vise, which grip using compression forces.  Instead, the clamping member and first flange work together to place the meter box wall in shear and bending.

36.     The ProLock products are designed so that the lower panel does not contact the meter-box wall.  Instead, the product is designed so that when the product is tampered with, the lower panel serves the function of engaging with the lip of the side wall of the meter box as additional locking mechanism for the box.  Even when that locking mechanism is engaged, the side wall of the meter box is not placed in compression.

### IV.    The ProLock Products Do Not Infringe Under the Doctrine of Equivalents

37.    The ProLock products do not infringe under the doctrine of equivalents because the bracket of the ProLock products is substantially different than the claimed jaw.

38.    The '691 patent issued in a crowded field.  The face of the '691 patent identifies no fewer than 29 prior art references.  TX 1, at col. 1-2.  The Examiner cited no fewer than 15 of those references in considering the patentability of the claims.  *Id.* ("* cited by examiner").

39.    As described above, the fact that the clamping member of the ProLock product moves outside and around the space that separates the first and second flanges, causes it to operate in a substantially different way than Inner-Tite's patent. The shear and bending achieved by the ProLock product simply would not be possible if the clamping member and the first flange met the meter-box wall directly opposite from one another.  Inner-Tite offered no expert testimony at trial to describe the *way* that the ProLock product works (shear and bending) or the way that Inner-Tite's patented "jaw mounted for movement between" functions (compression). Nor did introduce expert testimony as to whether shear and bending is substantially the same as compression.  In the absence of evidence on this question, Inner-Tite did not establish insubstantial differences.  To the contrary, the shear and bending of the ProLock products is a substantial difference, and DeWalch's witnesses testified that its product was designed to operate in a substantially different way than the claimed invention.  Given that Inner-Tite is entitled only to a narrow range of equivalents, shear and bending are not the equivalent of compression. The ProLock products, therefore, do not infringe under the doctrine of equivalents.

### CONCLUSIONS OF LAW

1.    In determining equivalents, this Court must determine whether the bracket of the ProLock products is substantially different from the "jaw" of the claimed invention.  *See Warner Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29-30 (1997) (stating that the doctrine

of equivalents is to be applied to individual claim elements, not to the invention as a whole).  A

patentee may prove infringement under the doctrine of equivalents if an element in the accused

product performs "substantially the same function, in substantially the same way, to achieve the

same result" as the claimed invention.  *Graver Tank & MFG CO., Inc. v. Linde Air Products Co.*,

339 U.S. 605 (1950).  A patentee must "explicitly delineate to the [fact-finder] equivalence of

function, means, and result between the claimed [invention] and accused [device or method]."

*Lear Siegler, Inc. v. Sealy Mattress Company of Michigan, Inc.*, 873 F.2d 1422 (Fed. Cir. 1989).

Alternatively, the patentee may prove "insubstantial differences" between the accused product

and the patented invention.  Graver Tank*,* 339 U.S. 605.  Under either test, Inner-Tite failed to

satisfy its burden to prove infringement by equivalents.

  2.  "What constitutes equivalency must be determined against the context of the

patent, the prior art, and the particular circumstances of the case."  *Warner-Jenkinson*, 520 U.S.

at 24.  Thus, where a patent issues in a "crowded" field, the patent is entitled only to a narrow

range of equivalents. <u>Hughes Aircraft Co. v. U.S.</u>, 717 F. 2d 1351 (Fed. Cir. 1983).

  3.  The doctrine of equivalents is legally not available to Inner-Tite.  Two different

doctrines preclude availability of the doctrine in this case.  First, prosecution history estoppel

precludes reliance on the doctrine of equivalents because Inner-Tite repeatedly and successfully

argued the criticality of the "movement between" limitation to the patentability of the claims.

Second, application of the doctrine of equivalents to a clamping member that surrounds the

flanges would vitiate the claim limitation requiring that it be "between" the flanges.

