IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| INNER-TITE CORP., | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. |
| | § | 04-40219-FDS |
| DEWALCH TECHNOLOGIES, INC., | § | |
| | § | |
| Defendant | § | |
| | § | |

**DEFENDANT DEWALCH'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

I.    FINDINGS OF FACT ............................................................................................1

    A.    The '691 Patent ....................................................................................1

    B.    The Prosecution History of the '691 Patent .............................................5

    C.    The Accused ProLock Products ..............................................................8

        1.    Structure of the ProLock Products ..............................................8

        2.    Operation of the ProLock Products ...........................................11

    D.    Literal Infringement ............................................................................13

        1.    "Either of two mechanical parts that open and close to grip or crush something, as in a monkey wrench or vise" ....................................13

        2.    "Mechanically interengaged with and carried by said bracket" ...............13

        3.    "For movement in or through the space that separates the first and second flanges" .......................................................................13

    E.    Plaintiff's Theories of Literal Infringement ............................................14

        1.    Theory Briefed At Summary Judgment .......................................14

        2.    "Pin" Theory ..........................................................................15

        3.    "Gravity" Theory ....................................................................16

    F.    Infringement Under the Doctrine of Equivalents .....................................18

        1.    Crowded Field.........................................................................18

        2.    Substantial Differences ............................................................19

II.   CONCLUSIONS OF LAW ...............................................................................20

    A.    Claim Construction ..............................................................................20

        1.    "Jaw Mechanically Interengaged With and Carried By Said Bracket For Movement Between Said First and Second Flanges" .......................................................................20

        2.    "First and Second Mutually Spaced Flanges" ..............................20

        3.    Preamble ................................................................................22

B.    Literal Infringement ..................................................................................23

C.    Doctrine of Equivalents ............................................................................24

    1.    Particularized Testimony and Linking Argument....................................25

    2.    Legal Limits on the Availability of the Doctrine of Equivalents...............25

        a.    Prosecution History Estoppel Precludes the Application
            of the Doctrine of Equivalents to the ProLock Products ...............26

        b.    The Doctrine of Claim Vitiation Precludes the
            Application of the Doctrine of Equivalents to the
            ProLock Products...........................................................................28

            (1)    Simplicity of the Structure. .................................................32

            (2)    Specificity and Narrowness of Claim
                 Limitation...........................................................................32

            (3)    Forseeability of Variations at the Time of Filing
                 with the PTO. .....................................................................34

            (4)    Difference in Kind Versus Degree.......................................35

III.    ORDER OF JUDGMENT ....................................................................................39

This case involves a dispute between Inner-Tite Corp. ("Inner-Tite") and DeWalch Technologies, Inc. ("DeWalch") regarding the alleged infringement of U.S. Patent No. 6,763,691 (the "'691 patent").  In particular, Inner-Tite alleges that two products offered by DeWalch, the ProLock 1 and the ProLock 2, infringe the '691 patent.

By stipulation filed April 19, 2006, the parties have narrowed the issues in this case to "the single issue of whether either or both of the ProLock Products … include 'a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges' as claimed in claim 1 of U.S. Patent No. 6,763,691 either literally or under the doctrine of equivalents."  Dkt. No. 31.  By its order dated August 31, 2007, the Court construed the above-quoted limitation of claim 1 as follows: "(1) either of two mechanical parts that open and close to grip or crush something, as in a monkey wrench or vise, (2) mechanically interengaged with and carried by said bracket (3) for movement in or through the space that separates the first and second flanges."  Dkt. No. 70.

The case was tried in a two-day bench trial on February 27 and 28, 2008.  The only issue before the Court was whether either of DeWalch's ProLock products include "a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges" as claimed in claim 1 of the '691 patent either literally or under the doctrine of equivalents.  The following sets forth the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

I.     **FINDINGS OF FACT**

   A.     **The '691 Patent**

   1.     The '691 patent provides a narrow advance over the prior art.  In particular, prior art locking devices included mounting brackets, force exerting means, and barrel locks. TX-51.

2.       The '691 patent disclosure recognizes that most of the components of the device were known in the prior art.  For example, in the "Description of the Prior Art" portion of the patent, several prior art meter-box locking devices are identified.   TX-1 at col. 1:13-25.  The prior art Michelman product in U.S. Patent No. 4,120,182, which is shown below, is exemplary:



TX-55.

3.      The "Description of the Prior Art" portion of the '691 patent also explains that meter locking devices with mounting brackets and retaining screws were also known in the art. *Id.* at col. 1:26-39.  Such mounting brackets avoided the necessity of piercing the meter-box side walls.  *Id.* at col.1:27-33.  The prior art Nielsen product in U.S. Patent No. 4,080,811 ("the '811 Nielsen patent"),  which is shown below, is exemplary.  For ease of reference, the mounting bracket is shown in yellow and the retaining screw is shown in blue.  In the words of the '691 patent, the mounting bracket has a first flange (38), a second flange (23), a third flange (33), and a retaining screw (25):



TX-51.

4.    The "Summary of the Invention Section" of the '691 patent explains that Inner-Tite's purported contribution to the art is nothing more than a "jaw [that] is mechanically interengaged with and carried by the mounting bracket for movement between the first and second flanges" of the mounting bracket.  *Id.* at col. 1:60-62; *see also id.* at Abstract.   Figures 2 and 4 of the '691 patent are shown below with the "jaw" shown in red between the first (30, 30a) and second (32, 32a) flanges of the bracket:



*Id.* at IT 00145.

5.    The '691 patent discloses several different jaws, each of which moves in and through the space that separates the first and second flanges of the disclosed embodiments.  *Id.* at IT 00145- 48; Tr. 1:53(16)-58(1).[1]

---

[1] In this brief, the format "Tr. 1:53(16)-58(1)," refers to Day 1 of the trial transcript at page 53, line 16 through page 58, line 1.

6.    Claim 1 recites:

For use in combination with a utility box having a bottom, a side wall, and a cover which may be opened to gain access to the interior of the box, and which when closed, overlaps an upper edge of the side wall, a lock assembly for maintaining the cover in its closed position, said lock assembly comprising:

a bracket having first and second mutually spaced flanges integrally joined by an intermediate web;

*a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges*, said bracket being configured for removable mounting on said side wall, with said intermediate web interposed between said cover and the upper edge of said side wall, and with said first flange and said jaw respectively located adjacent exterior and interior surfaces of said side wall;

force exerting means for urging said jaw towards said first flange to thereby clamp said side wall therebetween;

a cap having a lip configured and dimensioned to overlap said cover; and interlocking means for securing said cap to said bracket.

TX-1 at IT 00150 (disputed limitation emphasized).

**B.    The Prosecution History of the '691 Patent**

7.    During prosecution of the '691 patent, the patent examiner issued an office action dated May 8, 2002, rejecting claim 1 for obviousness over a combination of the '811 Nielsen patent and U.S. Patent No. 4,414,829 to Nielsen Jr. et al. (the "'829 Nielsen patent). TX-50 at IT 00043-48.

8.    Concerning the prior art '811 Nielsen patent, the patent examiner stated that the lock assembly disclosed therein did "not disclose a jaw mechanically interengaged with and carried by a bracket . . . ." *Id.* at IT 00046. However, he stated that the "Nielsen 829 teaches a jaw 56 mechanically interengaged with and carried by bracket 52." Figures 2 and 3 from the

5

'829 Nielsen patent are reproduced below with the "jaw" component 56 colored in red and the

bracket 52 colored in yellow:



TX-52.

9.      The patent examiner concluded that it would have been obvious to one of

ordinary skill in the art "to provide the lock of Nielsen 811, with a jaw engaging a box side wall

below a ledge in the side wall as taught by Nielsen 829, in order to more securely clamp the

bracket to the box side wall."  TX-50 at IT 00046-47.