## V.  Legal Limits on the Availability of the Doctrine of Equivalents

  4.  Infringement by equivalents may be found even where a claim is not literally

infringed.  *Warner-Jenkinson Co. Inc. v. Hilton Davis Chemical*, 520 U.S. 17, 40 (1997).  There

are, however, legal limits on the availability of the doctrine.  First, if an applicant surrendered

subject matter during prosecution, the applicant is estopped from asserting infringement by equivalents as to that subject matter. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki*, 535 U.S. 722, 723 (2002) ("Prosecution history estoppel … precludes a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent.") (quoting *Wang Labs., Inc. v. Mitsubishi Elec. Am, Inc.*, 103 F.3d 1571, 177-78 (Fed. Cir. 1997)).   Second, if a patentee's assertion of the doctrine of equivalents would entirely vitiate a claim element, the doctrine of equivalents is not available. *See Warner-Jenkinson*, 520 U.S. at 29 ("It is important to ensure that the application of the doctrine [of equivalents] is not allowed such broad play as to effectively eliminate that element in its entirety.  So long as the doctrine of equivalents does not encroach beyond the limits just described … we are confident that the doctrine will not vitiate the central functions of the patent claims themselves.").

5.    Thus, before determining whether the ProLock products infringe under the doctrine of equivalents, this Court must determine whether the doctrine of equivalents is legally available to Inner-Tite.   It is not.  As explained below, both prosecution history estoppel and the doctrine of claim vitiation preclude applicability of the doctrine of equivalents in this case.

### A.    Prosecution History Estoppel Precludes the Application of the Doctrine of Equivalents to the ProLock Products

6.    The doctrine of prosecution history estoppel prevents a patentee from recapturing through equivalents subject matter surrendered during prosecution. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870 (Fed Cir. 1985).  An amendment to the claim being asserted is not necessary in order to create prosecution history estoppel. *Builders Concrete, Inc. v. Bremerton Concrete Prods. Co.*, 757 F.2d 255, 260 (Fed Cir. 1985).  To the contrary, prosecution history estoppel "may arise from matter surrendered as a result of amendments to overcome patentability rejections, or as a result of argument to secure allowance of a claim." *Cybor Corp. v. FAS Tech.*

*Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (citation omitted); s*ee also Haynes v. Jessop*, 8 F.3d 1573 (Fed Cir. 1993) (affirming summary judgment of non-infringement by equivalents because of arguments made to the Examiner and the Board to procure allowance of the patent).

7.     In this case, prosecution history estoppel arises because of repeated arguments made by the patentee to secure allowance of claim 1 of the '691 patent.  As explained above, Inner-Tite argued both to the Examiner and to the Board that the claims were not obvious over the prior art because of the jaw which is mounted for "movement between" the first and second flange.  Ultimately, the Examiner allowed the claim because of that argument.  Hence, Inner-Tite is estopped as a matter of law from asserting infringement by any product that does not have a jaw mounted for movement between two flanges.  *See Southwall Techs. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995).

8.     In *Southwall*, for example, the plaintiff patentee in an infringement suit argued that defendant's two-step process infringed by equivalents the one-step process claimed in its patent.  During prosecution, however, it had distinguished a prior art reference, Franz, not by relying on the exact method in Franz but by emphasizing that Franz showed a multi-step process whereas plaintiff claimed a one-step process.  Affirming summary judgment of noninfringement, the Federal Circuit held that, by law, the broad disclaimer of prior art estopped a greater range of equivalents than that strictly necessary to distinguish the prior art and that the patentee had consequently disclaimed as equivalents all multi-step processes.  The court reasoned, "Other players in the market place are entitled to rely on the record made in the Patent Office in determining the meaning and scope of the patent." *Southwall* at 1581 (quoting *Lemelson v. General Mills, Inc.*, 968 F.2d 1202, 1208 (Fed Cir. 1992)).  Because the patentee has explicitly distinguished the combination on the basis of its failure to fall within the "movement between"

limitation, the range of equivalents permissible under the doctrine of equivalents also excludes any device not literally infringing the limiting language "movement between." DeWalch is entitled to rely on the record in the Patent Office, and as a matter of law, the patentee is now estopped from asserting that any structure that is not mounted for "movement between" the two flanges might be an equivalent. *See Haynes*, 8 F.3d at 1578 ("The legal standard for determining what subject matter was relinquished is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent.")