10.     Inner-Tite responded to the rejection by arguing that component 56 in Nielsen

'829 was different from a jaw mounted for movement between flanges of a bracket:  "It certainly

would not serve as a jaw mounted for *movement between* the flanges."  TX-50 at IT 00058

(emphasis in original).

11.     This argument originally did not convince the Examiner.  The Examiner

maintained the rejection of the claims as obvious over the prior art.  TX 50, at IT 00085-91.  In a

second argument to the U.S. Patent & Trademark Office ("Patent Office"), Inner-Tite again

focused on the fact that the prior art did not have a jaw.  *Id.* at IT 00082.

12.     Inner-Tite ultimately appealed the rejection to the Board of Patent Appeals and

Interferences at the Patent Office ("Board").  *Id.* at IT 00095-98.  In a third argument to the

Patent Office, Inner-Tite argued that the prior art "lacks a jaw that is *moveable between* the

bracket flanges 29 [sic-30], 32."  *Id.* at IT 00105 (emphasis added).

13.     In its "Decision on Appeal," the Board agreed with the argument that Inner-Tite

made in its Appeal Brief that the prior art did not show a bracket mounted for movement

between the flanges.  *Id.* at IT 00126.  The application was returned to the Examiner, and the

Examiner issued the patent as the Examiner was obliged to do.  In the "Reasons for Allowance,"

the Examiner stated:  "The prior art of record fails to disclose that the lock assembly further

comprises a jaw interengaged to the bracket in such a way that the jaw *moves between* first and

second flanges of the bracket …."  *Id.* at IT 00134 (emphasis added).  Thus, the *movement* of the

*jaw* between the first and second flanges was critical to patentability.

C.    **The Accused ProLock Products**

1.    **Structure of the ProLock Products**

14.    The ProLock products are depicted below in two perspective drawings:





**ProLock 1**                    **ProLock 2**

TX-27; TX-28.

15.    The only difference between the two ProLock products can be seen in the lower panel of the clamping member of the ProLock 2.  In the ProLock 2, a rectangular portion of the "lower panel" shown on the ProLock 1 has been removed to form secondary engagement "tabs" that extend from the side panels.  Tr. 2:64(17-23).

16.    The ProLock products are made up of three parts: a bracket, a lever, and a clamping member.  The drawing below identifies the various components of the parts of the ProLock products:

8



TX-29.

17.     The bracket of the ProLock products shown above has first, second and third flanges, two webs, and two pins.  The clamping member of the ProLock products has three surfaces:  two identical side panels on either side of a single lower panel.  There is also a "projection" on the lower panel which protrudes upwards from the clamping member for the purpose of stopping the travel of the lever.  Tr. 2:76(20)-77(11).  The lever is used to apply force to the clamping member.  The clamping member is mounted on two pins protruding from the outside surface of the second flange of the bracket.  Tr. 2:68(21)-69(3).  The two pins are inserted into the holes on the side panels of the clamping member.  Tr. 2:69(18)-70(12).

18.     The width of the first and second flanges on the bracket of both ProLock products is 1.430 inches. TX-91; Tr. 1:85(17)-86(10).  The *inside* width of the clamping member of both ProLock products is 1.490 inches.  *Id.*  The *outside* width of the bracket of both ProLock products is 1.430 inches.  *Id.*  The inside width of the clamping member, 1.490 inches, exceeds the width of the bracket of the ProLock products, 1.430 inches, by 0.060 inches.  *Id.*  When the

9

clamping member is centered on the bracket, the gap of 0.060 inches would be split, with a gap of 0.030 inches on each side of the bracket.  TX-91; Tr. 1:85(17)-87(4); Tr. 2:44(11)-45(20).

19.    The bracket of the ProLock products also has two pins protruding from the outside surface of the second flange on the bracket with each pin protruding 0.160 inches.  TX-91 (difference between 1.750 and 1.430 inches, divided by 2); Tr. 2:88(1-10).  Two holes of the clamping member are used to mount the clamping member on the two pins on the side of the second flange.  Tr. 2:69(15)-70(12).  These two protruding pins extend outside the width of the first flange.  TX-91.  These pins serve the function of allowing the clamping member to move outside and around the first and second flanges of the bracket.  Tr. 2:54(10)-55(9).  This configuration allows the clamping member to apply a force to the inside wall of the meter box that is not directly opposite from the force applied to the outside wall of the meter box by the first flange.  *Id.*  The forces applied by the clamping member are offset from the force applied by the first flange and cause the meter box to flex.  Tr. 2:81(14)-82(5).

20.    The pins that protrude from the side of the second flange of the ProLock product are not part of the second flange.  Rather, they are connected to the second flange.  Tr. 2:48(5-20); Tr. 2:54(15-18).

21.    The pins that protrude from the side of the second flange serve a different function than the second flange.  Particularly, they serve as a structure for the clamping member to rotate on.  Tr. 2:54(10)-55(9).

22.    The size of the lip on the meter boxes to which the ProLock products are applied is standard, Tr. 1:48(10-20), and the thickness of a standard meter box is about 0.060 inches. Tr. 1:142(23)-143(8).

23.    The thickness of bracket of the ProLock Product is 0.125 inches, more than twice the thickness of a standard meter box.  The bracket is also heat treated.  Tr. 1:140(9)-141(13); Tr. 2:82(16)-83(5).

### 2.    Operation of the ProLock Products

24.    The ProLock products are installed on the bottom portion of a meter box.  The top flange of the meter box holds the lid in place, and the function of the locking device is to hold the bottom part closed and secure.  Tr. 2:72(1-20).

25.    Installation of the ProLock products is a three step process.  First, the clamping member is placed over the side wall of the meter box.  Next, the installer rotates the lever until the side panels of the clamping member contact the box wall.  Finally, the lever is pushed into a locked position, flexing the box wall and locking the bracket in place.  Tr. 2:71(11)-76(8); Tr. 1:161(23)-162(24); Tr. 2:4(10)-5(3); Tr. 2:14(6)-15(5); TXs-14-16; TXs-22-24.

26.    The upper edges of the side panels of the clamping member of the ProLock products clamp the side wall of the meter box.  Tr. 2:5(4-22); Tr. 2:7(12-13).

27.    The clamping member of the ProLock products do not apply a compressive force to the side wall of the meter box.  Tr. 2:30(23-25); Tr. 2:80(19-20).

28.    The ProLock products operate through bending and shear forces because the side panels of the clamping member apply forces that are offset from the force applied by the first flange.  Tr. 2:9(7)-12(11); Tr. 2:15(6-8); Tr. 2:27(3)-28(3); Tr. 2:29(17)-32(3); Tr. 2:44(7-10); TX-20; TX-87 at 3; TX-88.

29.    The ProLock products use a cam to urge the clamping member toward the meter box wall.  Mr. DeWalch testified that the rise of the cam causes the clamping member to move toward the meter box wall and take up any looseness in the fit between the locking device and the meter box.  Tr. 2:73(24)-74(16).  Both Mr. Rafferty and Mr. DeWalch testified that some

mechanical part had to bend in response to the force applied. Mr. Rafferty testified that it was the bracket that moved, Tr. 1:91(20)-92(23), while Mr. DeWalch testified that both the bracket and the side wall of the meter box bend. Tr. 2:80(11)-83(17); Tr. 2:89(10)-90(10). Mr. DeWalch also testified that he tested the movement of the wall of the meter box using a dial indicator. He observed that when he tightened the ProLock product on the box the wall moved 0.005 inches. Tr. 2:89(17)-90(10). The ProLock Product was developed by John Stachowiak prior to April 2004. Tr. 1:155(9-18). Mr. Stachowiak is a former employee of DeWalch who now works for Weatherford International in an engineering-related position. Tr. 1:160(15)-161(2). Mr. Stachowiak was trying to develop a locking device that was quick and easy to install. Tr. 1:158(12-21). He wanted to avoid the use of a screw as seen in the Inner-Tite product because of the time it took to install the screw. Tr. 1:159(4-9).