> **B.    The Doctrine of Claim Vitiation Precludes the Application of the Doctrine of Equivalents to the ProLock Products**

9.    As a matter of law, the clamping members of the ProLock products cannot infringe under the doctrine of equivalents because such a finding of infringement would "vitiate" the claim limitation of "movement between." The claim vitiation doctrine is based on the "all limitations rule." *See Freedman Seating Co. v. American Seating Co*., 420 F.3d 1350, 1358 (Fed. Cir. 2005). This rule holds that "an accused product or process is not infringed unless it contains each limitation of the claim, either literally or by an equivalent."

10.    In *Warner-Jenkinson v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29 (1997), the Supreme Court, express concern that the doctrine of equivalents had "taken on a life of its own, unbounded by the patent claims," stated the prohibition against giving such a broad equivalence to a claim limitation so as to "effectively eliminate" the claim limitation:

> There can be no denying that the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement.

> * * *

> Each element contained in a claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to

individual elements of the claim, not to the invention as a whole.  *It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.*

*Id.* (emphasis added).[1]  The claim vitiation doctrine protects the "definitional and public-notice functions" of the patent claims.  *See Sage Prods. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997) ("Because th[e] issued patent contains clear structural limitations, the public has a right to rely on these limits in conducting its business activities.")

11.     The claim vitiation doctrine forecloses any analysis under the doctrine of equivalents here. Judgment as a matter of law is appropriate when the court determines, as a threshold matter, that a finding of equivalents infringement would "vitiate" a claim limitation. *See Warner-Jenkinson*, 520 U.S. 17, 39, 117 S.Ct. 1053 n.8 (1997) ("Thus, under the particular facts of a case, . . . if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further *material* issue for the jury to resolve."); *Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005) ("Second, an element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation."); *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320-21 (Fed. Cir. 2003); *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1429 (Fed. Cir. 1997).  Thus, "[i]f a theory of equivalence would vitiate a claim limitation, . . . then there can be no infringement as a matter of law." *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998).

12.     In claim 1 of the '691 patent, as construed  by the Court, the term "a jaw mechanically interengaged with and carried by said bracket for movement between said first and

---

[1] Later in the *Warner-Jenkinson* opinion, the Supreme Court used the term "vitiate," thus giving the claim vitiation doctrine its name.  *Warner-Jenkinson*, 520 U.S. 17, 39 n.8 (1997).

second flanges," requires that the "jaw" move "in or through the space that separates" the first and second flanges.  The preposition "between" provides a clear and specific indication as to the location of the movement of the jaw.  The Federal Circuit has consistently held that claim limitations expressly restricting some part of an apparatus to a particular location (such as the "movement *between* said first and second flanges" limitation in the '691 patent) would be vitiated if the doctrine of equivalents were used to extend the scope of such claims beyond their literal meaning.

13.     For example, in *Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317 (Fed. Cir. 2002), the Federal Circuit applied claim vitiation to the claim limitation "between the two plugs."  Specifically, the claim limitation required a "workover port" to enter a wellhead assembly "*between* the two plugs."  *Id.* at 1319 (emphasis added).  The defendant asserted the claim vitiation doctrine applied because the workover port in the accused device entered the wellhead assembly *above* the two plugs.  The Federal Circuit affirmed the application of that claim vitiation doctrine:  "Were we to ignore Cooper's decision to claim in the [asserted] patent a workover port that connects to the assembly only 'between' the plugs, we would vitiate that limitation and thereby run afoul of the all-limitations rule."  *Id.* at 1322.