30.    Mr. DeWalch testified how the force applied by a user to the lever is multiplied by the design of the ProLock products so as to allow the clamping member and the first flange to apply offset forces to the meter box. Specifically, he noted that the force is multiplied by the leverage of the lever. Tr. 2:74(23)-76(8); Tr. 2:84(24)-85(6); Tr. 98(22)-99(16), and by the second lever of the clamping member. Tr. 2:83(22)-84(20). Thus, in concert, the clamping member and first flange of the ProLock product place the meter box wall in sheer and bending, and thereby clamp the ProLock product in place. Tr. 2:11(6-14).

31.    The lower panel of the clamping member serves a security function-- in case an adversary attempts to pry the box open, the lower panel would be urged into abutment with the lip of the meter box and prevent the adversary from removing the box lid. Tr. 2:8(11)-9(3); TX-19; Tr. 2:12(12)-13(3); Tr. 2:64(17-13).

### D.    Literal Infringement

32.    The ProLock products do not infringe claim 1 of the '691 patent because they do not meet the first and third requirements of this Court's claim construction.

#### 1.    "Either of two mechanical parts that open and close to grip or crush something, as in a monkey wrench or vise"

33.    Plaintiff's witness, Mr. Rafferty, admitted that both a vise and monkey wrench operate through directly opposing forces which compress an object.  Tr. 1:125(15)-126(20); Tr. 1:130(4)-131(14).

34.    The clamping member of the ProLock products do not apply a compressive force to the side wall of the meter box.  Tr. 2:30(23-25); Tr. 2:80(19-20).

35.    The ProLock products operate through bending and shear forces because the side panels of the clamping member apply forces that are offset from the force applied by the first flange.  Tr. 2:9(7)-12(11); Tr. 2:15(6-8); Tr. 2:27(3)-28(3); Tr. 2:29(17)-32(3); Tr. 2:44(7-10); TX-20; TX-87 at 3; TX-88.

36.    The clamping member of the ProLock products does not grip or crush like a monkey wrench or a vise.  Tr. 2:88(13)-89(9).

#### 2.    "Mechanically interengaged with and carried by said bracket"

37.    The parties do not dispute that this element of the Court's claim construction is met by the accused ProLock products.

#### 3.    "For movement in or through the space that separates the first and second flanges"

38.    Comparing the width of the first and second flanges, 1.040 inches, with the width of the clamping member, 1.090 inches, it is clear that the clamping member moves outside of and around the first and second flanges.  TX-91.  Because the clamping member is wider than the bracket, it is physically impossible for the clamping member to move "in or through the

13

space that separates" the first and second flanges. Thus, the clamping member does not literally infringe claim 1 of the '691 patent.

39.    The clamping member of the ProLock products do not move in or through the space that separates the first and second flanges. Tr. 2:67(12)-68(9); Tr. 2:13(22-25); Tr. 2:16(6)-18(14).

40.    Plaintiff's witness, Mr. Robert E. Rafferty, admitted that when viewed from the side, the clamping member of the ProLock products remains "just outside" the space between the two flanges. Tr. 1:136(16)-137(7).

**E.    Plaintiff's Theories of Literal Infringement**

**1.    Theory Briefed At Summary Judgment**

41.    At the summary judgment stage of this case, Plaintiff set forth a theory of infringement based on an allegation that the bottom portion of the clamping member of the ProLock products enters the space between the first and second flange of the mounting bracket. Dkt. Nos. 33, 34, 35, 36, 37, and 58.

42.    Plaintiff's theory was based on an affidavit and drawings prepared by Mr. Rafferty. TX-92. Those drawing did not accurately depict the ProLock products that are accused of infringement in this case. Tr. 1:118(13-16); Tr. 1:120(15)-121(16).

43.    Plaintiffs did not present that theory of infringement at trial and did not offer these drawings to the Court. Tr. 1:118(5-12). Prior to trial, Plaintiff elected not to rely on the drawings prepared by Mr. Rafferty. Dkt. 77.

44.    Despite the fact that Mr. Rafferty had access to DeWalch's engineering drawings and despite the fact that Mr. Rafferty had discovered that his drawings did not accurately depict the ProLock products, neither Mr. Rafferty nor Inner-Tite informed this Court of its error. Tr. 1:118(13)-122(3).

2.      **"Pin" Theory**

45.     At trial, Plaintiff presented a "pin" theory of infringement.  Plaintiff's witness, Mr. Rafferty, alleged that the pins upon which the clamping member is mounted are part of the second flange of the ProLock bracket.  Mr. Rafferty concluded, therefore, that the clamping member of the ProLock products were "literally between" the two flanges.  Tr. 1:75(16)-77(7)

46.     The pins on the bracket are not part of the second flange.  Although they are made from the same piece of metal as the second flange, they serve a different function than the second flange.  Tr. 1:106(5)-108(22); Tr. 2:54(10)-55(9).

47.     Mr. Rafferty admitted that if the pins are not considered part of the second flange, then the clamping member of the ProLock products does not move in the space between the first and second flanges.  Tr. 1:78(12-20).

48.     Contrary to the arguments of Inner-Tite, Mr. Stachowiak did not testify that the pins were part of the "mutually spaced flanges."  Rather, Mr. Stachowiak testified that the pins were "connected" to the second flange.  Tr. 2:48(5-20).  When instructed to use "the terminology of third flange, intermediate web and second flange" with respect to the pin, Mr. Stachowiak stated that "it would be part of the second flange"; however, he added that it was "connected to the second flange."  Tr. 2:48(18); Tr. 2:48(20).  Mr. Stachowiak also testified that in his opinion, the clamping member did not move in or through the space between the first and second flanges.  Tr. 2:17(16)-18(4).  Thus, the pins are not part of the second flange.  He also testified that the pins actually served a different function than the second flange by allowing the clamping member to rotate around the pins and to take the clamping member away from the flanges so the clamping member can apply the forces outside of the first flange.  Tr. 2:54(10)-55(9).  Neither was Mr. Stachowiak's coloring of TX-91 testimony that the pins were part of the second flange. When asked to mark TX-91, Mr. Stachowiak was actually asked to mark that "portion of the

drawing that is associated with the 1.040 dimension," Tr. 2:41(4-7), which is merely the length of the second flange.  Coloring the portion within the 1.040 inch dimension does nothing more than indicate those structures that happen to be located within this distance.  During the annotation of this exhibit, Mr. Stachowiak was never asked whether the pin was part of the second flange.  Accordingly, the marking of the 1.040 inch dimension on TX-91 is not testimony by Mr. Stachowiak that the pins are part of the second flange.

### 3.     "Gravity" Theory

49.     At trial, Plaintiff presented a "gravity" theory of infringement.  Plaintiff's witness, Mr. Rafferty, alleged that when held vertically, the clamping member of the ProLock products falls within the space between the first and second flange.  Tr. 1:86(17)-88(8).

50.     To support his testimony, Mr. Rafferty applied a ProLock product to a meter box. He testified that when he put a ProLock product on a vertical box, the working surface of the clamping member fell behind the first flange.  *Id.*  Mr. Rafferty  applied the ProLock product to the top portion of a meter box, where there was a gap or hole in the meter box wall and testified that he could see part of the clamping member behind the first flange.  *Id.*  When Mr. Rafferty applied the ProLock product to the top portion of the meter box, however, he did not install the lid on the box.