14.     Similarly, in *Sage Products, Inc. v. Devon Industries, Inc.,* 126 F.3d 1420 (Fed. Cir. 1997), the Federal Circuit considered whether a patent claim directed to a hazardous medical waste disposal container was infringed under the doctrine of equivalents.  The claim at issue required "an elongated slot at the *top* of the container body" and a "constriction extending *over* said slot." *Id*. at 1422 (emphasis added).  The accused product had a slot that was located in the *interior* of the container rather than at the top of the container, and two constrictions *below the top* of the container. *Id*. at 1423-24.  The court upheld a finding of no infringement under the

doctrine of equivalents, concluding that equivalence would vitiate the "slot at the top of the container body" and "extending over said slot" limitations. *Id.* at 1424-26. "The doctrine of equivalents does not grant Sage license to remove entirely the 'top of the container' and 'over said slot' limitations from the claim." *Id*. at 1474. "Because this patent contains clear structural limitations, the public has a right to rely on those limits in conducting its business activities." *Id*. at 1425.

15.     The Federal Circuit applies the claim vitiation doctrine using a "totality of circumstances" test based a non-exclusive list of factors.  As the Federal Circuit observed in *Freedman*:

> There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule.  Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless.

*Freedman*, 291 F.3d at 1359.  In applying this totality of the circumstances test, the *Freedman* court identified a non-exclusive list of factors – "the simplicity of the structure, the specificity and narrowness of the claim, and the foreseeability of variations at the time of filing the claim with the PTO," as well as whether the difference between the claim limitation and the relevant aspect of the accused device is a "a *subtle difference in degree*" or "a clear, *substantial difference or difference in kind*." *Id*. (emphasis in original).  *See also Sage Products*, 126 F.3d at 1425 (noting the simplicity of the structure, the specificity and narrowness of the claim, and the foreseeability of variations at the time the claim was filed as factors to be consideration in determining whether this doctrine of claim vitiation applies).  Applying these four factors set forth in *Freedman* to the limitation "between" and the clamping member of the ProLock products, Inner-Tite's theory of infringement by equivalents is barred as a matter of law.

28

### 1.    Simplicity of the Structure.

16.    The invention claimed in the '691 patent involves a relatively simple mechanical device that is easily explained with plain language and drawings.  Like the Federal Circuit noted in *Sage Products* when it applied claim vitiation, "the claim at issue defines a relatively simple structural device."  *Sage Products*, 126 F.3d at 1425.  The bracket with flanges, the intermediate web, the jaw, the force exerting means shown in the '691 patent, the cap, and the interlocking means for securing the cap to the bracket are all straightforward mechanical devices.  Similar meter box locking devices that employed a bracket with first and second flanges and a screw for clamping the bracket to the meter box wall were described in the "Description of the Prior Art" section of the '691 patent.  TX 1 at col. 1: 12-39.  All of the drawings in the '691 patent clearly and unambiguously show the jaw moving "between" the first and second flanges.  *See* '691 patent.  In other words, in using the term "between," the patentee of the '691 patent did not fail to use the proper words to describe the movement of the jaw disclosed in the '691 patent.  As stated in *Sage Products*, "[n]o subtlety of language or complexity of the technology, nor any subsequent change in the state of the art, such as later developed technology, *obfuscated the significance of this limitation* at the time of its incorporation into the claim."  *Id.*, 126 F.3d at 1425 (emphasis added).  In the case of the location of a the movement of the jaw in the claimed apparatus, the simplicity of the structure makes location a straight-forward limitation.  As a result, this factor weighs heavily in favor of DeWalch.