51.      Mr. DeWalch testified that the ProLock products would never be used in such a configuration, because the flange on top holds the meter lid in place and the locking device holds the bottom part of the lid in place, closed and secure.  Tr. 2:72(1-20).  Also, Mr. DeWalch testified that the locking device is not intended to be installed at the top of the meter box.  Tr. 2:92(24)-93(9).  It is impossible to close the box lid when the locking device is installed at the top because it is too close to the flange.  Tr. 2:78(12-16).  It also would be improper operation to

install the clamping member over a notch where there is no material for the clamping member to clamp.  Tr. 2:92(24)-93(9).

52.    Mr. DeWalch testified that the clamping member did not move through the space between the first and second flanges.  He noted that the side panel of the clamping member was outside of the bracket as it was on top of the second flange of the bracket and thus outside of the bracket.  Tr. 2:90(11)-91(8).  With respect to the ProLock products mounted vertically that were published to the Court, Mr. DeWalch testified that the clamping member did not enter the space between the first and second flanges.  Tr. 2:102(l6-21).  When the Court observed the ProLock product during Mr. Rafferty's testimony, the ProLock product did not drop all the way down as testified by Mr. Rafferty.  Tr. 1:89(15-17).

53.    Mr. DeWalch repeated Mr. Rafferty's demonstration and testified that the clamping member did not move in or through the space that separates the first and second flanges.  Tr. 2:90(11)-92(18).  Counsel for DeWalch then published the meter box with the ProLock products as installed by Mr. DeWalch to the Court. Tr. 2:90(11)-91(8); Tr 2:102(16)-103(3).

54.    Mr. Stachowiak denies that the clamping member of the ProLock Product enters the space that separates the first and second flanges. Tr 2:15(16-19).  Mr. DeWalch also testified that he looked at the '691 patent when he first learned of the patent, and concluded that DeWalch did not infringe because the clamping member did not pass in or through the space that separates the two flanges.  Tr. 2:67(7)-68(10).

55.    Mr. DeWalch admitted that when Inner-Tite's counsel manipulated in his hand the ProLock product into a certain configuration (e.g., without combination with a utility box), a portion of the side wall of the clamping member could penetrate a portion of the border of the

space that separates the first and second flanges (Tr 2:97(19)-98(16).  The particular ProLock product manipulated by hand by counsel for Inner-Tite did not look to be made according to DeWalch specifications as the side panels of the clamping member were very distorted and not at 90 degrees.  Tr. 2:99(22)-100(12).  The subsequent ProLock product sample that counsel for Inner-Tite stated was overlapping when manipulated by hand did not show the clamping member between the first and second flange when installed on a meter box.  Tr. 2:101(24) – 103(2). Claim 1 of the '691 patent requires that the claimed invention is "for use in combination with a utility box."  TX-1.  The location of the clamping member of a ProLock product when manipulated by hand and not on a utility box is irrelevant to the question of literal infringement.

56.    Mr. DeWalch denies that the clamping member of the ProLock product enters the space that separates the first and second flanges when used in combination with a meter box.  Tr. 2:67(12)-68(9).

57.    When held vertically, the clamping member of the ProLock products rests on top of the bracket.  Tr. 1:144(14-21).  The preamble of claim 1 requires that the locking assembly be used in combination with a utility box, and thus how the clamping member may rest when the locking assembly is not installed on the meter box is irrelevant to the infringement issue.

58.    Even to the extent the bracket may fall out of alignment when not in use, when the product is mounted on a meter box, the bracket does not fall between the space that separates the first and second flange.  Tr. 2:90(24)-91(8).

**F.    Infringement Under the Doctrine of Equivalents**

**1.    Crowded Field**

59.    The '691 patent issued in a crowded field.  The face of the '691 patent identifies 29 prior art references, 15 of which were cited by the patent examiner.  TX-1 at IT 00143.  Mr.

DeWalch, alone, has about ten patents that deal specifically with locking devices for utility meter boxes.  Tr. 2:58(8-12).

## 2.     Substantial Differences

60.     The clamping member of the ProLock products is substantially different from the claimed jaw.  In particular, its design offers several advantages.  It is more secure, quicker, and safer than the claimed jaw, and it is more "fool proof" because of the positive snap offered by the levered design.  Tr. 2:62(4)-63(6); Tr. 2:21(14)-22(9).  The ProLock products were designed by Mr. Stachowiak to avoid some of the problems associated with products like the Jiffy Lock offered by Inner-Tite pursuant to the '691 patent.  Tr. 1:156(14)-158(21).

61.     The function of the clamping member of the ProLock products is substantially different from the function of the jaw in the '691 patent.  The function of the clamping member of the ProLock products is to flex the side wall of the meter box.  Tr. 2:54(10)-55(9); Tr. 2:81(14)-82(5); Tr. 2:74(23)-76(8).  The function of the jaw in the '691 patent is to compress the side wall of the meter box.

62.     The way the clamping member of the ProLock products functions is substantially different from the way that the jaw in the '691 patent functions.  The way that the clamping member of the ProLock products functions (bending the side wall of the box) is by applying offsetting forces.  Tr. 2:81(14)-82(5); Tr. 2:80(19-20); Tr. 2:88(13)-89(9).  The way that the jaw in the '691 patent functions (compressing the side wall of the meter box) is by applying directly opposing forces.

63.     The results achieved by the clamping member of the ProLock products are substantially different from the results achieved by the jaw in the '691 patent.  The results accomplished by the clamping member of the ProLock products are the attachment of the bracket to the meter box in a quicker, safer, and more reliable and secure fashion than the jaw of the '691

patent.  The jaw of the '691 patent: (1) takes more time to install because of the time to tighten

the screw, (2) is less secure because there is no positive feedback by the screw to indicate when

it is fully installed, and (3) is not as safe because it requires the user's hand to enter into the

meter box.  Tr. 2:61(13)-63(6); Tr. 2:21(14)-22(9).

64.    Further, the clamping member of the ProLock product offers a secondary security

function.  Specifically, in addition to the clamping action provided by the upper side panels of

the ProLock clamping member, the lower portion of the clamping member is designed to engage

with the lip of the meter box when someone tries to pry the top off the meter box.  Tr. 2:64(17-

23); Tr. 2:7(18)-8(21); Tr. 2:20(7)-21(13).

## II.    CONCLUSIONS OF LAW

### A.    Claim Construction

#### 1.    "Jaw Mechanically Interengaged With and Carried By Said Bracket For Movement Between Said First and Second Flanges"

For the reasons set forth in this Court's Memorandum and Order on Cross-Motions for

Summary Judgment and to Strike Affidavits, dated August 31, 2007, the claim language "a jaw

mechanically interengaged with and carried by said bracket for movement between said first and

second flanges" is construed to mean:  "(1) either of two mechanical parts that open and close to

grip or crush something, as in a monkey wrench or vise, (2) mechanically interengaged with and

carried by said bracket (3) for movement in or through the space that separates the first and

second flanges."

#### 2.    "First and Second Mutually Spaced Flanges"

During the trial of this case, a claim construction issue arose based on a theory of

infringement not presented in the summary judgment papers of the parties.  Specifically, the

"pin" theory asserted by Inner-Tite raises the claim construction issue of what is meant by "mutually spaced flanges."

Claim 1 of the '691 patent includes an express limitation regarding the first and second flanges. Claim 1 requires that the bracket have "first and second mutually spaced flanges integrally joined by an intermediate web." TX-1 at col. 4:30-31. As can be seen in Fig. 3 of the '691 patent, the first flange and the second flange have the same width and thus are "mutually spaced." *Id.* at Fig. 3. The specification similarly notes:

> With reference to FIG. 3, it will be seen that the lock assembly includes a mounting bracket 28 having first and second mutually spaced and angularly disposed flanges 30, 32 integrally joined by an intermediate web 34. A third flange 36 is formed integrally with and projects laterally from the first flange 30.