### 2.    Specificity and Narrowness of Claim Limitation.

17.    Courts are more likely to find claim vitiation when a structural limitation in a patent claim is clear and specific.  As the Supreme Court noted in *Warner-Jenkinson*, "[t]he doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice

functions of the statutory claiming requirement." *Id.* at 1049. In *Sage Products*, the Federal

Circuit explained:

> Thus, for a patentee who has claimed an invention narrowly, there may not be infringement under the doctrine of equivalents in many cases, even though the patentee might have been able to claim more broadly. If it were otherwise, then claims would be reduced to functional abstracts, devoid of meaningful structural limitations on which the public could rely.

*Sage Products*, 126 F.3d at 1424.

18.     In the present case, the Court has construed the term "between" to have a specific

meaning: "in or through the space that separates." This claim construction was so specific that

both parties agreed (at least initially) to this meaning. This specific meaning of "movement

between" is consistent with the '691 patent: all of the jaws shown in the '691 patent move "in or

through the space that separates" the first and second flanges. *See* '691 patent. The file history

also specifically highlighted the specific and narrow meaning of the term "between" when the

patentee distinguished the limitation at issue ("movement between") over the prior art rejections

by the Examiner.

19.     The preposition "between" was applied with specificity and narrowly in the

*Cooper Cameron* decision to a mechanical device, namely, a wellhead assembly. In *Cooper

Cameron*, the Federal Circuit held that the claim vitiation doctrine precluded finding a workover

port that entered the wellhead assembly *above the two plugs* infringed under the doctrine of

equivalents a limitation that required the workover port to enter the wellhead assembly "*between*

the two plugs." *Cooper Cameron*, at 1319 (emphasis added). Similarly, in *Sage Products,* the

Federal Circuit applied claim vitiation to prevent a patentee from asserting the limitations

regarding "an elongated slot at the *top* of the container body" and a "constriction extending *over*

said slot" were infringed under the doctrine of equivalents by a slot that was located in the

*interior* of the container, and had two constrictions *below the top* of the container. *Id*. at 1423-

24.  "Because this patent contains clear structural limitations, the public has a right to rely on those limits in conducting its business activities."  *Id.* at 1425.  Thus, this factor also strongly favors DeWalch.

### 3.     Forseeability of Variations at the Time of Filing with the PTO.

20.     If a skilled patent drafter should have foreseen the limiting potential of narrow and precise claim language, an equivalents analysis may be precluded.  As the Federal Circuit stated in *Sage Products*:

> If Sage desired broad patent protection for any container that performed a function similar to its claimed container, it could have sought claims with fewer structural encumbrances.  Had Sage done so, then the Patent and Trademark Office (PTO) have fulfilled its statutory role in helping ensure that exclusive rights issue only to those who have, in fact, contributed something new, useful, and unobvious.  Instead, Sage left the PTO with manifestly limited claims that it now seeks to expand through the doctrine of equivalents.

*Sage Products*, at 1425.  In the present case, the patentee used only the preposition "between" to claim the movement of the jaw with respect to the first and second flanges.  Even though the patentee did not disclose the movement of the jaw other than "between" the two flanges, the patentee now wishes to expand the reach of the limitation "between" to reach the clamping member of the ProLock products that moves outside and around the first and second flanges.  It was certainly foreseeable to the patentee that the term "between" would be construed in a limiting fashion after the patentee expressly distinguished the claimed invention over the prior art by highlighting the claimed language of "movement between."  Moreover, there is no basis in the '691 patent for expanding the meaning of the term "between" to read on a clamping member that moves outside and around the second flange of the bracket.  Thus, the third factor also favors DeWalch.