*Id.* at col. 2:47-52. This description of the "mutually spaced first and second flanges" and Figure 3 make clear that the second flange must be "mutually spaced" across the web from the first flange. Note that the third flange is not described in the '691 patent as mutually spaced because it is not. Thus, the second flange is "mutually spaced" from the first flange, and thus has the same width as the first flange.

To the extent that Inner-Tite is arguing that the proper claim construction is that the pins are part of the second flange is an equally reasonable claim construction, the public notice function as explained in *Athletic Alternatives, Inc. v. Prince Manufacturing, Inc.*, 73 F.3d 1573 (Fed. Cir. 1996), is controlling. In *Athletic Alternatives*, the Federal Circuit was faced with a situation where the dispositive claim language on its face was susceptible to two equally plausible meanings, under one of which the defendant infringed, and under the other of which it did not. The Federal Circuit adopted the narrower of the two constructions and held:

> Where there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the

> narrower meaning, we consider the notice function of the claim to
> be best served by adopting the narrower meaning.

*Id.* at 1581; *see also Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir.

1998) ("Because the applicant has the burden to "particularly point[ ] out and distinctly claim[ ]

the subject matter which the applicant regards as his invention," 35 U.S.C. § 112, ¶ 2 (1994), if

the claim is susceptible to a broader and a narrower meaning, and the narrower one is clearly

supported by the intrinsic evidence while the broader one raises questions of enablement under

§ 112, ¶ 1, we will adopt the narrower of the two.").  In the present case, the patentee has not

disclosed the use of pins on the side of the second flange and thus the notice function of the

claim is best served by adopting the narrower construction of the flanges as not including pins.

### 3.    Preamble

In support of its "gravity" theory of infringement, Inner-Tite offered evidence of the

operation of the ProLock products uninstalled on the meter box (*e.g.*, in the hand of a witness)

and installed on a meter box without a lid.  This raises a new claim construction issue.

The preamble of claim 1 reads as follows:

> 1.  *For use in combination with a utility box* having a bottom, a
> side wall, and *a cover* which may be opened to gain access to the
> interior of the box, and which when closed, overlaps an upper edge
> of the side wall, *a lock assembly for maintaining the cover in its
> closed position*, said lock assembly comprising:

TX-1 (emphasis added).  "[A] preamble generally limits the claimed invention if it 'recites

essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim.'"

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1305-1306 (Fed. Cir. 2005) (quoting

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)).  "When

limitations in the body of the claim rely upon and derive antecedent basis from the preamble,

then the preamble may act as a necessary component of the claimed invention."  *Eaton Corp. v.*

*Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003). Thus, the preamble requires that the

lock assembly be used "in combination with a utility box" and that the lock assembly must

function so as to maintain "the cover in its closed position." Accordingly, the evidence of how

gravity allows the clamping member of the ProLock Product to drop down when it is not

installed on the utility box is irrelevant to its operation on the utility box. In addition, the lock

assembly must be installed so that it can "[maintain] the cover in its closed position." This

requires the locking device to be installed on the bottom half of the utility box so the cover can

be closed. Accordingly, the installation of the ProLock product over the notch, as Mr. Rafferty

did, is not a proper application of the device. Tr. 2:92(19)-93(9); Tr. 2:72(1-20). Therefore, Mr.

Rafferty's testimony concerning the operation of the device when it is placed over the notch is

irrelevant. Finally, Mr. DeWalch testified that when the ProLock product is installed on a meter

box, the device will line so that the clamping member moves parallel to the side panels of the

bracket. Tr. 2:92(5-18). Accordingly, the clamping member will not enter the space between the

first and second flanges.

      **B.**      **Literal Infringement**

      Inner-Tite, the patentee, bears the burden of proving that the ProLock products infringe

the '691 patent. *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1545 (Fed. Cir. 1987). In

this case, as in most patent cases, the issue of literal infringement turns entirely on the Court's

construction of the disputed claim limitation as set forth in the order dated August 31, 2007, and

as set forth above with respect to "first and second mutually spaced flanges." For literal

infringement, the plaintiff must establish that each element of the claims is met literally. *Mas-*

*Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998) (stating that "[t]o prove

literal infringement, the patentee must show that the accused device contains every limitation in

the asserted claims.  If even one limitation is missing or not met as claimed, there is no literal

infringement.");  *see also Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302 (Fed. Cir. 2002).

     **C.**     **Doctrine of Equivalents**

     In determining whether the ProLock products infringe under the doctrine of equivalents,

this Court must determine whether the bracket of the ProLock products is substantially different

from the "jaw" of the claimed invention as construed by the Court.  *See Warner Jenkinson Co. v.*

*Hilton Davis Chem., Co.,* 520 U.S. 17, 29-30 (1997) (stating that the doctrine of equivalents is to

be applied to individual claim elements, not to the invention as a whole).  "If the accused device

performs a substantially different function *or* performs in a substantially different way *or* obtains

a substantially different result, it does not infringe under the doctrine of equivalents."  *Engel*

*Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1407 (Fed. Cir. 1996) (emphasis in original).  A

patentee must "explicitly delineate to the [fact-finder] equivalence of function, means, and result

between the claimed [invention] and accused [device or method]."  *Lear Siegler, Inc. v. Sealy*

*Mattress Co. of Michigan, Inc.*, 873 F.2d 1422 (Fed. Cir. 1989).  Inner-Tite failed to satisfy its

burden to prove infringement by equivalents.

     "What constitutes equivalency must be determined against the context of the patent, the

prior art, and the particular circumstances of the case."  *Warner-Jenkinson*, 520 U.S. at 24.

When a patent issues in a "crowded" field, the patent is entitled only to a narrow range of

equivalents.  *Hughes Aircraft Co. v. U.S.*, 717 F.2d 1351, 1362 (Fed. Cir. 1983);  *Slimfold Mfg.*

*Co., Inc. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1457 (Fed. Cir. 1991).

     The doctrine of equivalents is legally not available to Inner-Tite.  Two different doctrines

preclude availability of the doctrine in this case.  First, prosecution history estoppel precludes

reliance on the doctrine of equivalents because Inner-Tite repeatedly and successfully argued the

criticality of the "movement between" limitation to the patentability of the claims.  Second,

application of the doctrine of equivalents to a clamping member that surrounds the flanges would vitiate the claim limitation requiring that it be "between" the flanges.

### 1.    Particularized Testimony and Linking Argument

To prove infringement by equivalents the patentee must offer "particularized testimony and linking argument" as to each element not literally met by the claim. *Texas Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) ("Pursuant to our precedent, a patentee must still provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents.  Such evidence must be presented on a limitation-by-limitation basis.  Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.").

Mr. Rafferty's brief discussion of the function and result of the jaw of the '691 patent is insufficient to provide a meaningful explanation of the *way* by which the jaw achieves its intended result. Tr. 1:54(1)-56(3).

Mr. Rafferty's brief discussion of the function of the clamping member of the ProLock Product 1, "to be the movable member of a two part clamping mechanism," is insufficient to establish infringement by equivalents.

Inner-Tite did not present any evidence regarding the function of the jaw of the ProLock Product 2; nor did Inner-Tite present any evidence regarding the result of the jaw of either ProLock product or the way in which such result is achieved.