### 4.    Difference in Kind Versus Degree.

21.    The Federal Circuit found claim vitiation when there was a difference in kind between the claim limitation and the accused device.  In *Freedman*, the Federal Circuit held that an accused device had a structural difference that was not a "'subtle difference in degree,' but rather, 'a clear, substantial difference or difference in kind.'"  *Freedman*, at 1361 (quoting *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 3121 (Fed. Cir. 1998)).  In *Freedman*, the Federal Circuit considered whether a patent relating to a stowable seat was infringed by the defendant's seat.  The patent claim required a seat with a support member having a moveable end "slidably mounted" to the seatbase.  *Id.* at 1353.  The moveable end of the support member in the accused device was "rotatably mounted to the seatbase" and did "not slide or otherwise move along the seatbase." *Id.* at 1354. The Federal Circuit held that "the district court's finding of infringement under the doctrine of equivalents had the effect of entirely vitiating the 'slidably mounted' limitation." *Id.* at 1361.  The Federal Circuit noted:

> Freedman's argument would mean that any support member capable of allowing translational and rotational motion would be equivalent to a support member "slidably mounted to said seatbase," which reads "slidably mounted" completely out of the claims. This is the precise type of overextension of the doctrine of equivalents that the claim vitiation doctrine is intended to prevent.

*Id*. at 1362.  Thus, the accused device was different-in-kind from the claimed invention – "rotatably mounted" was different in kind from "slidably mounted."

22.    In the present case, the clamping member moves outside and around the two flanges of the bracket.  Movement "outside and around" the two flanges is different-in-kind from movement "between" the two flanges.  In claim 1 of the '691 patent, the term "interengaged with and carried by said bracket for movement between said first and second flanges" is a clear structural limitation upon which competitors, such as DeWalch, are entitled to rely in conducting their business.  The decisions in *Cooper Cameron* and *Sage Products* both involved prepositions

regarding location of certain features that were different in kind – a movement "between" is different in kind from a movement "outside and around."

23.     This Court's ruling in *Holmes Group, Inc. v. RPS Products, Inc*., 2006 U.S. Dist. LEXIS 13737 (D. Mass. 2006) regarding one of the contested claim limitations is consistent with this analysis.  In *Holmes Group*, this Court applied the claim vitiation doctrine to reject an argument by a patentee regarding a filter assembly that included a claim limitation that the hanger be coupled to the "top wall" of the frame for the filter.  The Court construed this limitation to cover an assembly with a hanger "that is coupled to the top wall of the frame, *or* to the top wall and the lip, *but not* solely to the lip."  *Id*. at *37 (italics in original).  The Court refused to find an accused filter that was solely coupled to the lip to infringe under the doctrine of equivalents.   The Court held that if it were "to conclude that [the accused filter assemblies] -- which were coupled to the lip -- had the equivalent of hangers coupled to the 'top wall,' it would vitiate the element that the hanger be coupled to the top wall."  *Id.* at *43.  This "difference in kind" is also present in the present case as the ProLock products are "solely" outside the first and second flanges, and do not move in or through the space that separates the first and second flanges.

24.     As a result, this fourth factor also favors DeWalch, and claim vitiation bars Inner-Tite from asserting the ProLock products infringe the limitation "between" under the doctrine of equivalents.

25.     Several cases previously cited by Plaintiff do not support Plaintiff's attempt to read the "movement between" limitation out of the claim.  In *Wright Medical Technology, Inc. v. Osteonics Corporation*, 122 F.3d 1440 (Fed. Cir. 1997), the Federal Circuit reversed a summary judgment in favor of the defendant, holding the plaintiff had raised a fact issue that required a

trial. Plaintiffs ignore that part of the opinion that shows the evidence offered by Plaintiff was a subtle difference in the degree of the extension through the femur. Specifically, the patentee in *Wright Medical* did not argue that the rod did not extend through the femur, but that it did not extend "all the way through." *Wright Medical*, at 1445.