### 2.    Legal Limits on the Availability of the Doctrine of Equivalents

Infringement by equivalents may be found even where a claim is not literally infringed. *Warner-Jenkinson*, 520 U.S. at 40.  There are, however, legal limits on the availability of the

25

doctrine.  First, if an applicant surrendered subject matter during prosecution, the applicant is

estopped from asserting infringement by equivalents as to that subject matter.  *Festo Corp. v.*

*Shoketsu Kinzoku Kogyo Kabushiki*, 535 U.S. 722, 723 (2002) ("Prosecution history estoppel . . .

precludes a patentee from regaining, through litigation, coverage of subject matter relinquished

during prosecution of the application for the patent.") (quoting *Wang Labs., Inc. v. Mitsubishi*

*Elec. Am., Inc.*, 103 F.3d 1571, 1577-78 (Fed. Cir. 1997)).   Second, if a patentee's assertion of

the doctrine of equivalents would entirely vitiate a claim element, the doctrine of equivalents is

not available.  *See Warner-Jenkinson*, 520 U.S. at 29 ("It is important to ensure that the

application of the doctrine [of equivalents] is not allowed such broad play as to effectively

eliminate that element in its entirety.  So long as the doctrine of equivalents does not encroach

beyond the limits just described . . .we are confident that the doctrine will not vitiate the central

functions of the patent claims themselves.").

    Thus, before determining whether the ProLock products infringe under the doctrine of

equivalents, this Court must determine whether the doctrine of equivalents is legally available to

Inner-Tite.   It is not.  As explained below, both prosecution history estoppel and the doctrine of

claim vitiation preclude applicability of the doctrine of equivalents in this case.

a.     **Prosecution History Estoppel Precludes the Application
of the Doctrine of Equivalents to the ProLock Products**

    The doctrine of prosecution history estoppel prevents a patentee from recapturing through

equivalents subject matter surrendered during prosecution.  *Loctite Corp. v. Ultraseal Ltd.*, 781

F.2d 861, 870 (Fed Cir. 1985).  An amendment to the claim being asserted is not necessary in

order to create prosecution history estoppel.  *Builders Concrete, Inc. v. Bremerton Concrete*

*Prods. Co.*, 757 F.2d 255, 260 (Fed Cir. 1985).  To the contrary, prosecution history estoppel

"may arise from matter surrendered as a result of amendments to overcome patentability

rejections, or as a result of argument to secure allowance of a claim." *Cybor Corp. v. FAS Tech. Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (citation omitted); *see also Haynes Int'l v. Jessop Sted Co.*, 8 F.3d 1573, 1578 (Fed Cir. 1993) (affirming summary judgment of non-infringement by equivalents because of arguments made to the Examiner and the Board to procure allowance of the patent).

In this case, prosecution history estoppel arises because of repeated arguments made by the patentee to secure allowance of claim 1 of the '691 patent. As explained above, Inner-Tite argued both to the Examiner and to the Board that the claims were not obvious over the prior art because of the jaw which is mounted for "movement between" the first and second flange. Ultimately, the Examiner allowed the claim because of that argument. Hence, Inner-Tite is estopped as a matter of law from asserting infringement by any product that does not have a jaw mounted for movement in or through the space between the first and second flanges. *See Southwall Techs. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995).

In *Southwall*, for example, the plaintiff patentee in an infringement suit argued that defendant's two-step process infringed by equivalents the one-step process claimed in its patent. During prosecution, however, it had distinguished a prior art reference, Franz, not by relying on the exact method in Franz but by emphasizing that Franz showed a multi-step process whereas plaintiff claimed a one-step process. Affirming summary judgment of noninfringement, the Federal Circuit held that, by law, the broad disclaimer of prior art estopped a greater range of equivalents than that strictly necessary to distinguish the prior art and that the patentee had consequently disclaimed as equivalents all multi-step processes. The court reasoned, "[O]ther players in the market place are entitled to rely on the record made in the Patent Office in determining the meaning and scope of the patent. *Id.* at 1581 (*quoting Lemelson v. General*

*Mills, Inc.*, 968 F.2d 1202, 1208 (Fed Cir. 1992)).  Because the patentee has explicitly

distinguished the combination on the basis of its failure to fall within the "movement between"

limitation, the range of equivalents permissible under the doctrine of equivalents also excludes

any device not literally infringing the limiting language "movement between."  DeWalch is

entitled to rely on the record in the Patent Office, and as a matter of law, the patentee is now

estopped from asserting that any structure that is not mounted for "movement between" the two

flanges might be an equivalent.  *See Haynes*, 8 F.3d at 1578 ("The legal standard for determining

what subject matter was relinquished is an objective one, measured from the vantage point of

what a competitor was reasonably entitled to conclude, from the prosecution history, that the

applicant gave up to procure issuance of the patent.").

> **b.**     **The Doctrine of Claim Vitiation Precludes the**
>              **Application of the Doctrine of Equivalents to the**
>              **ProLock Products**

As a matter of law, the clamping members of the ProLock products cannot infringe under

the doctrine of equivalents because such a finding of infringement would "vitiate" the claim

limitation of "movement between."   The claim vitiation doctrine is based on the "all limitations

rule."  *See Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358.  This rule holds that

"an accused product or process is not infringed unless it contains each limitation of the claim,

either literally or by an equivalent."

In *Warner-Jenkinson*, 520 U.S. at 29, the Supreme Court, expressed concern that the

doctrine of equivalents had "taken on a life of its own, unbounded by the patent claims," stated

the prohibition against giving such a broad equivalence to a claim limitation so as to "effectively

eliminate" the claim limitation:

> There can be no denying that the doctrine of equivalents, when
> applied broadly, conflicts with the definitional and public-notice
> functions of the statutory claiming requirement.

* * *

> Each element contained in a claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. *It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety*.

*Id.* (emphasis added).[2]  The claim vitiation doctrine protects the "definitional and public-notice functions" of the patent claims. *See Sage Prods, Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997) ("Because th[e] issued patent contains clear structural limitations, the public has a right to rely on these limits in conducting its business activities.").

The claim vitiation doctrine forecloses any analysis under the doctrine of equivalents here.  Judgment as a matter of law is appropriate when the court determines, as a threshold matter, that a finding of equivalents infringement would "vitiate" a claim limitation.  *See Warner-Jenkinson*, 520 U.S. at 39 n.8 ("Thus, under the particular facts of a case, . . . if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further *material* issue for the jury to resolve."); *Freedman Seating*, 420 F.3d at 1358 ("Second, an element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation."); *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320-21 (Fed. Cir. 2003); *Sage Prods.*, 126 F.3d at 1429 (Fed. Cir. 1997).   Thus, "[i]f a theory of equivalence would vitiate a claim limitation . . . then there can be no infringement as a matter of law." *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998).

---

[2] Later in the *Warner-Jenkinson* opinion, the Supreme Court used the term "vitiate," thus giving the claim vitiation doctrine its name. *Warner-Jenkinson*, 520 U.S. at 39 n.8.

In claim 1 of the '691 patent, as construed by the Court, the term "a jaw mechanically interengaged with and carried by said bracket for movement between said first and second flanges," requires that the "jaw" move "in or through the space that separates" the first and second flanges. The preposition "between" provides a clear and specific indication as to the location of the movement of the jaw. The Federal Circuit has consistently held that claim limitations expressly restricting some part of an apparatus to a particular location (such as the "movement *between* said first and second flanges" limitation in the '691 patent) would be vitiated if the doctrine of equivalents were used to extend the scope of such claims beyond their literal meaning.

For example, in *Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317 (Fed. Cir. 2002), the Federal Circuit applied claim vitiation to the claim limitation "between the two plugs." Specifically, the claim limitation required a "workover port" to enter a wellhead assembly "*between* the two plugs." *Id.* at 1319 (emphasis added). The defendant asserted the claim vitiation doctrine applied because the workover port in the accused device entered the wellhead assembly *above* the two plugs. The Federal Circuit affirmed the application of that claim vitiation doctrine: "Were we to ignore Cooper's decision to claim in the [asserted] patent a workover port that connects to the assembly only 'between' the plugs, we would vitiate that limitation and thereby run afoul of the all-limitations rule." *Id.* at 1322.