26.    The second case cited by Plaintiff, *Ericsson, Inc. v. Harris Corporation*, 352 F.3d 1369 (Fed. Cir. 2003), also does not support Plaintiff's attempt to ignore the "movement between" limitation. In *Ericsson*, the Federal Circuit reversed a motion for JMOL of noninfringement entered by the trial court and entered judgment based on a jury verdict of infringement under the doctrine of equivalents because the doctrine of claim vitiation was inapplicable once the facts were properly understood. The claim limitation at issue was "the speech signal amplifiers, which require power, *only supply power* to the telephone set when the receiver is off the cradle and a call can be made." *Id*. at 1372 (emphasis added). The defendant asserted that the "only supply power" limitation was vitiated because the defendant claimed the evidence showed that the speech signal amplifiers supply "some power" to the telephone set in the on-hook position. *Id.* The defendant and the trial court cited testimony that there are three transistors that "always supply a small amount of power to the subscriber line in order to prevent corrosion and also to supply power to enable the on-hook functions such as caller-ID." The Federal Circuit relied on contrary evidence to avoid any claim vitiation. First, the Federal Circuit noted that the "only supply power" limitation refers to power supplied by the speech signal amplifiers. The Federal Circuit pointed out that there was evidence that the transistors at issue that supplied the power were instead part of the control circuitry, which was separate from the speech signal amplifier circuitry. Because the power at issue was not supplied by the speech

signal amplifier, the Federal Circuit held the jury finding of infringement under the doctrine of equivalents did not vitiate the 'only supply power' limitation. *Id*. at 1375.

27.     More recently, the Plaintiff cited the case of *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005 (Fed. Cir. 2006), a case that dealt with the shape of an accused device. In *DePuy*, the Federal Circuit affirmed a finding of no literal infringement, but reversed a trial court that found claim vitiation for the limitation "inner hollow spherically-shaped portion" with respect to an accused device that had a "hollow conically-shaped portion of the receiver member." A review of the comparative drawings in the decision, *id.* at 1015, however, shows the location of the hollow conically-shaped portion of the receiver member of the accused device is identical to that of the claimed inner hollow spherically-shaped portion. In addition, the patentee offered particularized declarations of an expert demonstrating that the conically-shaped portion supported the screw head, allowed for flexible movement, and – when the compression member was engaged – created a rigid lock between the screw head and the receiver. *Id.* at 1020. The expert also identified other shapes that were different from the accused device but would not be capable of supporting the screw head, allowing flexible movement, and creating a rigid lock when the compression member is engaged. *Id.* In the present case, however, the location of the clamping member is not the same as the jaw of the '691 patent and, as discussed below, the ProLock product applies an offset force that applies a bending force to the meter box wall and not a directly compressive force as seen in the '691 patent. Accordingly, based on the totality of circumstances test, claim vitiation of the limitation "between" bars Inner-Tite infringement theory under the doctrine of equivalents.

## VI.    Conclusions

28.    Judgment shall be entered in DeWalch's favor on both literal infringement and

doctrine infringement under of equivalents for both the ProLock 1 and the ProLock 2 products.

Respectfully Submitted,


Dated: February 6, 2008                    /s/ Denise W. DeFranco

Denise W. DeFranco (BBO 558859)
E-mail: denise.defranco@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
55 Cambridge Parkway
Cambridge, MA 02142
Phone: (617) 452-1600
Facsimile: (617) 452-1666

Peter Mims (Texas Bar No. 14173275)
Admitted *pro hac vice*
VINSON & ELKINS, LLP
2300 First City Tower
1001 Fannin Street
Houston, Texas 77002-6760
Phone: 713.758.2732
Facsimile: 713.651.5703


ATTORNEYS FOR DEFENDANT,
DEWALCH TECHNOLOGIES, INC.

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the NEF.


Dated: February 6, 2008                     /s/ Denise W. DeFranco
                                           Denise W. DeFranco (BBO 558859)
                                           E-mail: denise.defranco@finnegan.com
                                           FINNEGAN, HENDERSON, FARABOW,
                                           GARRETT & DUNNER, L.L.P.
                                           55 Cambridge Parkway
                                           Cambridge, MA 02142
                                           Phone: (617) 452-1600
                                           Facsimile: (617) 452-1666