Similarly, in *Sage Products*, the Federal Circuit considered whether a patent claim directed to a hazardous medical waste disposal container was infringed under the doctrine of equivalents. *Sage Prods.*, 126 F.3d 1420. The claim at issue required "an elongated slot at the *top* of the container body" and a "constriction extending *over* said slot." *Id.* at 1422 (emphasis added). The accused product had a slot that was located in the *interior* of the container rather

than at the top of the container, and two constrictions *below the top* of the container. *Id.* at 1423-24. The court upheld a finding of no infringement under the doctrine of equivalents, concluding that equivalence would vitiate the "slot at the top of the container body" and "extending over said slot" limitations. *Id.* at 1424-26. "The doctrine of equivalents does not grant Sage license to remove entirely the 'top of the container' and 'over said slot' limitations from the claim." *Id.* at 1474. "Because this patent contains clear structural limitations, the public has a right to rely on those limits in conducting its business activities." *Id.* at 1425.

The Federal Circuit applies the claim vitiation doctrine using a "totality of circumstances" test based a non-exclusive list of factors. As the Federal Circuit observed in *Freedman Seating*:

> There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule. Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless.

*Freedman Seating*, 420 F.3d at 1359. In applying this totality of the circumstances test, the *Freedman Seating* court identified a non-exclusive list of factors – "the simplicity of the structure, the specificity and narrowness of the claim, and the foreseeability of variations at the time of filing the claim with the PTO," as well as whether the difference between the claim limitation and the relevant aspect of the accused device is a "a *subtle difference in degree*" or "a clear, *substantial difference* or *difference in kind*." *Id.* (emphasis in original). *See also Sage Prods.*, 126 F.3d at 1425 (noting the simplicity of the structure, the specificity and narrowness of the claim, and the foreseeability of variations at the time the claim was filed as factors to be consideration in determining whether this doctrine of claim vitiation applies). Applying these four factors set forth in *Freedman Seating* to the limitation "between" and the clamping member

of the ProLock products that moves outside and around the first and second flanges bars, Inner-Tite's theory of infringement under the equivalents as a matter of law.

### (1) Simplicity of the Structure.

The invention claimed in the '691 patent involves a relatively simple mechanical device that is easily explained with plain language and drawings. Like the Federal Circuit noted in *Sage Products* when it applied claim vitiation, "the claim at issue defines a relatively simple structural device." *Sage Prods.*, 126 F.3d at 1425. The bracket with flanges, the intermediate web, the jaw, the force exerting means shown in the '691 patent, the cap, and the interlocking means for securing the cap to the bracket are all straightforward mechanical devices. Similar meter box locking devices that employed a bracket with first and second flanges and a screw for clamping the bracket to the meter box wall were described in the "Description of the Prior Art" section of the '691 patent. TX-1 at col. 1:12-39. All of the drawings in the '691 patent clearly and unambiguously show the jaw moving "between" the first and second flanges. *See Id.* In other words, in using the term "between," the patentee of the '691 patent did not fail to use the proper words to describe the movement of the jaw disclosed in the '691 patent. As stated in *Sage Products*, "[n]o subtlety of language or complexity of the technology, nor any subsequent change in the state of the art, such as later developed technology, *obfuscated the significance of this limitation* at the time of its incorporation into the claim." *Id.* at 1425 (emphasis added). In the case of the location of the movement of the jaw in the claimed apparatus, the simplicity of the structure makes location a straight-forward limitation. As a result, this factor weighs heavily in favor of DeWalch.

### (2) Specificity and Narrowness of Claim Limitation.

Courts are more likely to find claim vitiation when a structural limitation in a patent claim is clear and specific. As the Supreme Court noted in *Warner-Jenkinson*, "[t]he doctrine of

equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement." *Id.* at 1049. In *Sage Products*, the Federal Circuit explained:

> Thus, for a patentee who has claimed an invention narrowly, there may not be infringement under the doctrine of equivalents in many cases, even though the patentee might have been able to claim more broadly. If it were otherwise, then claims would be reduced to functional abstracts, devoid of meaningful structural limitations on which the public could rely.

*Id.* at 1424.

In the present case, the Court has construed the term "between" to have a specific meaning: "in or through the space that separates." This claim construction was so specific that both parties agreed (at least initially) to this meaning. This specific meaning of "movement between" is consistent with the '691 patent: all of the jaws shown in the '691 patent move "in or through the space that separates" the first and second flanges. *See* TX-1. The file history also specifically highlighted the specific and narrow meaning of the term "between" when the patentee distinguished the limitation at issue ("movement between") over the prior art rejections by the Examiner.

The preposition "between" was applied with specificity and narrowly in the *Cooper Cameron* decision to a mechanical device, namely, a wellhead assembly. In *Cooper Cameron*, the Federal Circuit held that the claim vitiation doctrine precluded finding a workover port that entered the wellhead assembly *above the two plugs* infringed under the doctrine of equivalents a limitation that required the workover port to enter the wellhead assembly "*between* the two plugs." *Cooper Cameron*, 291 F.3d at 1319 (emphasis added). Similarly, in *Sage Products,* the Federal Circuit applied claim vitiation to prevent a patentee from asserting the limitations regarding "an elongated slot at the *top* of the container body" and a "constriction extending *over*

said slot" were infringed under the doctrine of equivalents by a slot that was located in the

*interior* of the container, and had two constrictions *below the top* of the container.  *Id.* at 1423-

24.  "Because this patent contains clear structural limitations, the public has a right to rely on

those limits in conducting its business activities."  *Id.* at 1425.  Thus, this factor also strongly

favors DeWalch.

### (3)  Forseeability of Variations at the Time of Filing with the PTO.

If a skilled patent drafter should have foreseen the limiting potential of narrow and

precise claim language, an equivalents analysis may be precluded.  As the Federal Circuit stated

in *Sage Prods.*:

> If Sage desired broad patent protection for any container that
> performed a function similar to its claimed container, it could have
> sought claims with fewer structural encumbrances.  Had Sage done
> so, then the Patent and Trademark Office (PTO) would have
> fulfilled its statutory role in helping ensure that exclusive rights
> issue only to those who have, in fact, contributed something new,
> useful, and unobvious.  Instead, Sage left the PTO with manifestly
> limited claims that it now seeks to expand through the doctrine of
> equivalents.

*Sage Prods.*, 126 F.3d at 1425.  In the present case, the patentee used only the preposition

"between" to claim the movement of the jaw with respect to the first and second flanges.  Even

though the patentee did not disclose the movement of the jaw other than "between" the two

flanges, the patentee now wishes to expand the reach of the limitation "between" to reach the

clamping member of the ProLock products that moves outside and around the first and second

flanges.  It was certainly foreseeable to the patentee that the term "between" would be construed

in a limiting fashion after the patentee expressly distinguished the claimed invention over the

prior art by highlighting the claimed language of "movement between."  Moreover, there is no

basis in the '691 patent for expanding the meaning of the term "between" to read on a clamping

member that moves outside and around the second flange of the bracket. Thus, the third factor also favors DeWalch.

**(4)     Difference in Kind Versus Degree.**

The Federal Circuit found claim vitiation when there was a difference in kind between the claim limitation and the accused device. In *Freedman Seating*, the Federal Circuit held that an accused device had a structural difference that was not a "'subtle difference in degree,' but rather, 'a clear, substantial difference or difference in kind.'" *Freedman Seating*, 420 F.3d at 1361 (quoting *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp*., 149 F.3d 1309, 1321 (Fed. Cir. 1998)). In *Freedman Seating*, the Federal Circuit considered whether a patent relating to a stowable seat was infringed by the defendant's seat. The patent claim required a seat with a support member having a moveable end "slidably mounted" to the seatbase. *Id.* at 1353. The moveable end of the support member in the accused device was "rotatably mounted to the seatbase" and did "not slide or otherwise move along the seatbase." *Id.* at 1354. The Federal Circuit held that "the district court's finding of infringement under the doctrine of equivalents had the effect of entirely vitiating the 'slidably mounted' limitation." *Id.* at 1361. The Federal Circuit noted:

> Freedman's argument would mean that any support member
> capable of allowing translational and rotational motion would be
> equivalent to a support member "slidably mounted to said
> seatbase," which reads "slidably mounted" completely out of the
> claims. This is the precise type of overextension of the doctrine of
> equivalents that the claim vitiation doctrine is intended to prevent.

*Id*. at 1362. Thus, the accused device was different-in-kind from the claimed invention – "rotatably mounted" was different in kind from "slidably mounted."

In the present case, the clamping member moves outside and around the two flanges of the bracket. Movement "outside and around" the two flanges is different-in-kind from

35

movement "between" the two flanges.  In claim 1 of the '691 patent, the term "interengaged with and carried by said bracket for movement between said first and second flanges" is a clear structural limitation upon which competitors, such as DeWalch, are entitled to rely in conducting their business.  The decisions in *Cooper Cameron* and *Sage Products* both involved prepositions regarding location of certain features that were different in kind – a movement "between" is different in kind from a movement "outside and around."

This Court's ruling in *Holmes Group, Inc. v. RPS Products, Inc*., 424 F. Supp. 2d 271 (D. Mass. 2006), regarding one of the contested claim limitations is consistent with this analysis.  In *Holmes Group*, this Court applied the claim vitiation doctrine to reject an argument by a patentee regarding a filter assembly that included a claim limitation that the hanger be coupled to the "top wall" of the frame for the filter.  The Court construed this limitation to cover an assembly with a hanger "that is coupled to the top wall of the frame, *or* to the top wall and the lip, *but not* solely to the lip."  *Id*. at 287 (italics in original).  The Court refused to find an accused filter that was solely coupled to the lip to infringe under the doctrine of equivalents.   The Court held that if it were "to conclude that [the accused filter assemblies] -- which were coupled to the lip -- had the equivalent of hangers coupled to the 'top wall,' it would vitiate the element that the hanger be coupled to the top wall."  *Id.* at 289.  This "difference in kind" is also present in the present case as the ProLock products are "solely" outside the first and second flanges, and do not move in or through the space that separates the first and second flanges.

As a result, this fourth factor also favors DeWalch, and claim vitiation bars Inner-Tite from asserting the ProLock products infringe the limitation "between" under the doctrine of equivalents.

Several cases previously cited by Plaintiff do not support Plaintiff's attempt to read the "movement between" limitation out of the claim. In *Wright Medical Technology, Inc. v. Osteonics Corp.,* 122 F.3d 1440 (Fed. Cir. 1997), the Federal Circuit reversed a summary judgment in favor of the defendant, holding the plaintiff had raised a fact issue that required a trial. Plaintiffs ignore that part of the opinion that shows the evidence offered by Plaintiff was a subtle difference in the degree of the extension through the femur. Specifically, the patentee in *Wright Medical* did not argue that the rod did not extend through the femur, but that it did not extend "all the way through." *Id*., 122 F.3d at 1445.

The second case cited by Plaintiff, *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369 (Fed. Cir. 2003), also does not support Plaintiff's attempt to ignore the "movement between" limitation. In *Ericsson*, the Federal Circuit reversed a motion for JMOL of noninfringement entered by the trial court and entered judgment based on a jury verdict of infringement under the doctrine of equivalents because the doctrine of claim vitiation was inapplicable once the facts were properly understood. The claim limitation at issue was "the speech signal amplifiers, which require power, *only supply power* to the telephone set when the receiver is off the cradle and a call can be made." *Id*. at 1372 (emphasis added). The defendant asserted that the "only supply power" limitation was vitiated because the defendant claimed the evidence showed that the speech signal amplifiers supply "some power" to the telephone set in the on-hook position. *Id.* The defendant and the trial court cited testimony that there are three transistors that "always supply a small amount of power to the subscriber line in order to prevent corrosion and also to supply power to enable the on-hook functions such as caller-ID." The Federal Circuit relied on contrary evidence to avoid any claim vitiation. First, the Federal Circuit noted that the "only supply power" limitation refers to power supplied by the speech signal amplifiers. The Federal

37

Circuit pointed out that there was evidence that the transistors at issue that supplied the power were instead part of the control circuitry, which was separate from the speech signal amplifier circuitry.  Because the power at issue was not supplied by the speech signal amplifier, the Federal Circuit held the jury finding of infringement under the doctrine of equivalents  did not vitiate the 'only supply power' limitation.  *Id*. at 1375.

More recently, the Plaintiff cited the case of *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005 (Fed. Cir. 2006), a case that dealt with the shape of an accused device.  In *DePuy*, the Federal Circuit affirmed a finding of no literal infringement, but reversed a trial court that found claim vitiation for the limitation "inner hollow spherically-shaped portion" with respect to an accused device that had a "hollow conically-shaped portion of the receiver member."  A review of the comparative drawings in the decision, *id.* at 1015, however, shows the location of the hollow conically-shaped portion of the receiver member of the accused device is identical to that of the claimed inner hollow spherically-shaped portion.  In addition, the patentee offered particularized declarations of an expert demonstrating that the conically-shaped portion supported the screw head, allowed for flexible movement, and – when the compression member was engaged – created a rigid lock between the screw head and the receiver.  *Id.* at 1020.  The expert also identified other shapes that were different from the accused device but would not be capable of supporting the screw head, allowing flexible movement, and creating a rigid lock when the compression member is engaged.  *Id.*  In the present case, however, the location of the clamping member is not the same as the jaw of the '691 patent and, as discussed below, the ProLock product applies an offset force that applies a bending force to the meter box wall and not a directly compressive force as seen in the '691

patent.  Accordingly, based on the totality of circumstances test, claim vitiation of the limitation

"between" bars Inner-Tite infringement theory under the doctrine of equivalents.

## III.    ORDER OF JUDGMENT

The Court having considered the questions of fact and the issues of law before it and

having made the above findings of fact and conclusions of law, judgment will enter for

Defendant, DeWalch.


Dated: March 21, 2008                    Respectfully submitted,


                                         COUNSEL FOR DEFENDANT
                                         DEWALCH TECHNOLOGIES, INC.

                                         /s/Denise W. DeFranco
                                         Denise W. DeFranco
                                         BBO 558859
                                         FINNEGAN, HENDERSON, FARABOW,
                                         GARRETT & DUNNER, L.L.P.
                                         55 Cambridge Parkway
                                         Cambridge, MA 02142
                                         Phone: (617) 452-1600
                                         Facsimile: (617) 452-1666

                                         Peter Mims
                                         Texas Bar No. 14173275
                                         Admitted pro hac vice
                                         VINSON & ELKINS, LLP
                                         2300 First City Tower
                                         1001 Fannin Street
                                         Houston, Texas 77002-6760
                                         Phone: 713.758.2732
                                         Facsimile: 713.651.5703

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the NEF.

Dated: March 21, 2008                    ___/s/ Denise W. DeFranco____
                                         Denise W. DeFranco (BBO 558859)
                                         E-mail: denise.defranco@finnegan.com
                                         FINNEGAN, HENDERSON, FARABOW,
                                         GARRETT & DUNNER, L.L.P.
                                         55 Cambridge Parkway
                                         Cambridge, MA 02142
                                         Phone: (617) 452-1600
                                         Facsimile: (617) 452-1666